1   ARTURO J. GONZÁLEZ (SBN 121490)
    AGonzalez@mofo.com
2   PENELOPE A. PREOVOLOS (SBN 87607)
    PPreovolos@mofo.com
3   MARGARET E. MAYO (SBN 259685)
    MMayo@mofo.com
4   MORRISON & FOERSTER LLP
    425 Market Street
5   San Francisco, California  94105-2482
    Telephone: 415.268.7000
6   Facsimile: 415.268.7522

7   PURVI G. PATEL (SBN 270702)
    PPatel@mofo.com
8   MORRISON & FOERSTER LLP
    707 Wilshire Boulevard
9   Los Angeles, California  90017-3543
    Telephone: 213.892.5200
10  Facsimile: 213.892.5454

11  Attorneys for Defendants
    APPLE INC., APPLECARE SERVICE
12  COMPANY, INC., and APPLE CSC INC.

                                    **REDACTED VERSION OF**
                                    **DOCUMENT SOUGHT TO BE**
                                    **SEALED**

13                  UNITED STATES DISTRICT COURT

14                  NORTHERN DISTRICT OF CALIFORNIA

15                  SAN FRANCISCO DIVISION

16

17  VICKY MALDONADO AND JUSTIN          Case No. 3:16-cv-04067-WHO
    CARTER, individually and on behalf of
18  themselves and all others similarly situated,   Related Case:
                                                    *English v. Apple Inc., et al.*
19                   Plaintiffs,                    Case No. 3:14-cv-01619-WHO

20         v.                                       **DEFENDANTS' REPLY IN SUPPORT**
                                                    **OF MOTION FOR SUMMARY**
21  APPLE INC., APPLECARE SERVICE                   **JUDGMENT, OR, IN THE**
    COMPANY, INC., and APPLE CSC INC.,              **ALTERNATIVE, PARTIAL**
22                                                  **SUMMARY JUDGMENT**
                     Defendants.
23                                                  Hearing:     August 7, 2019
                                                    Time:        2:00 p.m.
24                                                  Judge:       William H. Orrick
                                                    Courtroom:   2, 17th Floor
25
                                                    Complaint Filed:  July 20, 2016
26                                                  Trial Date:  April 20, 2020

27

28

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ........................................................................................ 1

II.   SUMMARY OF THE ARGUMENT ........................................................... 1

III.  ARGUMENT .............................................................................................. 2

    A.    Plaintiffs Fail to Come Forward With Evidence Sufficient to Establish a Genuine Dispute of Fact on Their Breach of Contract Claim................................ 2

        1.    Plaintiffs' Contractual Interpretation Is Illogical and Fails to Support Their Claims. ................................................ 2

        2.    Plaintiffs introduce no evidence that their replacement devices were not "equivalent to new in performance and reliability." ............................ 4

            a.    Carter has no evidence that any non-new part caused his battery issues. ........................................... 5

            b.    Maldonado has no evidence that a non-new part caused her "restarting" issues. ......................................... 7

        3.    Plaintiffs' Theoretical Speculation Regarding "Load Conditions" and Misplaced Reliance on Return Rates and ▮▮▮▮▮▮ Do Not Excuse Their Evidentiary Failures Regarding Their Own Devices. ........... 9

        4.    Plaintiffs Fail to Show That They Have Been Damaged. ....................... 10

    B.    Carter Fails to Overcome Defendants' Showing of Improper Conduct and Prejudice. ........................................................................ 11

    C.    Plaintiffs Do Not Dispute That, if Their Breach of Contract Claim Fails, Their Song-Beverly and Magnuson-Moss Claims Fail Too. ............................... 14

    D.    Plaintiffs Do Not Show a Dispute of Material Fact As to Their UCL Claims. ...................................................................... 15

IV.  CONCLUSION ........................................................................................ 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.,*
   637 F.3d 1047 (9th Cir. 2011)..................................................................................7, 9

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986).................................................................................................4

*Forsberg v. Pac. Nw. Bell Tel. Co.,*
   840 F.2d 1409 (9th Cir. 1988)...............................................................................5 n.3

*Lennar Mare Island, LLC v. Steadfast Ins. Co.,*
   176 F. Supp. 3d 949 (E.D. Cal. 2016)......................................................................4

*Leon v. IDX Sys. Corp.,*
   464 F. 3d 951 (9th Cir. 2006).................................................................................14 n.9

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
   475 U.S. 574 (1986).................................................................................................5

*People v. Buycks,*
   5 Cal. 5th 857 (2018) ............................................................................................4 n.2

*Reeves v. Miami-Dade Cty.,*
   No. 11-21709-CV, 2012 WL 12267854 (S.D. Fla. July 30, 2012)...........................6

*Summers v. A. Teichert & Son, Inc.,*
   127 F.3d 1150 (9th Cir. 1997)..................................................................................5

*UA Local 343 United Ass'n of Journeymen v. Nor-Cal Plumbing, Inc.,*
   48 F.3d 1465 (9th Cir. 1994)...............................................................................5, 6

*Villiarimo v. Aloha Island Air, Inc.,*
   281 F.3d 1054 (9th Cir. 2002)...............................................................................10

**Statutes**

15 U.S.C.
   § 2301(6) ..............................................................................................................14 n.10
   § 2302(a) ...............................................................................................................14

California Civil Code
   § 1794.4(c) .............................................................................................................14

1

## I.    INTRODUCTION

To avoid summary judgment, Plaintiffs Justin Carter and Vicki Maldonado must come forward with concrete, probative evidence that Apple failed to provide *them* with replacement devices under AppleCare+ that were not "new or equivalent to new in performance and reliability." Plaintiffs wholly fail to do so, and their attempt to rewrite the terms of their AC+ contracts and their sworn deposition testimony does not save their claims. Similarly, Plaintiffs do not come forward with a shred of evidence that the issues they allegedly experienced with their replacement devices related in any way to the limited non-new parts in those devices. The theoretical speculation they offer is insufficient to overcome summary judgment.

## II.    SUMMARY OF THE ARGUMENT

**AC+ Terms.** Plaintiffs argue that the AC+ terms are "unambiguous." Defendants agree. Plaintiffs' ever-varying interpretations of the terms, however, ignore their unambiguous meaning and make clear that Plaintiffs cannot advance any credible interpretation of the contract under which Apple is in breach. In the Complaint and in their deposition testimony, Plaintiffs contended that "new or equivalent to new" means "new." Plaintiffs now acknowledge what this Court ruled long ago: the phrase "equivalent to new" cannot mean the same thing as "new." But Plaintiffs still fail to come forward with anything close to a plausible interpretation of "equivalent to new" that Apple breached in providing their replacement devices.

**Issues with Replacement Devices and Lack of Damages.** Plaintiffs point to no evidence that either Carter or Maldonado ever experienced any issue with their replacement devices because of a non-new part. As a result, neither Carter nor Maldonado can show damages flowing from their theory of the case. Carter's claims are based solely on the allegation that he experienced battery issues with two of his replacement iPhones. But Carter does not dispute that the battery in all of his replacement iPhones was *new*. Further, Carter experienced the same battery issues with his original, new iPhone. The inescapable conclusion from these facts is that the battery issues Carter allegedly experienced were *not* the result of any non-new part, but of issues unique to Carter. Plaintiffs' suggestion that Carter's original iPhone experienced a "different" battery issue is contradicted by his sworn deposition testimony. And Plaintiffs'

1   expert, Dr. Michael Pecht, only speculates that a non-new part "could" have caused the battery

2   issues, but offers no explanation, analysis, or testing in support.

3        Like Carter, Maldonado's claims are based on the allegation that she experienced the

4   same issue (unexpected restarting) with her first replacement iPad that she experienced with her

5   original, new iPad.  Also like Carter, Maldonado comes forward with no evidence other than

6   speculation from Dr. Pecht that the issues were caused by a non-new part.  Again, Dr. Pecht does

7   not explain why, if her issue resulted from a non-new part, she experienced the same issue with

8   her original, new iPad.  And there is no evidence that Maldonado experienced any real issues with

9   her second replacement iPad.  To the contrary, she testified that it was "a little slower" to turn on

10  the first time she used it, but she continued to use it without raising any issue with Apple about it.

11       **Carter's Improper Litigation Conduct.**  Plaintiffs' attempt to justify or downplay the

12  impropriety and impact of Carter's improper litigation conduct is meritless, and the statements in

13  his self-serving declaration are insufficient to create a genuine dispute of fact.  Plaintiffs cannot

14  avoid the facts:  within three weeks after retaining counsel, Carter (i) obtained two replacement

15  devices (one of which he never used) directly from Apple without notice to Apple's counsel;

16  (ii) engaged in unauthorized inspections of three replacement devices, contrary to Apple's express

17  objections; and (iii) failed to preserve two of the three devices.

18       For these reasons and those set forth in Apple's opening brief and below, summary

19  judgment should be granted.

20  **III.   ARGUMENT**

21       **A.   Plaintiffs Fail to Come Forward With Evidence Sufficient to Establish a
             Genuine Dispute of Fact on Their Breach of Contract Claim.**
22

23            **1.   Plaintiffs' Contractual Interpretation Is Illogical and Fails to Support
                    Their Claims.**

24       Having alleged in their Complaint (FAC ¶¶ 78, 83, ECF No. 45) and testified at their

25  depositions (Mayo Decl. Ex. B at 108:10-22, ECF No. 111-7; *id.*, Ex. C at 108:20-109:1, ECF

26  No. 111-8) that "equivalent to new" means "new," Plaintiffs now concede that, as this Court has

27  held, "equivalent to new" cannot mean the same thing as "new."  (*See* Opp. at 14, ECF No. 131.)

28  But Plaintiffs merely pay lip service to that distinction.  Plaintiffs continue to ignore the fact that

1   reasonable consumers would understand the disjunctive phrase "new or equivalent to new in

2   performance and reliability" to mean that they would receive either (i) a new iPhone or iPad **or**

3   (ii) a non-new iPhone or iPad that will work the same as a new iPhone or iPad.  (Mot. at 8, ECF

4   No. 111.)  Instead, Plaintiffs advance the theoretical view of their expert Dr. Pecht that any device

5   that contains a single component that is not new cannot be "equivalent to new."  That argument

6   reads "equivalent to new" out of the AC+ contract and renders Plaintiffs' interpretation

7   unrealistic and insupportable.  It also returns Plaintiffs to exactly where they were before:

8   "equivalent to new" means "new."  But no reasonable consumer would have understood that

9   phrase in that manner in context.

10          Plaintiffs also wrongly contend that Defendants are seeking to reinterpret the AC+ terms

11   by pointing to the rigorous manufacturing standards and extensive testing Apple employs to

12   ensure that the replacement devices are "equivalent to new" in performance and reliability.  (Opp.

13   at 14-15.)  In the real world, the devices at issue are electronic devices that are designed,

14   manufactured, and tested based on engineering standards.  As Defendants have stated,

15   "performance" and "reliability" are widely-accepted engineering concepts, and Apple implements

16   exacting standards to confirm that its replacement devices are, in fact, equivalent to new in

17   "performance and reliability."  (Mot. at 9.)  Further, Apple applies the same rigorous reliability

18   testing to remanufactured devices as to new devices.[1]  There is simply no evidence in support of

19   Plaintiffs' theory that Apple's stringent testing processes are insufficient to identify (and

20   eliminate) any quality issues with non-new parts.

21          Plaintiffs' reliance on dictionary definitions does not help them.  Plaintiffs argue that

22   equivalent means "corresponding or virtually identical especially in effect or function."  (Opp. at

23   14.)  That argument is *not* consistent with Carter's and Maldonado's deposition testimony that

24   they thought it meant "new." (Mayo Decl. Ex. B at 108:10-22; *id.*, Ex. C at 108:20-109:1.)  It is,

25

26          [1] (*See* Defendants' Opposition to Plaintiffs' Motion for Class Certification ("Class Cert.
     Opp.") at 5, 18-19, ECF No. 113.)  Moreover, Apple's standards are not a "minimum" standard as
27   Plaintiffs contend.  (Opp. at 11.)  Apple's specifications are more stringent than those of other
     manufacturers and are at the "upper end of any performance spec of any product." (*See* Class
28   Cert. Opp. at 18-19.)

however, exactly what Apple's standards and testing, applied identically to new and remanufactured devices, establish.

Despite arguing that there is "no ambiguity in AC+ contracts" (Opp. at 13), Plaintiffs seek to introduce extrinsic evidence to interpret the AC+ terms. The law is clear that where there is no ambiguity in the contract, extrinsic evidence is not admissible to support an unreasonable interpretation. *See Lennar Mare Island, LLC v. Steadfast Ins. Co.*, 176 F. Supp. 3d 949, 963-64 (E.D. Cal. 2016) (extrinsic evidence is not admissible to interpret a contract if the language is not "reasonably susceptible" to the proposed interpretation).[2] Moreover, the Court has already ruled that language used in other contracts (like the Limited Warranty) is irrelevant to Plaintiffs' breach of contract claim. (ECF No. 64 at 9 n.7.) Plaintiffs' attempt to rely on language on apple.com relating to ███████████████ fails for the same reason. (Opp. at 15.) Regardless, there is nothing inconsistent in the statements; both statements reflect that the products must meet the same demanding standards as new products.

In any event, as demonstrated below, even under Plaintiffs' interpretation, Plaintiffs have not come forward with evidence that their remanufactured replacements were not "equivalent to new in performance and reliability."

> **2.    Plaintiffs introduce no evidence that their replacement devices were not "equivalent to new in performance and reliability."**

As a threshold matter, Plaintiffs incorrectly argue that Defendants have the burden to show that there is "no dispute that remanufactured devices are not equivalent to new" and to prove affirmatively that Plaintiffs' replacements were equivalent to new in performance and reliability. (Opp. at 16, 18.) That is not the standard. Defendants met their initial burden by showing the "absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Defendants did so by showing that Plaintiffs have no evidence (i) that that the remanufactured replacements they received were not "equivalent to new in performance and reliability," or (ii) that any issues Plaintiffs allegedly experienced with the

---

[2] Plaintiffs' reliance on *People v. Buycks*, 5 Cal. 5th 857, 879-80 (2018) is misplaced. (Opp. at 16.) That case is about statutory interpretation, not contractual interpretation, which makes it inapplicable here.

1    replacements were caused by non-new parts.  (Mot. at 10-12.)  The burden then shifted to

2    Plaintiffs to come forward with specific facts showing a genuine issue for trial and to introduce

3    "significant probative evidence" in support of their claims.  *Summers v. A. Teichert & Son, Inc.*,

4    127 F.3d 1150, 1152 (9th Cir. 1997) (citations omitted); *Matsushita Elec. Indus. Co. v. Zenith*

5    *Radio Corp.*, 475 U.S. 574, 587 (1986).  Plaintiffs have failed to make that showing.

6          Plaintiffs assert, without support, that their remanufactured devices "immediately did not

7    perform as well as their new devices."  (Opp. at 17.)[3]  But their sworn deposition testimony,

8    which they may not contradict, establishes that is not the case.  *UA Local 343 United Ass'n of*

9    *Journeymen v. Nor-Cal Plumbing, Inc.*, 48 F.3d 1465, 1473 (9th Cir. 1994) (finding no genuine

10   issue of fact where party's argument regarding element of alter-ego claim was contradicted by his

11   own sworn statements).

12                    a.       **Carter has no evidence that any non-new part caused his**
                              **battery issues.**

13

14         Carter has repeatedly asserted, both in the Complaint and during his deposition, that the

15   only issues he experienced with his replacement iPhones were alleged battery issues—the **same**

16   battery issues experienced with his original iPhone.  (FAC ¶¶ 102, 103, 112; Mayo Decl. Ex. B

17   at 38:3-39:1, 123:10-13, 151:2-6.)  But the batteries in all of Carter's replacements were **new**,

18   which Carter does not dispute.  (Lanigan Decl. ¶¶ 6, 18-19, ECF No. 110-16.)  The only logical

19   conclusion to draw from this undisputed evidence is that the limited number of non-new parts in

20   Carter's remanufactured iPhones did not cause the battery issues Carter allegedly experienced.

21   Rather, any battery issues resulted from the manner in which Carter used his iPhones and/or

22   software he installed on them.  (Lanigan Decl. ¶ 16; Mayo Reply Decl. Ex. N at 81:13-15.)

23   Carter's failure to come forward with any credible evidence that his alleged battery issues were

24   caused by a non-new part ends his claims.

25         **Carter's First Replacement.**  Carter contends that the battery issues he experienced with

26   ───────────────

27        [3] Plaintiffs fail to include any factual support for this and other arguments throughout their
     opposition.  *Forsberg v. Pac. Nw. Bell Tel. Co.*, 840 F.2d 1409, 1418 (9th Cir. 1988) ("The
     district judge is not required to comb the record to find some reason to deny a motion for

28   summary judgment.").

his first replacement were "different" from those he experienced with his original (new) iPhone (Opp. at 18.)  That contention conflicts with the Complaint (alleging that Carter experienced the "*same* battery issues" with his replacement iPhone as with his original) and with his deposition testimony (testifying he was "*still* having issues with [his] battery and it charging" with his first replacement).  (FAC ¶ 103 (emphasis added); Mayo Decl. Ex. B at 38:3-12 (emphasis added).)

Carter now seeks to avoid his earlier admissions by contending that the battery issues he experienced with his first replacement iPhone were "different" because it "never held a charge as well as his new iPhone and would shut off when it reached a certain percentage."  (Opp. at 18.)  But Carter repeatedly testified at his deposition that he experienced the same issues with his original iPhone:

| Original iPhone | First Replacement |
|---|---|
| "[I]t would get to 15 percent and just die."<br><br>"But then it would be like 30 percent and cut off, or, you know, it would just randomly power off."<br><br>"But you'd never know what percentage. I mean, some days it may be 15 percent.  Some days it may be 32 percent."<br><br>(Mayo Decl. Ex. B at 113:18-20, 113:22-24, 114:6-8.) | "[W]hen it got to, like, 16 percent, 20 percent, 22 percent, the phone would just shut off."<br><br>(*Id.* at 104:10-12.) |

As a matter of law, Carter may not point to internal inconsistencies in his own testimony to create a genuine issue of material fact.  *UA Local 343 United Ass'n of Journeymen*, 48 F.3d at 1473 ("internal inconsistencies in a party's own testimony fail to create a *genuine* issue of material fact"); *Reeves v. Miami-Dade Cty.*, No. 11-21709-CV, 2012 WL 12267854, at *7 (S.D. Fla. July 30, 2012) ("[T]he Court will not recognize inconsistencies in a nonmovant's own sworn testimony alone as sufficient to create a genuine issue of material dispute.").  The evidence is clear:  since he experienced the same issues with his original iPhone, Carter's alleged battery issues were not the result of the *new* battery in his first replacement device or of any "non-new" parts in that replacement device.  Rather, they were the result of Carter's usage patterns, the software he loaded on his devices, or other issues unique to Carter.  (Lanigan Decl. ¶ 16.)

Carter seeks to avoid this result by speculating that the non-new ███████████████

1   (referred to as ███████ by Plaintiffs) "could" have affected the battery life in his first

2   replacement.  (Opp. at 18.)  Carter "supports" this statement with a single, conclusory statement

3   in Dr. Pecht's declaration.  Dr. Pecht asserts that "[c]ertain components of an iPhone will drain

4   the battery and cause issues, ████████████████."  (Pecht Decl. ¶ 10, ECF No. 130-34.)

5   But Dr. Pecht does not offer evidence, authority, or logic to support his assertion.  The fact that a

6   ██████ is non-new does not mean that it is defective.  Further, Dr. Pecht never explains how an

7   allegedly ████████████ could cause the battery issues Carter allegedly experienced.  Nor

8   does he address the fact that Carter experienced the same alleged battery issues with his original,

9   new iPhone.  (Mayo Decl. Ex. B at 38:3-8, 123:10-13.)  Dr. Pecht's single, unsupported assertion

10  does not satisfy Carter's burden to come forward with concrete evidence to support the claim that

11  his alleged battery issues were caused by non-new parts.  *Cafasso, U.S. ex rel. v. Gen. Dynamics*

12  *C4 Sys., Inc.*, 637 F.3d 1047, 1061 (9th Cir. 2011) ("To survive summary judgment, a plaintiff

13  must set forth non-speculative evidence of specific facts, not sweeping conclusory allegations.").

14       **Carter's Second Replacement.**  Carter fares no better with respect to his second

15  replacement.  Carter expressly testified that he experienced the "same" battery issues as with his

16  two prior iPhones.  (Mayo Decl. Ex. B at 38:24 ("The same issues.  The battery issue.").)

17  Carter's testimony that the second replacement charged to 99% (instead of 100%) is a distinction

18  without a difference and does not overcome his admission that the issues were "the same."[4]

19       Further, the *only* non-new part in Carter's second replacement was the ██████.  Plaintiffs

20  do not contend, and Dr. Pecht does not opine, that the ██████ could have contributed to Carter's

21  battery issues.  Because Plaintiffs fail to introduce any evidence that the battery issues Carter

22  allegedly experienced with his second replacement could have been caused by the ██████,

23  summary judgment is appropriate.

24            **b.    Maldonado has no evidence that a non-new part caused her
              "restarting" issues.**

25

26  Like Carter, Maldonado's description of the "restarting" issues she allegedly experienced

27       [4] Plaintiffs do not explain why the trivial difference between a 99% and 100% charge could
    be due to a "non-new" part.  Moreover, Carter admitted he did not know if he had apps open at
28  while the device was charging, which could impact the charge.  (Mayo Decl. Ex. B at 165:4-21.)

1    with her first replacement iPad is indistinguishable from the issues she experienced with her

2    original, new iPad.  (*Compare* FAC ¶ 92 (first replacement would "restart several times a day")

3    *with* FAC ¶ 87 (original iPad was "constantly restarting and having hundreds of panics each

4    day").)  Maldonado now contends that her second replacement was "slower" than her original

5    iPad.  (Opp. at 4.)  But that is not what Maldonado testified.  When asked about the second

6    replacement iPad, Maldonado testified only that it was "a little slower" to start than her original

7    iPad *the very first time she turned it on*:

8              **A:** I remember the -- when I turned it, on it was a little slower, you
              know, it took a little to -- to -- to restart. . . .

9              **Q:** And that's the first time you turned it on?

10             **A:** Yes.

11   (Mayo Decl. Ex. C at 76:1-16.)  Maldonado admitted that she used that replacement without

12   complaint for almost two months.[5]  In contrast, Maldonado testified she returned her original iPad

13   because, in addition to the alleged "restarting" issues, "[i]t "was really slow."  (*Id*. at 68:2-69:7.)

14             Maldonado has not come forward with evidence that her replacement iPads were not

15   "equivalent to new in performance and reliability" or that her alleged restarting issue, common to

16   her original and first replacement iPad, had anything to do with non-new parts.  The fact that both

17   devices had the same alleged issues negates Plaintiffs' theory that a non-new part caused any

18   issue, and instead suggests that that Maldonado's issues related to factors extraneous to the parts

19   in the devices, such as an app on her device.  (Lanigan Decl. ¶ 16.)  Dr. Pecht's speculation that

20   the non-new ███ "could" have caused the issue is just that, speculation (Pecht Decl. ¶ 9); he

21   conceded he did not even know if Maldonado's iPads had been tested (Mayo Reply Decl. Ex. L at

22   38:21-25, 56:19-57:5).  Nor does he explain why Maldonado experienced the same alleged issue

23   with her original, new iPad.  Because Maldonado's claims are not supported by admissible

24   evidence, Apple is entitled to summary judgment.

25

26

27             [5] (*Id.* at 76:1-77:7.)  Maldonado obtained the second replacement iPad in May 2015 and used
      it until her trip in July 2015 when it was stolen.  (Gould Decl. ¶ 8, ECF No. 110-18; Mayo Decl.

28   Ex. I at Response to Interrogatory No. 13, ECF No. 111-14.)

1

2

**3.    Plaintiffs' Theoretical Speculation Regarding "Load Conditions" and Misplaced Reliance on Return Rates and ███████ Do Not Excuse Their Evidentiary Failures Regarding Their Own Devices.**

3      Tacitly acknowledging their failure to introduce evidence regarding their own devices,

4   Plaintiffs seek instead to rely on Dr. Pecht's theoretical speculation about "load factors" and on

5   return rates and ███████. None of these cures Plaintiffs' failure to demonstrate that they

6   experienced issues with *their* devices as a result of the use of non-new parts.

7      **Load Conditions.**  Plaintiffs' "load conditions" theory is exactly that—a theory.

8   Dr. Pecht admits he did not consider the specific non-new parts in Plaintiffs' devices or otherwise

9   examine Plaintiffs' devices.  (Mayo Decl. Ex. H at 56:19-23, ECF No. 111-13.)  His speculation

10   that the devices Plaintiffs received necessarily have a "shorter lifespan" and are "less reliable than

11   a new device" is insufficient to constitute the concrete, probative evidence necessary to avoid

12   summary judgment.  *Cafasso*, 637 F.3d at 1061 ("non-speculative evidence of specific facts" is

13   required to avoid summary judgment).  Further, as Defendants' expert, Dr. Alexander Glew,

14   explained, whether "load factors" would affect the useful life of any particular non-new part or

15   device would depend on the part at issue, the user's usage patterns, and a host of other factors.

16   (Mayo Reply Decl. Ex. M at 71:7-75:5; *see also id*. at 60:18-61:20, 67:25-68:18, 81:20-82:5,

17   83:4-20.)  Moreover, Dr. Pecht goes too far.  Plaintiffs concede that "equivalent to new" does not

18   mean "new."  (Opp. at 14.)  But Dr. Pecht's theory squarely contradicts Plaintiffs' contractual

19   interpretation and returns them to the untenable position that, notwithstanding the express terms

20   of AC+, AC+ requires Apple to provide only new replacement devices.

21      **Return Rates.**  Plaintiffs' attempt to rely on return rate data fares no better.  For the

22   reasons Defendants already stated, return rates are not "failure rates."  (Mot. at 13-14.)  Return

23   rate data shows only that a replacement device was returned, not that the return reflects a

24   hardware failure attributable to a non-new part.[6]  (*Id*.)  Finally, return rate data does not and

25

26   _____
      [6] Plaintiffs' attempt to rely on ███████ fails for the same reason. ████████

27   ████████ (*See* Mayo Reply Decl. Ex. K at 36:9-18.)  Thus, a ███████ is

28   effectively the same as a return rate in the context of service replacements.  Moreover, ████

9

1    cannot support the claim that the replacements *Plaintiffs themselves* received were not

2    "equivalent to new in performance and reliability." (Mot. at 13-14.)  To the contrary, Carter

3    returned two of his replacement devices for purposes of this litigation claiming the same alleged

4    "battery" issues—not because he genuinely desired service. (*Id*. at 14.)  Carter's statements in his

5    self-serving declaration that he did not request the replacements for litigation purposes are

6    insufficient to create a genuine dispute of fact. *See Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d

7    1054, 1061 (9th Cir. 2002) (There is no "'genuine issue' where the only evidence presented is

8    'uncorroborated and self-serving' testimony.") (citation omitted).  Similarly, Maldonado returned

9    her original and replacement iPads for exactly the same alleged "restarting" issues, suggesting

10   that Maldonado's issue was not due to the non-new part in her replacement iPad. (Mot. at 14.)

11   ███████. Plaintiffs' attempt to rely on ████████████████ is similarly

12   misplaced. ████████████████████████████

13   ███. (Mayo Reply Decl. Ex. J at 73:5-9.)  Because Plaintiffs' devices all passed that testing,

14   these rates are irrelevant. ████████████████████████████████

15   ████████████████████████████ (*Id*. at 74:14-22.)  For these

16   reasons, Plaintiffs cannot rely on ██████ to avoid summary judgment.

**4.      Plaintiffs Fail to Show That They Have Been Damaged.**

18        Plaintiffs contend that they were damaged because they allegedly did not receive what

19   they purportedly bargained for (a replacement that is "equivalent to new in performance and

20   reliability").  As discussed above, however, Plaintiffs have not come forward with any evidence

21   that their replacement devices were not, in fact, equivalent to new in performance and reliability,

22   or that their replacements experienced any issues as the result of a non-new part.

23        Moreover, Plaintiffs' contention that what they bargained for was solely to obtain

24   replacements that were "equivalent to new in performance and reliability" is a myopic view of the

25   contract as a whole.  AC+ provides a variety of services, including coverage for hardware failures

26   and accidental damage for two years.  Plaintiffs received prompt responses from Apple each time

27   ████████████████, and thus is irrelevant to the comparison between new and remanufactured

28   service units.

they sought service.  Both walked away with devices that they should have been happy with—Carter received a new replacement iPhone and Maldonado received a replacement iPad she continued to use without issue until it was stolen.

Finally, Plaintiffs' damages arguments are meritless.  First, under their theory of the case, Plaintiffs must come forward with evidence that the non-new parts in their replacement devices caused their devices to fail.  They have not done so.  Second, Plaintiffs contend that they are entitled to the difference between the retail price of a new iPhone or iPad and the retail price of a certified refurbished device.  (Opp. at 19-20.)  But, as Plaintiffs now concede, AC+ did *not* promise them a new device, and they therefore cannot predicate their damages theory on the retail price of such a device.  Finally, Plaintiffs' claims are based on the purchase of a service contract, not a device.  (FAC ¶¶ 86, 101.)  Notably, Plaintiffs do not present any evidence as to any alleged difference between what they paid for AC+ and the value they contend they received under AC+. Plaintiffs have failed to come forward with evidence that they were damaged, and for this reason as well, summary judgment is required.

## B.    Carter Fails to Overcome Defendants' Showing of Improper Conduct and Prejudice.

Carter seeks to re-write the narrative of his conduct, but the underlying facts remain undisputed and defeat Plaintiffs' efforts to downplay or justify Carter's improper pre-litigation conduct.  Those facts establish that, within a short 21-day period *after* Carter retained counsel and his counsel obtained an unopposed extension to file an amended complaint, Carter:

(i)    Requested two additional replacements under AC+ directly from Apple, without notice to Apple's counsel (Mayo Decl. Ex. B at 150:25-151:21, 170:1-8);

(ii)   Had all three replacements "inspected" without providing Apple notice or an opportunity to participate (*id.* at 134:19-22, 157:12-21, 173:16-18);

(iii)  Obtained a new iPhone paid for by his counsel *before* he requested the third replacement (*id.* at 170:1-23); and

(iv)   Caused two of the replacement iPhones to be unavailable for root cause analysis (*id.* at 157:22-158:5, 175:25-176:2).

Carter's conduct was for purposes of litigation, not the need for a replacement device, and prejudiced Apple in at least the following specific ways.

**Returning first replacement.**  By returning his first replacement, Carter rendered

1    unavailable the only replacement he apparently obtained because he genuinely required service.

2    Plaintiffs argue that Carter returned the first replacement because he was "required to" in order to

3    release the hold on his credit card.  (Opp. at 20-21.)  But that argument ignores the obvious

4    alternatives, including counsel reimbursing Carter for the amount of the hold (counsel paid

5    $588.49 for a new iPhone for Carter just one week later) or reaching out to Apple's counsel to

6    arrange to preserve the device.  Counsel for the parties were in regular contact at the time,

7    including Apple's explicit reminder to Plaintiffs to "maintain and preserve the devices in their

8    original condition."  (Mayo Decl. Ex. A, ECF No. 111-6.)  Given that the alternative was

9    spoliation of the very device on which Carter's claims are based, Plaintiffs cannot justify their

10   failure to preserve it.

11            Plaintiffs argue that Apple does "not need to inspect Carter's device under its defense that

12   remanufactured devices are equivalent to new [in performance and reliability] because they

13   undergo the same testing as new devices."  (Opp. at 23.)  Plaintiffs miss the point:  Carter makes

14   specific claims regarding alleged battery issues with the device, including the unsupported

15   speculation that notwithstanding its new battery, the alleged issues "may" relate to non-new parts

16   in the device.  Carter's conduct, both in failing to preserve the device and in permitting an

17   unauthorized "inspection" of it, denies Apple the ability to defend against Carter's claims.

18            **Conducting inspections without Apple's experts present.**  Plaintiffs performed *three*

19   inspections of Carter's devices without giving Apple notice or an opportunity to participate.

20   Carter contends he had his replacements inspected "to confirm they contained used parts."  (*Id.* at

21   21.)  But Plaintiffs' "expert" Thang Huynh now admits that he did not make any determination as

22   to whether the iPhones had non-new parts.[7]  (Mayo Reply Decl. Ex. N at 60:3-8, 82:1-83:20,

23   87:24-88:5, 105:12-18, 121:20-25.)  The inspections thus served no legitimate purpose.

24   _____
         [7] Huynh admitted that, other than this case, the related *English* case, and other work for Renee
25   Kennedy, he has never been hired as an expert, and has never received any training that would
     enable him to determine whether an iPhone is new or remanufactured.  (Mayo Reply Decl. Ex. N
26   at 23:15-17, 44:11-17, 50:20-25, 132:1-12, 133:1-8.)  Further, though Carter alleged in the
     Complaint that his second two replacements were remanufactured because there were scratches or
27   dents on internal parts (FAC ¶¶ 108, 117), Huynh admitted that he could not determine whether
     an iPhone was new or remanufactured based on the presence of scratches or other markings (e.g.,
28   fingerprints, smudges).  (Mayo Reply Decl. Ex. N at 60:3-8, 82:1-83:20, 116:8-10.)

1    Plaintiffs argue that Apple has not been prejudiced because Apple has not sought to test

2  the lone remaining replacement, *after* Plaintiffs' expert performed his "inspection" on it.  (Opp. at

3  21 n.109.)  But, as Defendants have stated (Mot. at 17), it is unclear whether testing the device

4  would reveal the root cause of any battery issues given the inspection performed and the passage

5  of time.  Because Plaintiffs excluded Apple from the initial inspections of the devices in direct

6  contravention of Apple's notice to them, Plaintiffs denied Apple the ability to conduct appropriate

7  testing at the appropriate time.

8    **Requesting additional replacements.**  As noted above and in Defendants' opening brief,

9  on October 26, 2016, Carter's counsel obtained an unopposed extension to November 14, 2016,

10  to file an amended complaint.  (Mot. at 17-18.)  Carter used that time to obtain and schedule

11  "inspections" for his second and third replacement devices (which took place on October 27,

12  2016 and November 4, 2016) so that he could include those replacements in the FAC, not because

13  Carter legitimately desired service.  Carter's statements to the contrary in his self-serving

14  declaration are implausible given that:  (i) Carter had the second replacement inspected the day he

15  received it, before using it; (ii) just *five days* later, he purchased a new iPhone paid for by his

16  counsel; and (iii) Carter requested the third replacement the day *after* he purchased the new

17  iPhone paid for by counsel, had that iPhone inspected the day he received it, and never used it.

18  (*See id.* 5, 18-19.)  These facts indisputably show that Carter *could not have had* any reason for

19  requesting the second and third replacements other than in aid of this litigation.

20    If Carter is permitted to proceed to trial, Apple will be prejudiced by his conduct in

21  multiple ways, including: the cost and burden of litigating claims regarding the second

22  replacement; the cost of testing the second replacement (even though that testing may not provide

23  meaningful results); and the inability to test the first or third replacements.[8]  (*Id.* at 18.)  Finally, if

24  the Court approves of Carter's conduct in communicating with a represented party in order to

25  obtain evidence against it and failing to preserve evidence, others may be encouraged to do the

26

27    [8] Plaintiffs contend that the third replacement is "irrelevant" because Carter dropped his
claims about it.  (Opp. at 20.)  But Carter included the third replacement in the FAC (FAC

28  ¶¶ 115-18), and only dropped his claims after he learned it was new.

1    same. (*See id.* (citing *Wyle v. R.J. Reynolds Indus., Inc.*, 709 F.2d 585, 589 (9th Cir. 1983)).)

2         Finally, while Defendants did raise Carter's spoliation issues at the pleading stage, the

3    Court noted that dismissal due to spoliation would be premature without an evidentiary hearing.

4    (ECF No. 64 at 7 n.4.)  The parties have now engaged in discovery regarding the timing and the

5    circumstances underlying inspections, and have presented a full factual record of what occurred

6    to the Court (obviating the need for an evidentiary hearing).  That discovery revealed the

7    undisputed facts set forth in the parties' papers, which unequivocally demonstrate an improper

8    course of conduct.  For these reasons, Carter should not be permitted to take his claims to trial.[9]

9         **C.    Plaintiffs Do Not Dispute That, if Their Breach of Contract Claim Fails, Their**
            **Song-Beverly and Magnuson-Moss Claims Fail Too.**

10        Most simply, Plaintiffs do not dispute that their Song-Beverly and Magnuson-Moss claims

11   are based on the same theory as their contract claims, and fail if Plaintiffs' contract claims fail.

12   (Opp. at 24.)  Plaintiffs assert that California Civil Code § 1794.4(c) and 15 U.S.C. § 2302(a) "list

13   all the information a service provider is required to put in the service contract or warranty."

14   (Opp. at 24.)[10]  But Plaintiffs never explain why they contend that Apple *violated* these

15   requirements, which say nothing about the nature or quality of replacement devices.

16        Further, Plaintiffs fail to refute Apple's argument that it remedied any alleged breach of

17   the AC+ contracts.  Plaintiffs once again fall back on their theoretical argument that

18   remanufactured devices can "never" be "equivalent to new in performance and reliability," but

19   that argument does not avoid this defense.  As discussed above, Apple promptly addressed

20   Plaintiffs' requests for service, and neither Plaintiff had any real issue with the last replacement

---

[9] Plaintiffs contend that Defendants must file a Rule 37 motion to raise Carter's spoliation issues.  But Defendants primarily seek relief under the Court's inherent power to control the proceedings and the litigants before it.  *See Leon v. IDX Sys. Corp.*, 464 F. 3d 951, 958 (9th Cir. 2006).  Plaintiffs cite no authority for the proposition that spoliation issues cannot be raised in a motion for summary judgment.

[10] While the Court need not reach this issue, Plaintiffs are wrong that AC+ is a "warranty" under Magnuson-Moss.  (Opp. at 24 n.120.)  AC+ is a "service contract," which is defined and regulated separately from warranties under Magnuson-Moss.  AC+ is sold separately and does not supplant the Limited Warranty that comes with every new iPhone and iPad.  It does not become part of the "the basis of the bargain" for the purchase of the iPhone or iPad, as required under Magnuson-Moss's definition of a "warranty."  15 U.S.C. § 2301(6).

1    they received.  Plaintiffs' Magnuson-Moss and Song-Beverly claims fail for this reason as well.

2              **D.     Plaintiffs Do Not Show a Dispute of Material Fact As to Their UCL Claims.**

3              Defendants are entitled to judgment as a matter of law on each of Plaintiffs' UCL claims.

4    Plaintiffs fail to show otherwise.  *First*, Plaintiffs concede that the Court dismissed their UCL

5    "fraudulent" claim.  (Opp. at 25.)  The Court thus need not address this claim again.

6              *Second*, Plaintiffs do not dispute that, if summary judgment is proper on their predicate

7    Song-Beverly and Magnuson-Moss claims, their UCL "unlawful" claim also fails.  (*Id*.)  Because

8    Defendants are entitled to summary judgment on those predicate claims for the reasons set forth

9    above, they are also entitled to summary judgment on Plaintiffs' UCL "unlawful" claim.

10             *Third*, Plaintiffs make clear that their UCL "unfair" claim rises and falls with their

11   contract claim.  (*Id*.)  Plaintiffs' argument in support of their "unfair" claim is based entirely on

12   the contention that their replacements were not "equivalent to new in performance and

13   reliability," and as a result, they allegedly did not receive the "benefit of the bargain."  (*Id*.)

14   Defendants are thus entitled to summary judgment on Plaintiffs' UCL "unfair" claim for the same

15   reasons as their breach of contract claim.[11]

16   **IV.    CONCLUSION**

17             This case has been pending for nearly three years, and Plaintiffs have yet to come forward

18   with any evidence that the devices they received were not equivalent to new in performance and

19   reliability.  Summary judgment should be granted.[12]

20   Dated:  July 10, 2019                              MORRISON & FOERSTER LLP

21

22                                                      By:  */s/ Purvi G. Patel*
                                                            Purvi G. Patel
23                                                          ***Attorneys for Defendants***

24

25             [11] Also, Plaintiffs fail to address Defendants' argument that, under the UCL's balancing test
     for "unfair" conduct, the environmental benefit of recovering and reusing high quality electronic
26   parts far outweighs the nonexistent alleged harm.  (Mot. at 21.)

27             [12] Nor have Plaintiffs identified any evidence in their Rule 56(d) motion that would warrant
     continuing the Court's ruling on summary judgment, which Defendants address fully in their
28   concurrently-filed response to that motion.