UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VICKY MALDONADO, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>APPLE, INC, et al.,<br><br>Defendants. | Case No. 3:16-cv-04067-WHO<br><br>**ORDER CERTIFYING CLASS AND DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 99, 100, 102, 103, 110, 111, 112, 121, 127, 128, 130, 132, 136, 138, 144, 147 |

According to plaintiffs Vicky Maldonado and Justin Carter, defendants Apple, Inc., AppleCare Service Company Inc., and Apple CSC Inc. (collectively, "Apple") breach the AppleCare and AppleCare+ agreements every time a consumer receives a remanufactured replacement device because those devices are not "equivalent to new in performance and reliability" as promised under the contract. Instead, the presence of non-new parts means remanufactured devices can never be as reliable as new ones. Plaintiffs move for class certification to pursue their claims against Apple, which opposes on predominance and other grounds and further contends that it is entitled to summary judgment on Maldonado's and Carter's claims. For the reasons set forth below, I will deny Apple's motion for summary judgment and grant plaintiffs' motion for class certification.

<strong>BACKGROUND</strong>

**I.      FACTUAL BACKGROUND**

**A.      AppleCare, AppleCare+, and the Remanufacturing Process**

AppleCare and AppleCare+ ("AC/AC+") plans provide extended warranty and technical support for Apple consumers who wish for more than the standard one-year hardware warranty

and 90 days of free technical support.[1]  *See* Declaration of Steve Berman ("Berman Decl.") Ex. 1 [Dkt. No. 103-2] (AC Plan); Berman Decl. Ex. 2 [Dkt. No. 103-3] (AC+ Plan).  Purchase of a plan entitles consumers to a second year of hardware coverage for non-accidental damage, two years of accidental damage coverage, and two years of free technical support.  The contract provides that when a consumer submits a claim for hardware issues, Apple will either repair the device or replace it with a device that is "new or equivalent to new in performance and reliability and is functionally equivalent to the original product."  AC+ Plan § 3.1.

Replacement devices provided under the AC/AC+ plans can be either new or remanufactured.[2]  New devices are made with only parts coming straight from vendors, while remanufactured devices use "a small quantity of components or parts recovered from the field-returned units."  Deposition of Jason Fu ("Fu Depo."), Berman Decl. Ex. 7 [Dkt. No. 102-10] 19:20–20:1; *see* Deposition of Michael Lanigan ("Lanigan Depo."), Berman Decl. Ex. 3 [Dkt. No. 102-5] 21:25-22:6.

When a customer returns a device, Apple disassembles it and performs tests to determine which parts, if any, can be recovered.[3]  Lanigan Depo. 33:17-20, 37:5-8, 63:3-4; *see* Fu Depo. 22:24-23:12.  Parts can be recovered if they pass Apple's tests without problems.[4]  *See* Lanigan Depo. 73:14-16.  Only the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ will be repaired and retested if issues are found initially.  Lanigan Depo. 73:2-16; Fu Depo. 43:5-14.  Each individual

---

[1] AppleCare and AppleCare+ are identical except that the former does not coverage accidental damage.  AppleCare was offered until about 2012.

[2] "Refurbished" means the same thing as remanufactured.  Lannigan Depo. 24:12-16, 25:3-10, 17-25.  Consumers who make a warranty claim receive the same devices as individuals who seek a replacement under AC/AC+.  *Id.* at 31:25-32:8.

[3] While the parts that make up remanufactured units have to pass the same tests that new parts have to pass, Apple does not compare the relative function of remanufactured and new devices on an ongoing basis.  *Id.* at 130:9-23.

[4] Apple has only used the following recovered parts for remanufactured iPhones: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Lanigan Decl. ¶ 6.  Apple has only used the following recovered parts for remanufactured iPads: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  *Id.*  Batteries are always new.

2

part can be recovered up to three times.[5]  Lanigan Depo. 63:6-12.  Apple exercises this limitation even if a component meets the applicable testing standards.[6]  *Id.* at 65:9-20.  There are some exceptions where the limit is lower than three; for example, where certain repairs on ██████ "could have an adverse effect," that part may be used only up to two times.  *See id.* at 67:8-14, 68:10-69:4.  Remanufactured devices and new devices go through the same "kitting process" to gather all the component parts along with the same assembly process.  *Id.* at 24:21-25, 40:23-41:24, 56:11-17.  The parts—whether new or recovered—that are used to build a particular device are selected at random from a common pool.[7]  *Id.* at 57:9-16.  Accordingly, each remanufactured device could have a different mix of recovered parts.  Fu Depo. 30:5-8.

The testing process and criteria are the same for both new and remanufactured devices.  *Id.* at 36:1-7.  Reliability tests are part of Apple's qualification process.  Lanigan Depo. 33:10-17, 46:6-47:23 (describing "a set of physical tests to stress the device both electrically and mechanically"); *id.* at 50:11-14 (noting that "[i]t's not [that] every consumer device goes through some reliability suite").  Devices that have gone through reliability testing are "scrapped."  *Id.* at 53:8-15 (noting that, for example, ████████████████████████████████████ ████████████████████████); *see also* Fu Depo. 25:17-20 (noting that "[d]evices going through these stress tests are not shippable to customer").

Apple performs reliability tests on test samples "with a clear understanding [of] what parts in the remanufactured phones are recovered from field-returned units."  Fu Depo. 27:5-15.  Out of a sample of 100 devices with a certain recovered part, Apple might perform reliability tests on 20 of them.  *See id.* at 31:21-32:24.  "Apple tests a sample of iPhones that have a random mix of non-new parts, a sample of iPhones that have specific non-new parts (e.g., a non-new ██████), and a sample of iPhones with all potential non-new parts for that specific model."[8]  Declaration of Jason

---

[5] Apple's shop floor system ensures that parts are not used more than three times.  Lanigan Depo. 64:9-12.

[6] Lannigan understands that the number is three based on "legacy" at Apple.  *Id.* at 66:16-67:4.

[7] Apple maintains data on which component parts of a device were new or recovered, although it is not apparent visually.  Lannigan Depo. 62:10-24; Fu Depo. 97:9-17.

[8] "For earlier iPhone models, Apple performed rolling reliability testing on an ongoing basis in

United States District Court
Northern District of California

Fu ("Fu Decl.") [Dkt. No. 112-16] ¶ 4; *see* Fu Depo. 31:3-32:17. If the testing shows no quality or reliability concerns, then the remanufactured devices with that non-new part can be sent to customers. Fu Depo. 107:2-4. If there are issues, Apple does a root cause analysis to understand the cause of the failures. *Id.* at 107:10-14. If the issue is related to the recovered part, Apple will stop recovering that part and "rework" the devices built using that recovered part. *Id.* at 107:15-23.

### B.    Returns, Failure Rate, and Equivalence to New

From an engineering perspective, Apple considers a device "equivalent to new" if it meets the same engineering specifications as a new device. Fu Depo. 21: 20-24. Apple has the same quality standards for new and remanufactured devices, and it goes through the same process to qualify the remanufactured products for distribution to consumers. *See id.* at 21:11-16. The difference between performance and reliability depends on the timing. *Id.* Performance refers to how the device functions when it leaves the factory, while reliability refers to its "lifetime in the field." *Id.* at 22:3-7. How long an iPhone lasts is "highly dependent on how the phones will be used." *Id.* at 110:2-7.

Apple uses a few reference points to monitor products in the field and better understand device failure. *See* Declaration of Michael Lanigan ("Lanigan Decl.") [Dkt. No. 112-18] ¶ 15. One is the 90-day[9] looper metric. A looper is a unit that has been returned to Apple after being out in the field. Lanigan Depo. 36:11-18. When a consumer returns a phone or seeks a replacement device, an Apple customer service representative records the customer's primary concern with the device by selecting a CompTIA code from a pull-down menu. *Id.* at 91:18-24, 36:11-18 (noting as one example, the consumer dropping the device); Declaration of Avijit Sen ("Sen Decl.") [Dkt. No. 112-14] ¶ 5. Apple has no control over the accuracy of these codes; they "do not necessarily reflect the actual or only reason for the service event" and "do not provide a component level

connection with qualifying its remanufacturing lines." Lanigan Decl. ¶ 10. For iPads, Apple tests fully assembled devices that have a specific non-new part before using that part in any remanufactured iPad. *Id.*

[9] The time period for a looper starts when the device leaves the warehouse and ends the day it comes back. Lannigan Depo. 39:2-9.

4

hardware root cause." Deposition of Avijit Sen ("Sen Depo.") Berman Decl. Ex. 8 [Dkt. No. 102-12] 81:19–24; *see* Sen Decl. ¶ 5. Apple compares CompTIA codes for new and remanufactured devices, although the reliability tests are "a more controlled way to identify what's causing a device to fail, all the stress conditions." Fu Depo. 90:3-10, 91:5-8.

Apple is not able to test all devices that customers return under AC/AC+ to determine whether they are actually experiencing problems.[10] Lanigan Decl. ¶ 13. But as a service to its customers, "Apple sometimes provides replacements in response to a customer complaint without conclusively determining whether a customer's device is actually experiencing the complained of issue." *Id.* Units can come back for genuine issues or because the consumer is "leverag[ing] the service environment for a new device." Lanigan Depo. 103:22-104:20; *see also* Fu Depo. 69:24-70:3 (noting "return rate is just a number" and a customer might return a device for reasons other than performance and reliability). Although a return does not necessarily mean the device has actually failed, Apple uses the return rate to help it understand device failure. *See* Lanigan Depo. 97:7-25, 108:6-109:8; *see also* Lanigan Decl. ¶ 15 (noting that Apple refers to return rate as failure rate "even where [it] has not yet conducted a root cause analysis or determined that a true failure occurred"); Fu Depo. 70:8-71:23 (noting that the return rate, while part of the discussion about remanufactured and new devices, is "not reliable information").

## II.     NAMED PLAINTIFFS' EXPERIENCES WITH AC/AC+

Plaintiff Justin Carter paid $849 for an iPhone 6 Plus and $99 for AC+. Deposition of Justin Carter ("Carter Depo."), Patel Decl. Ex. A [Dkt. No. 113-2] 91:15-19. Almost a year after he had purchased the phone, Carter began experiencing battery issues with it. *Id.* at 95:16-24. On May 26, 2016, Carter called Apple and set up a repair appointment due to the limited battery life and cosmetic damage.[11] *Id.* at 16:1-11; Declaration of Charlotte Gould ("Gould Decl.") [Dkt. No. 112-20] ¶ 3. On July 10, 2016, he canceled the repair and requested a replacement device because of the battery issues. Gould Decl. ¶ 4. The following day Apple shipped a replacement iPhone,

---

[10] The results of a root cause analysis on one device cannot be used "to extrapolate the reliability for other devices." Fu Depo. 93:19-94:2.

[11] The phone powered off after reaching 20 percent battery life. Carter Depo. 38:6-12.

United States District Court
Northern District of California

which was remanufactured with ▆▆ recovered parts: ▆▆▆▆▆▆▆▆▆▆▆▆▆ ▆▆▆▆. *Id.* ¶ 4; Lanigan Decl. ¶ 18. Carter also experienced battery issues with the first replacement. Carter Depo. 16:16-23. After Carter spoke with counsel about those problems, someone came to his work and visually inspected the phone on October 18, 2016. *Id.* at 134:21-25, 135:12-15, 139:10-16.

Carter was experiencing the same problems a week later on October 25, 2016, so he called Apple about those problems. Gould Decl. ¶ 5; Carter Depo. 150:19-151:6. The following day Apple shipped a second remanufactured replacement device with a recovered ▆▆▆. Gould Decl. ¶ 5; Lanigan Decl. ¶ 19. The same individual visually inspected the second replacement device. Carter Depo. 162:3-25. Carter then purchased a new iPhone from Verizon, which Apple shipped on November 2, 2016. Carter Depo. 172:6-12 (noting he paid for the phone and received reimbursement from counsel). On November 3, 2016, Carter received an email indicating that a third replacement had been shipped, and he received that device on November 4. *Id.* at 172:24-173:9; Gould Decl. ¶ 6. The third replacement device was new. Lanigan Decl. ¶ 20.

In September 2013, Vicky Maldonado bought a fourth generation iPad and AC+ at the mall. Deposition of Vicky Maldonado ("Maldonado Depo."), Patel Decl. Ex. B [Dkt. No. 113-3] 66:12-15, 25. In the beginning it worked well, but after a while she brought it back to Apple because of technical issues. *Id.* at 67:11-19. At first Apple attempted to repair the iPad, but on May 8, 2015, they replaced it with a remanufactured replacement iPad with a recovered ▆▆▆. *Id.* at 67:13-19; Gould Decl. ¶ 7; Lanigan Decl. ¶ 21. She experienced the same problems with the replacement device. Maldonado Depo. 67:20-25. It functioned slowly, it turned off unexpectedly, and it had other people's information on it, namely a picture. *Id.* at 67:20-25, 69:4-8, 73:16-20. She brought the phone back to the store immediately. *See id.* at 74:11-25. On May 22, 2015, Maldonado received a second remanufactured replacement iPad with a recovered ▆▆▆. Gould Decl. ¶ 8; Lanigan Decl. ¶ 22. That iPad was later stolen on a flight, and Maldonado was unable to locate it. Maldonado Depo. 78:5-10, 79:22-80:12.

## I.      PROCEDURAL BACKGROUND

Plaintiffs filed this case on July 20, 2016, and on August 12, 2016, I granted Apple's

request for an order relating it to the earlier filed case before me, *English v. Apple*, 14-cv-1619. Dkt. Nos. 1, 21. On March 2, 2017, I granted in part and denied in part Apple's motion to dismiss.[12] Order on MTD [Dkt. No. 64]. After a few continuations of the case schedule, plaintiffs filed a motion for class certification on February 28, 2019.[13] Motion for Class Certification ("Cert. Mot.") [Dkt. No. 102-4]. On March 29, 2019, pursuant to the parties' stipulation, I consolidated the hearings for the class certification motion and Apple's forthcoming motion for summary judgment. Dkt. No. 109. On April 8, Apple moved for summary judgment. Motion for Summary Judgment ("MSJ") [Dkt. No. 110-4]. On June 10, plaintiffs filed a conditional motion for additional discovery under Federal Rule of Civil procedure 56(d). Dkt. No. 132. I heard argument on all the motions on August 7, 2019. Dkt. No. 149.

**LEGAL STANDARD**

## I.      SUMMARY JUDGMENT

Summary judgment on a claim or defense is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to identify "specific facts showing there is a genuine issue for trial." *Id.* The party opposing summary judgment must present affirmative evidence from which a jury could return a verdict in that party's favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 257 (1986).

On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant. *Id.* at 255. In deciding the motion, "[c]redibility determinations, the weighing of the

---

[12] I gave plaintiffs 20 days to amend their complaint, but they declined to do so.

[13] Plaintiffs originally filed on February 25 but amended their motion on February 28. *See* Dkt. Nos. 99, 100, 102, 103. The original motions at Dkt. Nos. 99 and 100 are TERMINATED AS MOOT.

United States District Court
Northern District of California

evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* However, conclusory and speculative testimony does not raise genuine issues of fact and is insufficient to defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

## II. CLASS CERTIFICATION

"Before certifying a class, the trial court must conduct a rigorous analysis to determine whether the party seeking certification has met the prerequisites of Rule 23." *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 588 (9th Cir. 2012) (internal quotation marks omitted). The party seeking certification has the burden to show, by a preponderance of the evidence, that certain prerequisites have been met. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348-50 (2011); *Conn. Ret. Plans & Trust Funds v. Amgen Inc.*, 660 F.3d 1170, 1175 (9th Cir. 2011).

Certification under Rule 23 is a two-step process. The party seeking certification must first satisfy the four threshold requirements of Rule 23(a). Specifically, Rule 23(a) requires a showing that: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a).

Next the party seeking certification must establish that one of the three grounds for certification applies. *See* Fed. R. Civ. P. 23(b). Plaintiffs seek certification under Rule (b)(3), which requires them to establish that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). They also seek certification under Rule 23(b)(2) for injunctive relief.

In the process of class-certification analysis, there "may entail some overlap with the merits of the plaintiff's underlying claim." *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 568 U.S. 455, 465–66 (2013) (internal quotation marks omitted). However, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Id.* at 466. "Merits questions may be considered to the extent—but only to the extent—that they are relevant to

United States District Court
Northern District of California

determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.*

## DISCUSSION

## I.   SUMMARY JUDGMENT

Apple moves for summary judgment on Maldonado's and Carter's breach of contract claims and asserts that the remaining claims fall for the same reasons. According to Apple, plaintiffs lack evidence to prove their essential elements of their breach of contract claims, and Carter's conduct should prevent him from pursuing his claims.

### A.   Plaintiffs' Theory of Liability and Damages

The motion for summary judgment is based on three main arguments: (i) plaintiffs contend that they were entitled to new devices, in clear contradiction of the contract language; (ii) plaintiffs lack evidence showing that their remanufactured devices were not equivalent to new; (iii) plaintiffs cannot show that Apple's alleged breach caused their damages because the malfunctions they complained of do not relate to non-new part(s) in their devices. MSJ 8-16. These arguments are based on a misunderstanding of plaintiffs' theory of liability; none succeeds.

According to Apple, plaintiffs' position boils down to an assertion that they were entitled to new devices rather than the remanufactured devices they received. MSJ 8-9 (contending that in their deposition testimony, plaintiffs "appear ultimately to take the position that 'equivalent to new in performance and reliability' means 'new'"). This theory contradicts the AC/AC+ language, which unambiguously states that consumers may receive one of two types of replacement devices under the contract: new or "equivalent to new." MSJ 8-9.

I agree with Apple that given the language of the contract, equivalent-to-new devices cannot be the same as new devices. But plaintiffs' theory does not amount to a contention that they were entitled to new devices. Their case rests on their ability to prove that remanufactured devices are not "equivalent to new." *See* Carter Depo. 108:11-18 (testifying that he understood "equivalent to new" as meaning the phone would "operate exactly like [his] new phone did").[14] If

---

[14] Apple uses the following definitions of these "accepted engineering terms": "[T]o be equivalent to new in 'performance' means that remanufactured devices meet the same engineering specifications as new devices, and to be equivalent to new in 'reliability' means that the remanufactured devices satisfy the same reliability test suites as new devices." MSJ 9. But as

United States District Court
Northern District of California

plaintiffs can prove this theory, consumers who received such devices did not receive the benefit of their bargain.

Apple also challenges the evidence plaintiffs rely on to prove their theory:  plaintiffs' interpretation of the contract is "unrealistic and unsupportable" because the expert opinion of Michael Pecht—that any device with a non-new component cannot be equivalent to new—"reads 'equivalent to new' out of the AC+ contract."  Reply MSJ 3; *see infra* Section II.B – Plaintiffs' Classwide Theories (discussing Pecht's opinions in more detail).  I disagree.  Pecht's report sets forth reasons why remanufactured devices do not meet that mark; it does not read "equivalent to new" out of the contract.  Apple's performance must match its promise, and a reasonable fact finder could rely on this evidence to conclude that it does not.

Apple next contends that it is entitled to summary judgment because plaintiffs lack evidence showing that *their* specific devices were not equivalent to new in performance and reliability.  MSJ 10-14.  Instead, the evidence shows that remanufactured devices go through the same manufacturing and testing process as new iPhones and iPads.  *Id.* at 11-12.  Apple presents evidence of its remanufacturing and testing processes that could lead a fact finder to conclude that the resulting remanufactured devices are equivalent to new.  But a fact finder could also credit the reports of Pecht and Robert Bardwell and conclude that remanufactured devices—including Maldonado's and Carter's—are inferior.  Plaintiffs' theory of breach does not depend on the nature of any individual device.  They assert that load conditions prevent *all* devices with non-new parts from being considered "equivalent to new."  *See infra* Section II.B.1 – Plaintiffs' Classwide Theories (discussing the Pecht and Bardwell reports in more detail).

Finally, Apple claims that plaintiffs cannot show that a non-new part caused the problems they allegedly experienced, and thus there is no evidence to tie Apple's alleged breach with plaintiffs' alleged damages.  MSJ 14-16.  For the reasons discussed above, plaintiffs' success does not depend on the functioning or malfunctioning of individual devices.  Oppo. MSJ 17.  Apple promised plaintiffs equivalent-to-new devices under the AC+ contract.  Plaintiffs assert that when

United States District Court
Northern District of California

---

plaintiffs point out, given that AC/AC+ is a consumer contract, it is appropriate to construe the terms in the way a consumer would understand them.  *See* Oppo. MSJ 13-14

they submitted claims under the contract, instead of receiving the benefit of their bargain they received inferior devices that were more likely to fail and have shorter lifespans. If a fact finder credits this theory, then Apple breached—and caused plaintiffs' damages—at the time of that exchange.

Apple can challenge plaintiffs' evidence at trial, but material disputes of fact preclude summary judgment.

### B.     Carter's Conduct

Apple argues that Carter should not be permitted to pursue his claims because he engaged in improper conduct that prejudiced it. MSJ 16-19. Someone opened and inspected Carter's replacement iPhones without Apple's expert present, and Carter returned two of his replacement devices rather than preserving them for this litigation. As a result, Apple is unable to test the phones or otherwise rely on that evidence to disprove Carter's claims. Finally, Carter improperly obtained his second and third replacements for purposes of this litigation, meaning he effectively manufactured aspects of his claims.

I disagree with Apple that Carter's conduct constitutes spoliation or that it will prejudice Apple. As articulated above and discussed in more detail below, plaintiffs' theory is not tied to any specific remanufactured device, and detailed inspections are not necessary to defend against Carter's claims. Accordingly, Apple's inability to test all of the replacement devices Carter received will not cause it prejudice. Finally, Carter testified that he was experiencing problems with his replacement devices separate and apart from his interactions with counsel. *See* Carter Depo. 16:16-23, 150:19-151:6. Carter's conduct does not merit summary judgment in favor of Apple.

Apple's motion for summary judgment on the remaining claims fails for the same reasons as the breach of contract claim. *See* MSJ 19-22 (setting forth reasons why the remaining claims fall with the breach of contract claims). For all of these reasons, Apple's motion for summary judgment is DENIED. Plaintiffs' conditional motion for additional discovery under Federal Rule of Civil Procedure 56(d) and the motions to seal related to the parties' briefing on that motion are

United States District Court
Northern District of California

DENIED AS MOOT. *See* Dkt. Nos. 138,[15] 144, 147.

## II.    CLASS CERTIFICATION

Plaintiffs seek certification of the following class: "All individuals who purchased AppleCare or AppleCare+, either directly or through the iPhone Upgrade Program, on or after January 1, 2009, and received a remanufactured replacement Device." Apple challenges plaintiffs' Rule 23 showing on several grounds: (i) the class is overbroad in terms of members and time period; (ii) plaintiffs can establish neither commonality nor predominance; (iii) named plaintiffs' experiences are not typical; and (iv) named plaintiffs are not adequate class representatives.

As an initial matter, I agree with Apple that plaintiffs have failed to justify a class period extending back to January 1, 2009 rather than to July 20, 2012, four years before they filed suit. Oppo. Cert. Mot. 10; *see* Cal. Civ. Proc. Code § 337 (providing four years within which a contract action can be brought). The parties discussed the class period in September and November 2017, at which time plaintiffs told Apple they would support their tolling theory during class certification briefing. Patel Decl. ¶ 2. Plaintiffs failed to support their proposed class period in their motion or reply, despite the fact that Apple squarely addressed this issue in its opposition.[16] *See* Oppo. Cert. Mot. 10. Plaintiffs have failed to meet their burden to show that it is appropriate to extend the class period; accordingly, the class period will begin on July 20, 2012, four years before this case was filed.

### A.    Rule 23(a)

#### 1.    Numerosity

Rule 23(a)(1) requires that the "the class [be] so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). The party seeking certification "do[es] not need to state the exact number of potential class members, nor is a specific number of class members required

---

[15] The motion at Dkt. No. 138 is denied only insofar as it related to the 56(d) motion rather than the motion for summary judgment.

[16] At the hearing plaintiffs asserted that the class period can extend to 2009 because claims do not accrue until a party has reason to know of them. Hearing Transcript [Dkt. No.153] 14:7-23. This untimely argument is not sufficient.

United States District Court
Northern District of California

United States District Court
Northern District of California

for numerosity." *In re Rubber Chemicals Antitrust Litig.*, 232 F.R.D. 346, 350 (N.D. Cal. 2005). Courts generally find that numerosity is satisfied if the class includes forty or more members. *See Villalpando v. Exel Direct Inc.*, 303 F.R.D. 588, 605-06 (N.D. Cal. 2014); *In re Facebook, Inc., PPC Adver. Litig.*, 282 F.R.D. 446, 452 (N.D. Cal. 2012).

Plaintiffs assert that their class is sufficiently numerous because Apple's records show that it sold over three million AC/AC+ plans where it provided at least one replacement device, many of which were remanufactured. Cert. Mot. 16. Even with a class period beginning in 2012 rather than 2009, this showing is sufficient to satisfy the numerosity requirement.

### 2. Commonality

Rule 23 requires that there be questions of law or fact common to the class. Fed. R. Civ. P. 23(a)(2). Plaintiffs must show that the class members have suffered "the same injury," meaning their claims "depend upon a common contention" that is of such a nature that "determination of its truth or falsity will resolve an issue that is central to the validity of each [claim] in one stroke." *Dukes*, 564 U.S. at 350 (internal quotation marks and citation omitted). Plaintiffs must demonstrate not merely the existence of a common question, but rather "the capacity of classwide proceedings to generate common answers apt to drive the resolution of the litigation." *Id.* (internal quotation marks and emphasis omitted). For purposes of Rule 23(a)(2), "even a single common question will do." *Id.* at 359 (internal quotation marks and modifications omitted).

Plaintiffs argue that the common question for all their claims is whether Apple's remanufactured devices are equivalent to new in performance and reliability. Cert. Mot. 17. For the breach of contract claim, the common questions are: (i) "whether remanufactured devices' higher rate of failure or shorter life span establishes those devices are not equivalent to new"; (ii) whether Apple must employ comparison testing to assess whether remanufactured devices are equivalent to new"; and (iii) "whether passing Apple's uniform minimum test standards proves that remanufactured devices are equivalent to new." *Id.* For the warranty and UCL claims, the common questions are: (i) "whether Apple's promise to provide equivalent to new devices was a misrepresentation"; (ii) "whether a reasonable consumer would have been deceived by Apple's misrepresentations"; and (iii) "whether Apple's conduct constitutes an unfair or unlawful business

13

practice." *Id.*

Apple argues that plaintiffs fail to show common questions because neither breach nor causation nor injury can be adjudicated on a classwide basis. As discussed below for purposes of the predominance inquiry, plaintiffs present evidence that, if credited, could establish remanufactured devices are not equivalent to new in performance and reliability. Plaintiffs have established common questions.

### 3. Typicality

"The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984 (9th Cir. 2011) (internal quotation marks and citation omitted). Class certification is not appropriate if unique defenses threaten to preoccupy the class representatives and thus cause absent members to suffer. *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). But, "the defense of non-reliance is not a basis for denial of class certification." *Id.* at 509.

Plaintiffs assert that they can satisfy the typicality requirement because the named plaintiffs purchased AC/AC+ with the same promise from Apple and received remanufactured devices that they assert were not equivalent to new. Cert. Mot. 18. Apple argues that named plaintiffs' claims are not typical of the class claims because they have not tied any problems they had with their remanufactured devices to any non-new parts. Cert. Oppo. 24. Specifically, the issues they experienced were likely related to software, usage, or geography rather than the non-new parts. *Id.* Plaintiffs counter that their claims rest on their evidence that *all* remanufactured devices are inferior to new devices. Reply ISO Class Certification ("Cert. Reply") [Dkt. No. 121-2] 14-15. Because the named plaintiffs received remanufactured devices with non-new parts, their claims are typical. *Id.*

As I discuss below, plaintiffs present classwide evidence that remanufactured devices are not equivalent to new in performance and reliability. Both Carter and Maldonado purchased AC+ plans, sought replacement devices, and received remanufactured devices. Accordingly, their claims are typical of the class's claims.

14

#### 4. Adequacy

Finally, to establish adequacy under Rule 23(a)(4), named plaintiffs must show that they "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "To determine whether named plaintiffs will adequately represent a class, courts must resolve two questions: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Ellis*, 657 F.3d at 985 (internal quotation marks omitted).

Apple argues that Carter is an inadequate class representative because he improperly sought replacement devices for the purposes of this litigation, and counsel from Hagens Berman Sobol Shapiro LLP is inadequate because they were involved in that conduct. Cert. Oppo. 24-25. Plaintiffs counter that Carter was already experiencing problems with a remanufactured device before he contacted counsel about this case. Reply 15. Neither he nor counsel had reason to seek replacements for the purposes of litigation because Carter had already received a remanufactured device under AC+, which was enough to make him an appropriate plaintiff in this case.[17] *Id.*

Carter's conduct does not rise to the level of making him an inadequate class representative. In addition, Hagens Berman has extensive experiencing litigating consumer protection class actions. *See* Berman Decl. Ex. 15 [Dkt. No. 103-15] (firm resume). Plaintiffs have made a sufficient showing of adequacy under Rule 23(a)(4).

#### B.    Rule 23(b)(3)

To proceed under Rule 23(b)(3) for damages, plaintiffs must show that it is superior to proceed as a class action and "the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). The predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods, Inc. v. Windsor*, 521 U.S. 591, 623 (1997). "The focus is on the relationship between the common and individual issues." *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1019 (9th Cir. 2011) (internal quotations and citation omitted).

---

[17] Both parties agree that Carter's third replacement, which Apple alleges he misleadingly requested from Apple, is not part of this case. *See* Oppo. MSJ 20; Oppo. Cert. Mot. 13 n.13.

15

Predominance is established if "common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication." *Mazza*, 666 F.3d at 589. Commonality and predominance are related issues, and there is often substantial overlap between the two tests, but the test for predominance is "far more demanding." *Amchein Prods.*, 521 U.S. at 623-24.

Plaintiffs argue that common questions predominate over individual questions for each of their causes of action because they can establish on a classwide basis that remanufactured devices are not "equivalent to new in performance and reliability." Cert. Mot. 20-24. With the expert report of Lance Kaufman, plaintiffs also put forth a methodology to measure damages on a classsswide basis. Apple challenges plaintiffs' classwide showings on several grounds, detailed below.

### 1.    Plaintiffs' Classwide Theories

Plaintiffs rely on the expert report of Michael Pecht to assert that remanufactured devices can never be equivalent to new because they have been subject to "load conditions." Expert Report of Michael Pecht ("Pecht Rpt."), Pecht Decl. Ex. A [Dkt. No. 102-21]. Pecht has expertise and experience in the fields of engineering and electronics testing and reliability. *See id.* at 3-4. His report addresses whether remanufactured iPhones and iPads can be equivalent to new in terms of performance and reliability and whether Apple's testing procedures are sufficient to allow Apple to make this representation to purchasers of AC/AC+. *Id.* at 5-6.

According to Pecht, "Electronic parts and products (device, equipment) are known to wear-out with time, usage (operational) conditions, and environmental conditions." *Id.* at 10. Such degradation begins at the time the parts are made. *Id.* Both environmental conditions and operation, which Pecht calls "load (stress) conditions,"[18] can contribute to the degradation. *Id.* These load conditions may not be visible, may not be detected during testing, and may not impact the device's performance right away, but they "use up (degrade) the life of a device[]." *Id.* at 10-

---

[18] These conditions include "thermal ranges and changes, mechanical loads / stresses (including handling and operation such as pushing buttons), humidity and moisture, vibration, shock, dust, smoke and other contaminates, and even radiation." Pecht Rpt. 10.

United States District Court
Northern District of California

11. Pecht concludes that "[d]evices containing salvaged (used) components can never be as reliable as devices containing new components" and that "Apple's testing is insufficient for Apple to represent that remanufactured devices are equivalent to new devices in reliability." *Id.* at 13. Plaintiffs' theory is that the replacement devices are necessarily less reliable than new devices by virtue of having non-new parts. If a jury were to credit this theory, as supported by Pecht's analysis, it could determine the question of equivalence for the entire class.

Plaintiffs also rely on the expert report of Robert Bardwell to assert that remanufactured devices fail at a higher rate than new devices do. Expert Report of Robert Bardwell ("Bardwell Rpt."), Bardwell Decl. Ex. A [Dkt. No. 102-23]. Bardwell has experience and expertise in statistical analysis and probability modeling. *Id.* at 21. He used the Mantel-Haenszel method to test whether manufactured devices have a higher failure rate than new replacement devices, as measured by the rate at which the devices are returned. *Id.* at 7-9. He excluded the iPhone 5 from his analysis because of "the abnormal number of failures in new phones." *Id.* at 8. He estimates that "remanufactured iPhones have over 2.3 times the odds of being returned than new replacement iPhones" and "remanufactured iPads have over 1.7 times the odds of being returned as new replacement iPads." *Id.* at 9. Each of these figures is "statistically significant at an extremely high level." *Id.* He lists limitations on his analysis that suggest the failure rate is actually higher than the estimates he reaches. *Id.* at 12.

### 2.      Apple's Challenges

#### a.      Standing and Overbreadth

Apple argues the proposed class is overbroad because it includes individuals who never experienced problems with their replacement devices. Cert. Oppo. 8-10. These individuals were never injured and cannot establish Article III standing. *Id.* at 9. Plaintiffs counter that their class is not overbroad because it is limited to "those who suffered a common injury—receipt of a deficient remanufactured device under AC/AC+." Cert. Reply 1.

There is a distinction between injury as a jurisdictional problem and injury as a Rule 23

United States District Court
Northern District of California

problem.[19] *See Moore v. Apple Inc.*, 309 F.R.D. 532, 542 (N.D. Cal. 2015). In *Moore*, the Hon. Lucy Koh declined to certify a class because it was overbroad under *Mazza* and Rule 23. *Id.* at 542. Plaintiffs sought to bring claims on behalf of individuals who had switched from using an Apple iPhone to a non-Apple cell phone and subsequently did not receive all text messages sent to them from Apple devices. *Id.* at 535-36, 538. Apple argued that the class included three groups of individuals who were not injured: "(1) persons who experienced no disruption in their text message services; (2) persons who failed to receive text messages because of technical issues unrelated to the iMessages system; and (3) persons who failed to receive text messages because of restrictions in their wireless contracts." *Id.* at 542.

Judge Koh agreed with Apple that the class was overbroad because it "include[d] individuals who, by definition, *could not* have been injured by Defendant's alleged wrongful conduct."[20] *Id.* at 542 (emphasis in original). This was so because some members of the proposed class had wireless contracts that did not in fact allow them to receive text messages. *Id.* Judge Koh distinguished between this group—who, because they had no contractual right to receive text messages, could not have been injured by non-receipt of text messages—and "proposed class members who, by happenstance, *may* not have experienced disruption of text message services due to Defendant's alleged wrongful conduct."[21] *Id.*; *see also Patel v. Trans Union, LLC*, No. 14-CV-00522-LB, 2016 WL 6143191, at *8 (N.D. Cal. Oct. 21, 2016) (distinguishing between individuals who "*by definition*, [could not] be among those who may be entitled to recovery" and "absent plaintiffs may ultimately fail to prove liability"); *O'Shea v. Epson Am., Inc.*, No. CV 09-8063 PSG CWX, 2011 WL 4352458, at *11 (C.D. Cal. Sept. 19, 2011), *aff'd sub nom. Rogers v. Epson Am., Inc.*, 648 F. App'x 717 (9th Cir. 2016) (noting that the class was defined to include

---

[19] I already concluded that named plaintiffs have standing sufficient for jurisdiction. Order on MTD 6-7.

[20] Judge Koh concluded certification was inappropriate on a different, but related basis—that individualized inquiries would be required to determine whether individuals were actually injured. *Moore*, 309 F.R.D. at 544-46.

[21] As discussed below, Judge Koh concluded that individualized inquiries would be required to determine whether each class member actually experienced disruption in messaging and whether iMessage had caused that disruption. *Moore*, 309 F.R.D. at 542-43; 545-46.

consumers who were never actually exposed to the allegedly deceptive representation).

The proposed class is defined in a way that avoids the overbreadth issues identified in *Moore*, *Patel*, and *Epson*. Rather than including consumers who by definition could not have been injured, this class includes only individuals who received replacement devices. Plaintiffs rightly do not seek to include individuals who received new phones. Just as individuals who were never entitled to receive messages could not be injured by not receiving messages, individuals who received new phones could not have been injured even if a jury finds that Apple provides remanufactured phones that are not equivalent to new. Because plaintiffs' class avoids Article III overbreadth, Apple's arguments go to predominance under Rule 23. *See Moore*, 309 F.R.D. at 543.

Apple's predominance argument fails because it is based on a misapprehension of plaintiffs' theory of injury. Contrary to Apple's assertions, plaintiffs' injury occurred when they filed a claim under AC/AC+ and received a device that was not "equivalent to new in performance and reliability" because of load conditions or shorter lifespan. This injury occurred regardless of whether an individual experienced problem with the device.[22] *See Nguyen v. Nissan N. Am., Inc.*, 932 F.3d 811, 819 (9th Cir. 2019) ("Plaintiff's theory is that the defect was inherent in each of the Class Vehicles at the time of purchase, regardless of when and if the defect manifested."). If a fact finder credits plaintiffs' theory, then all individuals who received a remanufactured replacement device were injured. Accordingly, the class can include all consumers who purchased AC/AC+ during the class period and received a remanufactured device pursuant to the contract.

### b.    Individualized Inquiries into Equivalence

Apple argues that plaintiffs cannot show predominance because individualized inquiries will be necessary to determine which parts were not new and whether the non-new part actually caused the problem a particular consumer experienced (as opposed to a new part or the device's

---

[22] In my Order on Apple's motion to dismiss, I stated that plaintiffs would have to "point to some 'problem' with their devices to support their allegations that the devices were not 'new or equivalent to new in performance and reliability.'" Order on MTD 7. With plaintiffs' benefit-of-the-bargain theory crystallized, and in reliance on cases like *Nguyen*, I now conclude that all individuals who received a remanufactured device allege an injury sufficient to confer standing.

United States District Court
Northern District of California

software being the cause). Cert. Oppo. 13-14. Because all of the remanufactured iPhones and iPads will "vary in the number and mix of non-new parts," classwide proof cannot establish that they are not "equivalent to new in performance and reliability" as a result of the non-new part(s). *Id.*

In *Moore*, Judge Koh found that a few different individualized issues predominated over common issues. *Moore*, 309 F.R.D. at 545. First, variations in service agreements regarding text messages meant that individuals' non-receipt of text messages could have been caused not by Apple but by the individual having exceeded the number of messages paid for or having blocked a number. *Id.* Plaintiffs had no way of answering these questions on a classwide basis. *Id.* at 546. Second, individualized inquiries would be required to establish that an individual's non-receipt of messages was in fact caused by iMessage rather than the many other possible causes.[23] *Id.* at 546-47. Judge Koh rejected plaintiffs' argument that iMessage had a "systemic flaw" that prevented delivery of messages:

> [T]he question [was] not whether Plaintiff and members of the proposed class [would] ultimately be able to prove that iMessage could cause disruptions in text messaging services as a general matter. Instead, the relevant question under Rule 23 [was] whether determining if iMessage caused a class member's injury require[d] an individualized inquiry such that class treatment [was] inappropriate.

*Id.* at 547. The plaintiffs' theory of causation inappropriately relied on the assumption "the iMessage system actually interfered with a class member's ability to receive text messages." *Id.* at 548; *see also Bruce v. Teleflora, LLC*, No. 2:13-CV-03279, 2013 WL 6709939, at *6 (C.D. Cal. Dec. 18, 2013) (noting that "one would have to assess each individual [flower] arrangement delivered to each putative class member to determine whether she received an inferior-quality arrangement").

Apple argues that the same individualized inquiries into the following will be necessary in this case because of the unique mix of new and non-new parts in each device. Each device will have to be individually analyzed to assess which parts were not new and whether the non-new part(s) in fact caused the problems the consumer experienced, rather than the myriad other

---

[23] The court noted the frequency of text message delivery failure and the numerous reasons that could cause those failures. *Moore*, 309 F.R.D. at 546.

United States District Court
Northern District of California

possible causes. Plaintiffs counter that they have classwide proof of non-equivalence across the remanufactured devices, regardless of the performance of a particular device. Through their experts, they offer evidence that no remanufactured devices are equivalent to new because (i) load conditions mean that used parts can never be equivalent to new parts and (ii) remanufactured devices fail at significantly higher rates than new devices. Reply 4.

Apple's arguments do not overcome plaintiffs' predominance showing. Its reliance on the *Teleflora* case, which addressed the quality of flower bouquets, is unpersuasive. *Teleflora*, 2013 WL 6709939, at *6-7. It hardly bears mentioning that there is a difference between assessing the quality of unique, handmade floral arrangements and assessing the reliability of hardware. Plaintiffs' benefit-of-the-bargain theory of Apple's liability is not dependent on the analysis of a particular device. *See Nguyen*, 932 F.3d at 819 ("Plaintiff's theory is that the defect was inherent in each of the Class Vehicles at the time of purchase, regardless of when and if the defect manifested.").[24] Individualized inquiries—into whether a device experience problems or whether those problems were tied to a non-new part—will not be necessary to prove plaintiffs' case. *See* Pecht Depo. 57:6-14 (noting that his opinions are "quite broad-based and fundamental reliability engineering statements" that "hold true" regardless of an individual examination of a single product). Apple's remaining challenges to the Pecht report go to its merits, not whether his opinions can serve as evidence for the entire class.

Apple next argues that its testing procedures are "**the** standard" in the industry and that plaintiffs appear to take the "absurd position" that Apple should test replacements that are provided to consumers in the extreme manner that it tests new devices. Cert. Oppo. 18-19. Such testing on remanufactured devices would be impossible because the process often destroys the device. *Id.* at 19. Both sides appear to agree that extreme reliability testing would make it impossible to give remanufactured devices to consumers. But that reality does not necessarily support a finding in Apple's favor.[25] Instead, a fact finder could rely on this fact to conclude not

---

[24] The Ninth Circuit published this opinion after class certification briefing had concluded in this case, but counsel discussed it during the hearing on these motions.

[25] As plaintiffs point out, Pecht does not opine that Apple should perform reliability testing on all

21

that plaintiffs' position is absurd but that despite Apple's promises, it is not capable of ensuring remanufactured devices are equivalent to new. Apple can raise these challenges to Pecht, but his opinions and conclusions can nevertheless serve as classwide proof of plaintiffs' claims.

Apple's criticisms of the Bardwell report also go to the merits rather than to the question of classwide proof. Apple argues that plaintiffs cannot rely on the return rate as the rate of failure because a return does not necessarily indicate that the device failed or that the non-new part caused the device's problems. Cert. Oppo. 14-15. Plaintiffs counter that Apple itself "uses return rates to assess reliability and calls them 'failure rates,' a common approach with consumer electronics." Cert. Reply 6; *see* Lanigan Depo. 108:6-109:8. Apple further criticizes Bardwell's exclusion of the iPhone 5 and from his analysis and argues that that its own expert's report shows that there is no difference between the return rates of remanufactured and new replacements. Cert. Oppo. 15-17. All of these challenges go to the merits of Bardwell's conclusions, not to whether the report, if credited by a fact finder, could serve as classwide proof of plaintiffs' claims.

### c.    Individualized Inquiries into Damages

As part of the predominance inquiry, plaintiffs must demonstrate that "damages are capable of measurement on a classwide basis." *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013). Plaintiffs must present a damages model consistent with their theory of liability—that is, a damages model "purporting to serve as evidence of damages in this class action must only those damages attributable to that theory." *Id.* at 35. "Calculations need not be exact," *id.*, nor is it necessary "to show that [the] method will work with certainty at this time," *Khasin*, 2016 WL 1213767, at *3. "Restitution under the UCL and FAL 'must be of a measurable amount to restore to the plaintiff what has been acquired by violations of the statutes, and that measurable amount must be supported by evidence.'" *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 988 (9th Cir. 2015).

Plaintiffs advance two theories of classwide damage calculations through the expert report of Dr. Lance Kaufman, an economist with experience calculating economic damages. Expert

remanufactured devices; instead he asserts that the testing Apple does perform is not sufficient to establish equivalence as promised under the AC/AC+ contract. *See* Cert. Reply 11.

United States District Court
Northern District of California

Report of Lance Kaufman ("Kaufman Rpt.") [Dkt. No. 102-25].  He asserts that he can calculate economic harm on a classwide basis using:  (i) the difference in retail price between remanufactured devices and new devices and (ii) the cost of AC/AC+ plans.  *Id.* at 4.  He asserts that consumers value remanufactured devices less than new devices as evidenced by their willingness to pay more for new devices.  *Id.* at 5-7.  "Damage related to historically received remanufactured devices should be equal to the sum of the price difference at the time each replacement device was received for all replacement devices received."  *Id.* at 7.  In addition, he asserts that class members should be able to choose contract rescission because the price difference calculation may not fully mitigate the harm.  *Id.* at 8.

Apple argues that the difference in retail price calculation is not tethered to plaintiffs' theory of liability; instead, any damages theory must be based on the price of the AC/AC+ plans that Apple allegedly breached.  Cert. Oppo. 21.  Further, damages cannot be based on the retail price of new devices because plaintiffs were not promised new devices.  *Id.* at 22.  Apple also criticizes Kaufman's model for being underdeveloped and failing to account for the discounted prices most consumers pay for their phones thanks to a cellular service contract.  *Id.*

Plaintiffs' first damages model satisfies *Comcast* because it is tethered to their theory of liability, namely that Apple's breach deprived them of the benefit of their bargain.  *See Nguyen*, 932 F.3d at 816 (finding a sufficient nexus between a benefit-of-the-bargain theory of liability and a model based on the average cost of replacing the allegedly defective system in the car).  In return for their payment under the AC/AC+ plans, they were entitled to replacement devices that were equivalent to new.  Instead, they contend they received inferior remanufactured devices.  *See Nguyen*, 932 F.3d at 822 (concluding that plaintiffs' damages model was tied to their theory of liability, namely that "the allegedly defective clutch itself [was] the injury, regardless of whether the faulty clutch caused performance issues").  One measure of the inferiority of the devices is the difference in retail price between new devices and those the plaintiffs received.  Although it is true that "equivalent to new" means that consumers were not necessarily entitled to new devices under AC/AC+, plaintiffs' expert reasonably relies on the retail price of new devices to measure the retail price of equivalent-to-new devices.

Apple urges that the model is inappropriate because individuals could receive a greater amount in damages than they paid for the AC/AC+ coverage. That possibility does not preclude plaintiffs' damages model; all insurance schemes run the same risk. Apple offered consumers the opportunity to purchase AC/AC+ at a certain price, likely determined by reference to the (presumably) lower cost of producing remanufactured devices and based on an understanding that not all purchasers would require replacement devices. For those purchasers who *did* require replacement devices, they were entitled under the contract to one that met an equivalent-to-new standard. If a fact finder determines that remanufactured devices do not meet that mark, the class will be entitled to damages. Kaufman's model appropriately measures the difference between the value of what plaintiffs were promised—equivalent-to-new devices, as measured by the retail price of new devices—and what they received—remanufactured devices, as measured by their retail value. Apple struck this bargain and was obligated to deliver on its promise.

For two reasons, plaintiffs cannot proceed on a rescission model. First, that model is not tied to their theory of liability, which is that Apple breached when it provided purchasers of AC/AC+ with remanufactured devices, which are not equivalent to new. Second, an inferior replacement device does not render the AC/AC+ plans valueless because they provided other benefits, including free technical support.

For the reasons set forth above, plaintiffs have met their Rule 23 burden to show that class certification is appropriate.[26] I will certify the following class: All individuals who purchased AppleCare or AppleCare+, either directly or through the iPhone Upgrade Program, on or after July 20, 2012, and received a remanufactured replacement Device.

## III.   MOTIONS TO SEAL

Both parties filed motions to seal the briefing and exhibits associated with the pending motions. Plaintiffs made their requests based on Apple's designation of the information as

---

[26] Apple objects to the declarations of Bardwell and Kaufman submitted with plaintiffs' reply in support of class certification. Dkt. No. 126. Apple argues that the declarations go beyond the proper scope of a reply because they are based on information that was available to both experts when they authored their initial reports. I had no need to rely on this evidence to resolve the motion for class certification. The objected-to portions are STRUCK.

24

confidential; they "take no position on whether these documents qualify for protection." Motion to Seal re: Cert. Mot. [Dkt. No. 102] 2.[27]

Both motions before me are "more than tangentially related to the merits of [the] case"; accordingly, Apple's sealing requests are subject to the compelling reasons standard. *See Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1101 (9th Cir. 2016). In deciding summary judgment in the companion case before me, 14-cv-1619 *English v. Apple*, I granted Apple's motion to seal "specific and narrowly tailored requests to seal information pertaining to its testing processes and procedures, sales and services numbers, and databases." Unredacted Order on FRCP 56(d) and Summary Judgment [14-cv-1619 Dkt. No. 334] 30. Later I unsealed the Unredacted Order because Apple had not provided compelling reasons why the redacted information should be sealed. Order Denying Defendants' Sealing Requests [14-cv-1619 Dkt. No. 339]. The Order and motions before me in this case involve much more detailed and sensitive information than at issue there; accordingly, more information is sealable. I will address each category of requests in turn as set forth in the declarations of Pami Vyas.[28] *See* Declaration of Pami Vyas ISO Motions to Seal re: MSJ ("Vyas MSJ Decl. ") [Dkt. No. 110-1]; Declaration of Pami Vyas ISO Motions to Seal re: Class Certification ("Vyas Cert. Decl.") [Dkt. No. 128-1]; Declaration of Pami Vyas ISO Motions to Seal MSJ Reply [Dkt. No. 138-1].

First, Apple seeks to seal information related to its remanufacturing and testing process, including the specific parts that it uses in remanufactured devices and how those devices are assembled and tested. Apple asserts that I have sealed such information in the past and that it is "among the most competitively sensitive information that is at issue in this case." Vyas MSJ Decl. ¶ 3. Apple expends significant resources developing these processes and maintaining their confidentiality. *Id.* ¶¶ 4-5. Second, Apple seeks to seal references to the information it tracks and how it maintains that data. Apple has expended time and resources to develop these business

---

[27] The plaintiffs amended their motion for class certification and accompanying motion to seal. The original motions to seal at Dkt. No. 99 are TERMINATED AS MOOT.

[28] Outside of the charts laying out specific redactions, the declarations are identical through paragraph 10.

practices and maintain their confidentiality. *Id.* ¶¶ 8-9. Third, Apple seeks to seal the serial numbers associated with Maldonado's and Carter's devices on the ground that third parties could misuse them to plaintiffs' detriment. *Id.* ¶ 12. Fourth, Apple seeks to seal information about its sales and service numbers for AC/AC+ on the grounds that their disclosure would allow its competitors to unfairly compete by using Apple's numbers in their own forecasting, planning, and marketing efforts. Vyas Cert. Decl. ¶¶ 12-13.

These categories are likely to include sealable information. That said, Apple's requests are overbroad. *See* Civ. L.R. 79-5(b) ("The request must be narrowly tailored to seek sealing only of sealable material."). I will not seal information that is necessary to understand plaintiffs' theory of liability and hence this Order. *See* Dkt. No. 128 (requesting to seal the following language from plaintiffs' class certification motion: "Remanufactured devices with used parts are not equivalent to new as they fail at a rate significantly higher than new devices."[29]). Because I recognize the potential sensitivity of the categories of information, and because in another context I allowed Apple to seal more general information than I am contemplating allowing here, in this redacted Order I have temporarily redacted information that does not appear sensitive and does appear central to plaintiffs' theory that will be tried in open court. **But I intend to file an unredacted version of the Order in ten days unless Apple submits a declaration meeting the compelling reasons standard on any of that information.**

With respect to the rest of the sealed information, the sheer number of lines for some documents reveals the overbreadth; in some cases Apple seeks to seal entire pages of deposition testimony. *See generally* Dkt. No. 128.[30] Redactions to the Pecht, Bardwell, and Kaufman reports must be narrowed. Information about the manufacturing process of remanufactured devices is

---

[29] This assertion may be based on evidence that Apple considers confidential, but it does not reveal anything about the data sets themselves.

[30] To provide Apple an example of its overbreadth, it requests sealing of the majority of pages 24 and 25 of the Lanigan deposition. Those pages describe the difference (or lack thereof) between the terms refurbished, certified refurbished, and remanufactured. This testimony does not describe Apple's manufacturing and testing procedures (and is not sealable on that basis) but rather explains the relationship between terms that are potentially relevant to this outcome of this case. As currently before me, there are no compelling reasons to seal such information.

26

certainly key to Apple's defense; for this reason, redactions to depositions and declarations of Lanigan, Fu, and Sen should be narrowly tailored.

**With this guidance in mind, Apple shall file amended sealing requests within 30 days of the date of this Order for all requests other than the information that is currently redacted in this Order**.  Apple need not submit new versions of any documents, but it should clearly reference the docket numbers as it has done in its prior filings.  After I have reviewed the narrower requests, I will order the parties to submit public versions of documents with approved redactions as necessary.

## CONCLUSION

As set forth above, plaintiffs' motion for class certification is GRANTED for the following class:  All individuals who purchased AppleCare or AppleCare+, either directly or through the iPhone Upgrade Program, on or after July 20, 2012, and received a remanufactured replacement Device.  Maldonado and Carter are appointed as class representatives, and Hagens Berman is appointed as class counsel.  Apple's motion for summary judgment is DENIED.  Plaintiffs' Conditional Motion under Rule 56(d) and the accompanying motions to seal are TERMINATED AS MOOT.  The remaining motions to seal are resolved in accordance with the discussion above.

A further Case Management Conference is set for December 3, 2019 at 2:00 p.m.

**IT IS SO ORDERED.**

Dated: September 17, 2019

William H. Orrick
United States District Judge

United States District Court
Northern District of California

27