Karen L. Dunn (DC SBN 1002520; *pro hac vice*)
kdunn@paulweiss.com
William A. Isaacson (DC SBN 414788; *pro hac vice*)
wisaacson@paulweiss.com
Kyle N. Smith (DC SBN 1029803; *pro hac vice*)
ksmith@paulweiss.com
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
2001 K Street, NW
Washington, DC 20006
Telephone: (202) 223-7300
Facsimile:  (202) 223-7420

Meredith R. Dearborn (SBN 268312)
mdearborn@paulweiss.com
Gabriel R. Schlabach (SBN 304859)
gschlabach@paulweiss.com
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
943 Steiner Street
San Francisco, CA 94117
Telephone: (202) 223-7300
Facsimile:  (202) 223-7420

*Attorneys for Defendants*
*APPLE INC., APPLECARE SERVICE COMPANY, INC., and*
*APPLE CSC INC.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| VICKY MALDONADO AND JUSTIN CARTER, individually and on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>APPLE INC., APPLECARE SERVICE COMPANY, INC., AND APPLE CSC INC.,<br><br>Defendants. | Case No. 3:16-cv-04067-WHO<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO EXCLUDE THE EXPERT TESTIMONY OF MICHAEL PECHT, PH.D.**<br><br>Date:  April 7, 2021<br>Time:  2:00 PM<br>Judge:  William H. Orrick<br>Courtroom:  2, 17th Floor |

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................ 1

II.    FACTUAL BACKGROUND ................................................................................ 4

       A.    Dr. Pecht's "Load" Opinion. ................................................................... 4

       B.    No Further Testing or Modeling. ............................................................ 5

       C.    Equivalence Is Measured by Even Minute, Tiny Changes. .................... 7

III.   LEGAL STANDARD ......................................................................................... 8

IV.    ARGUMENT ...................................................................................................... 9

       A.    Dr. Pecht's Opinion Does Not "Fit" the Facts of This Case. .................. 9

             1.    Dr. Pecht's "Load" Opinion Is Only Relevant Under an Erroneous
                   Interpretation of the AppleCare Contract Language. ................................ 10

             2.    Dr. Pecht's "Load" Opinion Describes, at Most, an Immaterial
                   Breach of Contract, Which Does Not Match Plaintiffs' Damages
                   Theory ............................................................................................... 13

       B.    Dr. Pecht's Opinion Is Not Grounded in Any Scientific Methodology. ................ 15

V.     CONCLUSION ................................................................................................ 18

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Allumination Filmworks, LLC* v. *Doyle*,
2011 WL 13220485 (C.D. Cal. July 18, 2011)...................................................................14

*Avila* v. *Willits Envtl. Remediation Tr.*,
633 F.3d 828 (9th Cir. 2011) ...........................................................................................8

*Brodsky* v. *KaVo Dental Technologies, LLC*,
2018 WL 620453 (D. Md. Jan. 30, 2018)........................................................................15

*Cardinal* v. *Lupo*,
2020 WL 3101025 (N.D. Cal. June 11, 2020) ................................................................11

*City of Pomona* v. *SQM N. Am. Corp.*,
750 F.3d 1036 (9th Cir. 2014) ..................................................................................8, 9, 13

*Comcast Corp.* v. *Behrend*,
569 U.S. 27 (2013)................................................................................................9, 10, 14

*Corning Glass Works* v. *S. New England Tele. Co.*,
674 F. Supp. 999 (W.D.N.Y. 1987).................................................................................12

*Corwin* v. *Walt Disney Co.*,
475 F.3d 1239 (11th Cir. 2007) .......................................................................................10

*Daubert* v. *Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993)...................................................................................................8, 9, 15

*Davis* v. *McKesson Corp.*,
2019 WL 3532179 (D. Ariz. Aug. 2, 2019)...................................................................15

*Diviero* v. *Uniroyal Goodrich Tire Co.*,
114 F.3d 851 (9th Cir. 1997) ...........................................................................................15

*Great Am. All. Ins. Co.* v. *Sir Columbia Knoll Assocs. Ltd. P'ship*,
2020 WL 5351035 (D. Or. Sept. 4, 2020) ...............................................................10, 13

*Huawei Tech. Co, Ltd* v. *Samsung Elecs. Co, Ltd.*,
340 F. Supp. 3d 934 (N.D. Cal. 2018)............................................................................10

*Legendary Investors Grp. No. 1, LLC* v. *Niemann*,
224 Cal. App. 4th 1407 (2014) .......................................................................................11

*Lust* v. *Merrell Dow Pharms., Inc.*,
89 F.3d 594 (9th Cir. 1996) ...............................................................................................9

*McLeodUSA Telecomm. Servs., Inc.* v. *Iowa Utils. Bd.*,
550 F. Supp. 2d 1006 (S.D. Iowa 2008) ...............................................................12

*Nease* v. *Ford Motor Co.*,
848 F.3d 219 (4th Cir. 2017) .................................................................16, 17, 18

*Noskowiak* v. *Bobst SA*,
2005 WL 2146073 (E.D. Wis. Sept. 2, 2005) ..................................................8, 9

*Owen* v. *Gen. Motors Corp.*,
2007 WL 1655760 (W.D. Miss. 2007) ................................................................15

*In re Packaged Seafood Prods. Antitrust Litig.*,
2020 WL 4530744 (S.D. Cal. Aug. 6, 2020) ...........................................9, 10, 14

*Perez* v. *State Farm Mut. Auto. Ins. Co.*,
2012 WL 3116355 (N.D. Cal. July 31, 2012)......................................................16

*Poly-America, Inc.* v. *Serrot Int'l, Inc.*,
2002 WL 1996561 (N.D. Tex. Aug. 26, 2002)......................................................11

*Pro Service Automotive, LLC* v. *Lenan Corp.*,
469 F.3d 1210 (8th Cir. 2006) ............................................................................15

*Smith* v. *Nexus RVs, LLC*,
472 F. Supp. 3d 470 (N.D. Ind. 2020) ..........................................................16, 18

*St. Paul Fire & Marine Ins. Co.* v. *Am. Dynasty Surplus Lines Ins. Co.*,
101 Cal. App. 4th 1038 (2002) ...........................................................................14

*Tahoe-Sierra Preservation Council* v. *State Water Resources Control Bd.*,
210 Cal. App. 3d 1421 (1989) ............................................................................12

*Tajonera* v. *Black Elk Energy Offshore Operations, LLC*,
2016 WL 9414205 (E.D. La. May 23, 2016).........................................................9

*Tamraz* v. *Lincoln Elec. Co.*,
620 F.3d 665 (6th Cir. 2010) ..............................................................................15

*U.S. Gypsum Co.* v. *Lafarge N. Am. Inc.*,
670 F. Supp. 2d 737 (N.D. Ill. 2009) ..................................................................10

*United Food & Commercial Workers Local 1776 & Participating Employers
Health & Welfare Fund* v. *Teikoku Pharma USA*,
296 F. Supp. 3d 1142 (N.D. Cal. 2017) ...........................................................8, 9

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*
(*Clean Diesel II*), 2020 WL 6688912 (N.D. Cal. Nov. 12, 2020) .........................10

iii

*Walker* v. *DDR Corp.*,
  2019 WL 1349514 (D.S.C. Mar. 26, 2019) ..........................................................16

*In re Wellbutrin XL Antitrust Litig.*,
  308 F.R.D. 134 (E.D. Pa. 2015)...................................................................10, 13

STATUTES

Cal. Civ. Code § 3360................................................................................................14

OTHER AUTHORITIES

*Equivalent*, BLACK'S LAW DICTIONARY (11th ed. 2019)..............................................12

*Equivalent*, MERRIAM-WEBSTER, https://www.merriam-
  webster.com/dictionary/equivalent (last accessed Jan. 6, 2021)...........................11

*Equivalent*, OXFORD ENGLISH DICTIONARY (2017), https://perma.cc/H4Z9-NCGD ...................11

Federal Rule of Evidence 401 ......................................................................................9

Federal Rule of Evidence 402 ......................................................................................9

Federal Rule of Evidence 702 .............................................................................3, 8, 9

*Virtually*, MERRIAM-WEBSTER, https://www.merriam-
  webster.com/dictionary/virtually (last accessed Jan. 6, 2021)..............................11

DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY OF MICHAEL PECHT, PH.D.
Case No. 3:16-cv-04067-WHO

1

**NOTICE OF MOTION AND MOTION**

2

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD**

3

     **PLEASE TAKE NOTICE THAT** on April 7, 2021 at 2:00 p.m., or as soon thereafter as

4

the matter may be heard in the above-entitled Court, Defendants Apple Inc., AppleCare Service

5

Company, Inc., and Apple CSC Inc. (collectively, "Apple"), will bring for hearing in the United

6

States District Court, Northern District of California, San Francisco Division, located at 450

7

Golden Gate Avenue, San Francisco, California 94102, before the Honorable William H. Orrick,

8

their Motion to Exclude the Expert Testimony of Michael Pecht, Ph.D. This motion is based on

9

this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities in

10

support of the Motion, the Omnibus Declaration of Meredith Dearborn in Support of Apple's

11

*Daubert* and Dispositive Motions with accompanying exhibits, the papers and records on file in

12

this action, and such other written and oral argument as may be presented to the Court.

13

**RELIEF SOUGHT**

14

     Apple seeks an order excluding the expert testimony of Dr. Michael Pecht at trial.

15

**MEMORANDUM OF POINTS AND AUTHORITIES**

16

**STATEMENT OF ISSUES TO BE DECIDED**

17

     1.     Whether the Court should exclude Dr. Pecht's opinion that replacement devices

18

containing both new and recovered components are not "equivalent to new" on the grounds that

19

his opinions are predicated on a legally erroneous definition of the phrase "equivalent to new."

20

     2.     Whether the Court should exclude Dr. Pecht's opinions because for an

21

undetermined number of class members, those opinions only establish, at most, nominal

22

damages, which do not align with the theory of damages that Plaintiffs are pursuing in this case.

23

     3.     Whether the Court should exclude Dr. Pecht's opinions on the ground that they

24

rely solely on theoretical reasoning as to how abstract principles <u>might</u> apply to the devices at

25

issue in this case, and are unsubstantiated by any testing or other methods of validation to

26

determine whether that theoretical reasoning is correct.

27

**I.    INTRODUCTION**

28

     At the class-certification stage, Plaintiffs' expert Dr. Pecht opined "that any device with a

non-new component cannot be equivalent to new." Order on Class Cert. at 10, ECF No. 160. His brief, eleven-page report was purely theoretical: Dr. Pecht conducted no tests or analysis of the Apple devices at issue in this case. In moving for class certification, Plaintiffs promised the Court that "comparative testing would show" the impact of alleged "load" on reliability. Reply ISO Class Certification, ECF No. 122, at 10. The Court certified the class Plaintiffs requested, noting that Plaintiffs' case "rests on their ability to prove that remanufactured devices are not 'equivalent to new.' . . . If plaintiffs can prove this theory, consumers who received such devices did not receive the benefit of their bargain." Order on Class Cert. at 9–10, ECF No. 160.

Plaintiffs have not kept their promise. Despite having had the opportunity to do so, for the merits phase, Dr. Pecht made no effort to prove his theory. He simply re-submitted his previous report without any further validation or testing. Dr. Pecht has now testified that he believes that even minute, benign or inconsequential loads render a device "never" equivalent to new in reliability (which he defines as performance over time), even if the user never perceives those differences. He still has no scientific analysis showing how the maxims he identifies applies to the facts of this case. Now that merits expert discovery is closed, it is apparent that Dr. Pecht's opinions should be excluded.

First, under *Daubert*, courts must exclude expert testimony when it relies on an incorrect legal standard. Here, Dr. Pecht applies his own definition of "equivalent," which cannot support a claim for a material breach of contract or support Plaintiffs' claim for hundreds of millions of dollars in damages. Under the Court's prior orders, "equivalent to new in performance and reliability" does not mean brand-new. And under ordinary English usage and rules of contract interpretation, as well as the decisions of other courts, "equivalent" does not mean "exactly the same"—there can be some small differences between a thing and its equivalent. But Dr. Pecht's opinions collapse this difference. If any "load"—even tiny, immaterial or benign changes—render Apple iPhones and iPads containing non-new parts no longer "equivalent to new in performance and reliability," as Dr. Pecht believes, then only devices with all-new parts would suffice—and even such a device would no longer be equivalent to new in performance and reliability, if, for example, the device sat untouched on a shelf for even a day or week. In other words, in his mind,

there is, as a practical matter, no such thing as a device that is "equivalent to new in performance and reliability" that is not, in fact, new. This interpretation either reads the "or" out of the phrase "new or equivalent to new" in the AppleCare contract, or relies on a definition of "equivalent" that contradicts well-settled statutory rules of contract interpretation. It is for the Court to interpret the contract language. Here, the plain language of the AppleCare contract confirms that Dr. Pecht's opinions rely on an erroneous definition of "equivalent to new in performance and reliability," and one that is inconsistent with the Court's ruling that "equivalent to new" is not the same as "new."

Even were Dr. Pecht's opinions taken to establish a breach of contract (and they do not), any breach would be, at most, an immaterial breach. Such a claim supports only nominal damages, which Plaintiffs' nine-figure damages claims obviously are not. Dr. Pecht also does not know how many class members experienced only minute and immaterial changes; there is no method by which Dr. Pecht can determine which class members suffered immaterial versus material changes in their devices to support a damages award. Because Dr. Pecht has no basis to testify that any breach was material, much less that all class members suffered a material breach, his opinions do not fit the facts of the case, are irrelevant and prejudicial, and should be excluded.

Finally, Dr. Pecht's opinions should be excluded because he never once applied the scientific method to assess whether and to what extent load conditions actually affect the performance or reliability of the devices at issue in this case. He conducted no inspections. He performed no tests. He failed to analyze even a single device of the millions implicated by Plaintiffs' claims. Courts, like scientists, routinely require that experts conduct testing to validate their theories and demonstrate that their conclusions are reliable. So does the scientific field in which Dr. Pecht practices—reliability engineering—as Plaintiffs' expert Dr. Dasgupta has explained.[1] Purely theoretical opinions lack the scientific rigor required by Federal Rule of Evidence 702. In fact, the only tests done in this case—conducted by Apple's retained expert— demonstrated that Pecht's opinion does not hold for all of the devices in the class. For this reason

---

[1] Dr. Dasgupta submitted a report in response to Apple's expert report of Dr. Paul Briant. He has identified himself as an expert in reliability physics, and rendered opinions on load in both his report and his deposition.

1    alone, Dr. Pecht's testimony should be excluded.

2    **II.     FACTUAL BACKGROUND**

3           Plaintiffs claim that the replacement devices they received under the AppleCare Protection
4    Program and AppleCare+ service programs (collectively, "AppleCare") were not "equivalent to
5    new in performance and reliability," as required by the contracts, because the devices contained
6    recovered parts.  ECF No. 1, ¶¶ 9–21.  To avoid individualized questions about causation and
7    damages, Plaintiffs represented that they could prove liability on a class-wide basis by presenting
8    "common proof that *all* remanufactured devices are not equivalent to new in performance and
9    reliability."  Reply ISO Class Certification, ECF No. 122, at 15 (emphasis in original); *see also id.*
10   at 5, 10 ("*all* remanufactured devices are not equivalent to new" (emphasis added)); Order on Class
11   Cert. at 14, ECF No. 160.  Plaintiffs' central theory is that replacement devices containing
12   recovered parts "are necessarily less reliable than new devices by virtue of having non-new parts,"
13   and so as a categorical matter cannot be equivalent to devices containing all new parts as far as
14   performance and reliability are concerned.  Order on Class Cert. at 17, ECF No. 160.

15          **A.     Dr. Pecht's "Load" Opinion.**

16          To support their categorical contentions, Plaintiffs again rely on the opinions of Dr.
17   Michael Pecht, whom they proffer as an expert in the fields of engineering and electronics
18   reliability.  Dr. Pecht submitted an expert report at the class-certification stage that Plaintiffs chose
19   not to update at the merits stage.  ECF No. 102-21 ("Pecht Rep.").  In his report, which comprises
20   less than eleven substantive pages, Dr. Pecht discusses the concept of "load conditions," which, as
21   he describes it, is the generic principle that an electronic component degrades over the course of
22   its life-cycle in response to different stresses (or "loads").  *Id.* at 10–11.  He opines that devices
23   with recovered parts "can never be" equivalent to new devices in reliability.  *Id.* at 13 (Conclusion
24   1); Order on Class Cert. at 14, ECF No. 160.

25          Dr. Pecht defines reliability for purposes of his opinions as the "time to failure": reduced
26   reliability means a shorter time to failure.  Omnibus Declaration of Meredith Dearborn in Support
27   of Apple's *Daubert* and Dispositive Motions ("Dearborn Declaration"), Ex. 3 at 53:2–10 ("Pecht

28

Dep."); *see also id.* at 69:8–70:17.[2]   Dr. Pecht reasons that load conditions cause recovered components to degrade, meaning that they "will not have the same life span as a new component / device," and thus their "life span will have shortened / degraded."  Pecht Rep. at 11.  He then states that this means that devices containing recovered components "can never be equivalent to new in reliability" relative to devices containing all-new components.  *Id.* at 13.

### B.   No Further Testing or Modeling.

Dr. Pecht specifically notes that he has no idea how this principle affects the devices in the class: "Without knowing the specific tests and standards applied, I can only opine generically that load conditions could diminish performance."  Pecht Rep. at 11–12 (emphasis added).

As Plaintiffs' experts admit, it is possible to test the performance and reliability of electronic components and devices.   Ex. 3, Pecht Dep. 54:1–54:18; Ex. 5 at 86:21–87:11 ("Dasgupta Dep.").  Dr. Pecht knows how to do those tests; he purports to be an expert in the field of "electronics testing," and has written books about testing.  Pecht Rep. at 3–4; ECF No. 103-21, at 16–17.  In his own field, reliability engineers undertake experiments and modeling "to determine whether any specific amounts of load cause any specific effects."  Ex. 3, Pecht Dep. 126:2–13.

But Dr. Pecht chose not to test the application of his load theory to the devices at issue in this case.  Ex. 3, Pecht Dep. 30:11–31:1.  His reports contain no testing or modeling.  Pecht Rep. Dr. Abhijit Dasgupta, another of Plaintiffs' experts with background in the field of reliability engineering or physics and laboratory equipment to conduct tests, also did no testing because he did not consider it part of his assignment from Plaintiffs' counsel.  Ex. 5, Dasgupta Dep. 41:5– 42:9.

Dr. Pecht confirmed in deposition that there is no testing in this case to support his opinions; instead, he is relying entirely on theoretical reasoning based on generic principles.  Specifically, he testified that he did not test or engage with any of the devices actually involved in this case in order to validate his opinions, or to confirm his theory that the load conditions principle

---

[2] All subsequent "Ex." citations in this Motion refer to the exhibits to the Omnibus Declaration of Meredith Dearborn in Support of Apple's *Daubert* and Dispositive Motions ("Dearborn Declaration").

applies the way he opines it does.  Ex. 3, Pecht Dep. 54:1–54:18; 65:6–65:16.  It is impossible to assess the effect that prior load has had, if any, on any device's reliability without undertaking hands-on testing.  *Id.* at 68:6–69:13.

Plaintiffs' expert, Dr. Dasgupta, further explained that the field of reliability physics tries "to quantify for different classes of materials how much load causes how much damage" through "experiments and modeling."  Ex. 5, Dasgupta Dep. 85:1–87:1.  Load theory, as Dr. Dasgupta explains, is based on whether load "in a repetitive, sustained manner over the life-cycle of the product" causes a product to degrade; the purpose of this field of science is to determine how "many such repetitions can it withstand before it starts to develop problems."  *Id.* (emphasis added).  In other words, science in this field begins with a "hypothesis based on load theory," *id.* at 215:24–216:2, but the next step is to test the hypothesis through modeling, laboratory testing, and statistical testing, *id.* at 216:3–15.  "In the absence of experiments or modeling, load theory does not answer the question as to whether any specific amount of load has any specific effect"; instead, "[y]ou have to apply it to the example at hand to know the answer."  *Id.* at 87:2–11.

In order to conduct the necessary experiments and modeling, information about the pre-existing load on the recovered parts from prior use is necessary.  Ex. 3, Pecht Dep. 54:1–5 ("That's correct.").  "[T]o make a reasonable estimate of the amount of damage" from load, you would need to know the "certain amount of load" on the parts at issue—information which is missing in this case.  Ex. 5, Dasgupta Dep. 89:10–90:6, 152:7–18.

Based on his review of the evidence, including Dr. Pecht's reports, Dr. Dasgupta admitted that he could not give an opinion on how many of the millions of devices in the class experienced visible degradation or a harmful effect.  *Id.* at 60:7–16, 60:24–61:12.  He testified that this sort of analysis would be "hard to do, because you've got a wide variety of users and usage -- usage conditions, life cycle usage conditions."  *Id.* at 56:11–58:2.  Dr. Pecht testified that in order to understand the amount of loading conditions on components, there's "so many different phones and so many different components, you would have to look at all of that.  Because there's so many different ways that people use products, you would have to capture all of that. . . . do the people live in Florida?  Are they living in, you know, Washington, D.C.?  What are the – the outside

6

environmental conditions?  You know, all – all of these things.  Contamination in the air.  How does the temperature changes, you know?  You know, do they go in and out of the building where it's – maybe it's – it's cold inside or hot outside or right now vice versa.  All of those things would be – have to be input into the test."  Ex. 3, Pecht Dep. 61:3–64:15.  Dr. Pecht also could not say whether the class members in this case actually experienced an observable or visible effect from load conditions.  Ex. 3, Pecht Dep. 37:6–38:7 ("it would depend on, you know, individual cases").  Based on the information that Dr. Dasgupta reviewed, he was not able to say that, for example, 75% of the class had suffered an effect, much less a visible effect, on their devices with recovered parts.  Ex. 5, Dasgupta Dep. 101:20–102:6 ("I wouldn't be able to answer that").

Defendants' expert Dr. Paul Briant <u>did</u> conduct testing as to whether and how load conditions actually affect, or could affect, the devices at issue in this case.  Dr. Briant found that of those in the sample he tested, the devices containing recovered parts were no less reliable and performed no worse than devices containing all new parts when subjected to identical, extreme load conditions.  Ex. 19, ¶¶ 32–33 ("Briant Rep.").  In fact, test results demonstrated scores that were generally as good, or better, for devices containing a combination of new and recovered components compared to devices with new components only.  *Id.*  Plaintiffs contest the validity of his results, but Dr. Briant's experiment remains the only testing that has been undertaken by any retained expert in this case on the specific devices implicated by Plaintiffs' claims.

## C.    Equivalence Is Measured by Even Minute, Tiny Changes.

Dr. Pecht's analysis does not address how much reduced time to failure any device experienced in this case: he conceded that the reduced time "might be one minute; it might be one year."  Ex. 3, Pecht Dep. 53:11–14.  It could even be as little as 30 seconds.  *Id.* at 54:6–11.  "You don't know until you run the [testing] software."  *Id.* at 53:11–14.  In the absence of that testing, "you just know that it's reduced."  *Id.* at 57:10–12.  You don't know whether it's 30 seconds or one year, "you just know that it's reduced."  *Id.* at 57:10–13.  As a result, Dr. Pecht has no opinion on "the amount of useful life that has been lost."  *Id.* at 38:8–14.

Moreover, Dr. Pecht's opinion is that even minute, imperceptible "loads" render a device "never" equivalent to new.  Pecht Rep. at 13 (Conclusion 1).  Loads can cause "damage" to a

device that is "benign." Ex. 3, Pecht Dep. 185:1–10.  In his view, "some damage" means some damage "no matter how minute."  *Id.* at 185:9–12 (emphasis added); *see also id.* at 106:6–15; *id.* at 106:16–19 ("it doesn't matter how small that effect is").  Even a one-degree temperature change in a room where a device is located creates load.  *Id.* 221:20–222:5.  In fact, even brand new devices have been subject to load.  *Id.* 221:8–19, 222:6–223:15 (agreeing that a product starts to degrade as soon as it is made, and that assembling, testing, shipping, and storing a device all cause load, even on brand-new devices before they are put on the shelves at an Apple store).  Dr. Pecht's opinions were offered only on the issue of whether devices with recovered parts were equivalent to new in reliability—they do not address whether class members experienced any harm or damages.  *Id.* 35:6–21, 38:15–39:7 ("I didn't do any harm analysis.").

## III.    LEGAL STANDARD

Under Federal Rule of Evidence 702, expert testimony is admissible only if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue"; the witness is qualified "by knowledge, skill, experience, training, or education"; and "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."  *Avila* v. *Willits Envtl. Remediation Tr.*, 633 F.3d 828, 836 (9th Cir. 2011); *Daubert* v. *Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).  Courts exercise a "gatekeeping" role to keep unreliable and potentially prejudicial opinions from the jury. *Daubert*, 509 U.S. at 597.

An expert's opinion must have "a valid connection to the pertinent inquiry" to be relevant evidence under the Federal Rules.  *City of Pomona* v. *SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014).  This is described as a requirement of "fit."  *Daubert*, 509 U.S. at 591.  Expert opinions that are "contrary to the law" or that rest on incorrect interpretations of the law fail to assist the jury and are appropriately excluded under *Daubert*.  *United Food & Commercial Workers Local 1776 & Participating Employers Health & Welfare Fund* v. *Teikoku Pharma USA*, 296 F. Supp. 3d 1142, 1183 (N.D. Cal. 2017); *Noskowiak* v. *Bobst SA*, 2005 WL 2146073, at \*5 (E.D. Wis. Sept. 2, 2005) (expert "testimony should not be a source of confusion by invoking a

8

1    legal standard, which entails a different set of issues than those operative in the present

2    controversy").

3         Under this same principle, courts may exclude testimony by liability experts whose

4    opinions do not align with the plaintiffs' theory of damages, on the grounds that such opinions are

5    irrelevant under Rules 401 and 402 of the Federal Rules of Evidence.  *See, e.g.*, *In re Packaged*

6    *Seafood Prods. Antitrust Litig.*, 2020 WL 4530744, at *2 (S.D. Cal. Aug. 6, 2020) ("To the extent

7    an expert offers opinions on damages not at issue in the complaint, those opinions fail this

8    requirement for the simple reason that the opinion will not help the 'jury in resolving a factual

9    dispute.'"); *see Comcast Corp.* v. *Behrend*, 569 U.S. 27, 35 (2013) (damages model in class action

10   must fit plaintiffs' theory of liability).

11        In assessing the separate question of scientific reliability under Rule 702 and *Daubert*,

12   courts consider, among other things, "whether the method 'can be (and has been) tested,'" and

13   "whether there is a 'known or potential rate of error.'"  *Lust* v. *Merrell Dow Pharms., Inc.*, 89 F.3d

14   594, 596 (9th Cir. 1996) (quoting *Daubert*, 509 U.S. at 594).  Plaintiffs, as the proponents of the

15   expert testimony, must show "by a preponderance of proof" that Dr. Pecht's opinions are

16   admissible.  *Daubert*, 509 U.S. at 592 n.10 (citing *Bourjaily* v. *United States*, 483 U.S. 171, 175–

17   76 (1987)).

18   **IV.    ARGUMENT**

19        **A.    Dr. Pecht's Opinion Does Not "Fit" the Facts of This Case.**

20        In order to be admissible, an expert's opinions must be relevant—that is, they must "fit the

21   facts of the case."  *Daubert*, 509 U.S. at 591; *City of Pomona*, 750 F.3d at 1044.  Expert opinions

22   that are premised on incorrect formulations of the relevant legal standard are not relevant or

23   helpful, and accordingly are subject to exclusion under *Daubert*.  *See, e.g.*, *Teikoku Pharma*, 296

24   F. Supp. 3d at 1183; *Noskowiak*, 2005 WL 2146073, at *5 (court can exclude testimony "based on

25   an incorrect legal standard" because it is irrelevant and may confuse the jury); *Tajonera* v. *Black*

26   *Elk Energy Offshore Operations, LLC*, 2016 WL 9414205, at *9 (E.D. La. May 23, 2016)

27   (defendants may raise "a challenge to the legal standard an expert assumes applies in order to

28   allege that the expert's assumption regarding the controlling law is incorrect and therefore the

9

expert's testimony is not relevant"); *Corwin* v. *Walt Disney Co.*, 475 F.3d 1239, 1251 (11th Cir. 2007) (upholding district court's exclusion of four experts who focused on non-copyright-protectable "concepts and ideas," as opposed to "expression" as copyright law requires).

In a contract-based case like this one, an opinion that relies on an erroneous interpretation of a contract term is irrelevant and should be excluded for lack of relevance and fit. *Great Am. All. Ins. Co.* v. *Sir Columbia Knoll Assocs. Ltd. P'ship*, 2020 WL 5351035, at *4–5 (D. Or. Sept. 4, 2020). Similarly, courts have excluded expert opinions under *Daubert* as irrelevant or not helpful where the expert's testimony was inconsistent with the plaintiffs' theory of damages, or where the expert relied on a legally incorrect damages standard. *See In re Packaged Seafood Prods. Antitrust Litig.*, 2020 WL 4530744, at *2 ("To the extent an expert offers opinions on damages not at issue in the complaint, those opinions fail this requirement for the simple reason that the opinion will not help the 'jury in resolving a factual dispute.'"); *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.* (*Clean Diesel II*), 2020 WL 6688912, at *9 (N.D. Cal. Nov. 12, 2020) (excluding expert's opinion as irrelevant where expert failed to tailor analyses to pertinent damages theories); *U.S. Gypsum Co.* v. *Lafarge N. Am. Inc.*, 670 F. Supp. 2d 737, 745 (N.D. Ill. 2009) (excluding damages opinion premised on a theory of harm not actionable under applicable statute); *cf. Comcast Corp.*, 569 U.S. at 35 (damages model in class action must fit plaintiffs' theory of liability).

### 1. Dr. Pecht's "Load" Opinion Is Only Relevant Under an Erroneous Interpretation of the AppleCare Contract Language.

Courts routinely exclude expert opinion testimony that does not match a proper interpretation of the contract. *See, e.g., Great Am. Alliance Ins. Co.*, 2020 WL 5351035, at *4–5 & n.5 (excluding expert's opinion to the extent expert relied on a definition of language in an insurance contract that differed from the court's interpretation); *In re Wellbutrin XL Antitrust Litig.*, 308 F.R.D. 134, 146–47 (E.D. Pa. 2015) (excluding expert opinions premised on interpretation that was "not consistent with the plain meaning of" relevant language in class definition); *Huawei Tech. Co, Ltd* v. *Samsung Elecs. Co, Ltd.*, 340 F. Supp. 3d 934, 949 (N.D. Cal. 2018) (striking expert opinion that ventured "beyond the plain and ordinary meaning of" claim

construction term that would be defined as a matter of law); *Poly-America, Inc.* v. *Serrot Int'l, Inc.*, 2002 WL 1996561 (N.D. Tex. Aug. 26, 2002) (in case involving interpretation of provision that was "properly construed according to its ordinary meaning," excluding expert testimony "concerning meanings . . . that vary from the one pronounced by the court" for lack of relevance).

Here, the AppleCare contract provides for replacement devices that are "new <u>or equivalent to new</u> in performance and reliability."  The meaning of the language, including the key phrase "equivalent to new in performance and reliability," is an issue of law for the court, not a question of fact for the jury.  *Legendary Investors Grp. No. 1, LLC* v. *Niemann*, 224 Cal. App. 4th 1407, 1413 (2014) ("contract interpretation is a legal question for the court").  Under California law, courts look to the "'clear and explicit' meaning of [contract] provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage.'"  *Cardinal* v. *Lupo*, 2020 WL 3101025, at *5 (N.D. Cal. June 11, 2020) (quoting *Santisas* v. *Goodin*, 17 Cal. 4th 599, 608–09 (1998)) (internal citations omitted).  Here, the AppleCare contract does not define "equivalent to new in performance and reliability," and the ordinary meaning of the language controls.  *Id.*

As this Court has recognized, "equivalent to new" does not mean "new."  Order on Class Cert. at 9, ECF No. 160 ("I agree with Apple that given the language of the contract, equivalent-to-new devices cannot be the same as new devices").  Apple promised its customers that it would replace their devices, if needed, with ones that are "new <u>or</u> equivalent to new in performance and reliability," demonstrating that the two sorts of devices are different.  Moreover, the word "equivalent" itself does not mean "the same"— there may be some differences between two things that are equivalent.  It can mean "<u>tantamount</u>" to or "<u>virtually the same thing</u>" as, rather than identical.  *Equivalent*, Oxford English Dictionary (2017), https://perma.cc/H4Z9-NCGD (emphases added).[3]  Similarly, Black's Law Dictionary provides that "equivalent" means, among

---

[3] Other dictionary definitions of "equivalent," as relevant to descriptions of products or characteristics of products, include, for example, "corresponding or <u>virtually</u> identical especially in effect or function," *Equivalent*, Merriam-Webster, https://www.merriam-webster.com/dictionary/equivalent (last accessed Jan. 6, 2021) (emphasis added), with "virtually" commonly understood to mean "<u>nearly</u>," *Virtually*, Merriam-Webster,

other, similar definitions, "<u>nearly</u> equal" or "[<u>c</u>]orresponding in effect or function." *Equivalent*, Black's Law Dictionary (11th ed. 2019) (emphases added).   Each of these definitions contemplates that two items can be "equivalents" even if there are perceptible differences between them and certainly if there are only imperceptible differences.

Court decisions are in accord, repeatedly holding that the word "<u>equivalent</u>" does not mean "<u>identical</u>." *See, e.g.*, *McLeodUSA Telecomm. Servs., Inc.* v. *Iowa Utils. Bd.*, 550 F. Supp. 2d 1006, 1028 (S.D. Iowa 2008) ("Equivalent does not mean identical," so disparate terms of agreements could be "equivalent" within the ordinary meaning of the word); *see also, e.g.*, *Tahoe-Sierra Preservation Council* v. *State Water Resources Control Bd.*, 210 Cal. App. 3d 1421, 1436 (1989) (interpreting "equivalent" in context of a state statute and concluding that it "does not mean identical"); *Corning Glass Works* v. *S. New England Tele. Co.*, 674 F. Supp. 999, 1011 (W.D.N.Y. 1987) (concluding, in construing replacement contracts, that "value equivalent does not mean an identical relationship").

Dr. Pecht's opinions are predicated on an incorrect definition of the word "equivalent." During his deposition, he testified that according to his definitions, a device is no longer "equivalent to new in performance and reliability" if it is subject to <u>any</u> loads of <u>any</u> magnitude. Ex. 3, Pecht Dep. 221:8–222:5; *see also id.* at 106:6–106:19 (device is not equivalent to new even if it is subject to loads so tiny that consumers would never see the effects).   He confirmed that a load that reduced a device's life span by even 30 seconds out of a product life-cycle of multiple years would defeat equivalence as he has defined it.  *Id.* at 91:7–92:10.  He further testified that in his view, some loads are "benign," but the devices subject to those loads still are not "equivalent to new." *Id.* at 184:9–185:12.  More broadly, he clarified that he considers devices to be degraded, and therefore not equivalent to new devices, even if the supposed degradation never yields any visible effects.  *Id.* at 36:12–38:7.

The sorts of tiny, imperceptible loads that Dr. Pecht describes are untethered to the idea of

https://www.merriam-webster.com/dictionary/virtually (last accessed Jan. 6, 2021) (emphasis added).

equivalence.  They instead demand a device that is <u>identical</u> to new.  A device that has experienced one extra degree of temperature change would not be equivalent to new.  Ex. 3, Pecht Dep. 221:20–222:5.  Even walking out of a store with a device means load will be experienced by the time you hit the sidewalk, according to Dr. Pecht.  *Id.* at 161:18–162:8 ("Yeah, and . . . if there was even a small temperature change . . . there's a reduced reliability" and "degradation already.").  A device that had been turned on and off is not equivalent to new.  *Id.* 49:14–19.  Taking his opinion to its logical conclusion leads to absurd results:  A brand-new device has experienced load before it even has been put on a shelf, through its manufacture, assembly, testing, shipping, and storage.  Ex. 3, Pecht Dep. 221:8–223:14.  Thus, even two different <u>new</u> devices manufactured a week apart cannot be "equivalent" to each other, because one has been on a shelf for a week longer, experiencing load.  And a consumer's device is no longer "equivalent to new" just one minute after she bought it.  Dr. Pecht's opinions accordingly contradict the plain language of the AppleCare contract and any commonsense reading of its terms.

Dr. Pecht's definition of the key contract language runs counter to the ordinary meaning of the language, and the definition of "equivalent" that other courts have accepted.  That ordinary meaning supplies the correct definition of the contract terms.  Because Dr. Pecht's opinions are only relevant if the jury applies the wrong definition of "equivalent," his opinions are irrelevant and should be excluded.  *Great Am. Alliance Ins. Co.*, 2020 WL 5351035, at *4–5; *Wellbutrin*, 308 F.R.D. at 146–47; *see also City of Pomona*, 750 F.3d at 1044.

**2.    Dr. Pecht's "Load" Opinion Describes, at Most, an Immaterial Breach of Contract, Which Does Not Match Plaintiffs' Damages Theory.**

Dr. Pecht readily admits that, under his definition of "load," some class members will never experience any difference in performance and reliability in replacement devices containing one or more non-new parts.  Ex. 3, Pecht Dep. 185:1–10 (some loads are "benign"); *see also id.* at 185:9–12 (some loads cause "minute" damage); *id.* at 106:16–19 ("it doesn't matter how small that effect is"); *id.* at 57:10–12 (conditions resulting in 30-second loss of life amount to load).  It is nonetheless his view that even those imperceptible loads mean that a device containing non-new parts can <u>never</u> be "equivalent to new."  Pecht Rep. at 13 (Conclusion 1).

13

There is a name for this alleged theory: immaterial breach of contract. An immaterial breach of contract, to the extent it can support a damages claim at all, can only support a claim for nominal damages. Cal. Civ. Code § 3360 ("When a breach of duty has caused no appreciable detriment to the party affected, he may yet recover nominal damages."); *Allumination Filmworks, LLC* v. *Doyle*, 2011 WL 13220485, at *4 n.28 (C.D. Cal. July 18, 2011) (party is "entitled to substantial damages only when there is a material breach"). And Plaintiffs must also prove that their damages were "proximately caused by the specific breach" in order to recover on their breach of contract claims. *St. Paul Fire & Marine Ins. Co.* v. *Am. Dynasty Surplus Lines Ins. Co.*, 101 Cal. App. 4th 1038, 1061 (2002) (internal quotation marks omitted).

Here, Plaintiffs cannot possibly argue that their damages claims—in the hundreds of millions of dollars—are nominal. Both of Plaintiffs' damages experts presume that every class member experienced a substantial amount of harm. Dr. Kaufman calculates that harm at more than $750 million, with every class member experiencing harm of over $195 on average; Dr. Weir presents an alternative model calculating harm at more than $385 million, with every class member experiencing average harm of over $95. Ex. 10, Kaufman Third Rep. at 6; Ex. 13, Weir Supp. Dec. ¶ 2, Tbl. 2. In fact, Dr. Kaufman testified that his opinions were premised on devices actually failing at higher rates than new devices, meaning that the device actually "fails to meet the consumer's performance expectations," that consumers spent "substantial time and inconvenience" in "replacing a device," that consumers "had an issue that the customers were not satisfied with." Ex. 11, Kaufman Dep. 53:21–54:22. These "substantial" damages claims, predicated on the assumption that each and every class member experienced measurable harm, are only available if Plaintiffs show that Apple materially breached the contract. *Allumination Filmworks*, 2011 WL 13220485, at *4 n.28.

Plaintiffs' damages claims accordingly are premised on an opinion that Dr. Pecht does not give—that load actually changed device reliability in more than a minute way. Dr. Pecht's opinion, which sweeps in, at most, immaterial breaches of contract and cannot differentiate between immaterial and material breaches, does not match Plaintiffs' damages theory and is therefore irrelevant. *In re Packaged Seafood Prods.*, 2020 WL 4530744, at *2; *Comcast*, 569 U.S. at 35.

14

### B.    Dr. Pecht's Opinion Is Not Grounded in Any Scientific Methodology.

*Daubert*—and, really, the scientific method—require experts to test their conclusions.  As the Supreme Court observed in *Daubert* itself, scientific methodology consists of "generating hypotheses and testing them to see if they can be falsified."  *Daubert*, 509 U.S. at 593 (emphasis added).  Testing is critical to establishing that the expert's methodology is reliable.  "[I]n order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method.  Proposed testimony must be supported by appropriate validation – *i.e.*, 'good grounds,' based on what is known."  *Id.* at 590.  Courts do not admit expert opinions, even plausible or intuitive ones, that are based on "'unsubstantiated speculation'" or the expert's "'subjective beliefs.'"  *Diviero* v. *Uniroyal Goodrich Tire Co.*, 114 F.3d 851, 853 (9th Cir. 1997); *see also, e.g.*, *Tamraz* v. *Lincoln Elec. Co.*, 620 F.3d 665, 670 (6th Cir. 2010) ("Th[e expert's opinion] is a plausible hypothesis.  It may even be right.  But it is no more than a hypothesis, and it thus is not 'knowledge,' nor is it 'based upon sufficient facts or data' or the 'product of reliable principles and methods . . . applied . . . reliably to the facts of the case.'" (quoting Fed. R. Evid. 702)).  Particularly in cases in which an expert is proffered to support a technical proposition about cause-and-effect, courts have emphasized that expert opinions cannot rely on theory alone.  "Reasonable suspicions and plausible theories are not enough."  *Davis* v. *McKesson Corp.*, 2019 WL 3532179, at *7 (D. Ariz. Aug. 2, 2019); *see also id.* (noting that "'hunch is not admissible if it lacks scientific rigor'" (citation omitted)); *Pro Service Automotive, LLC* v. *Lenan Corp.*, 469 F.3d 1210, 1216 (8th Cir. 2006) (excluding expert opinion that "offered only vague theorizing based upon general principles"); *Brodsky* v. *KaVo Dental Technologies, LLC*, 2018 WL 620453, at *2 (D. Md. Jan. 30, 2018) (excluding expert opinion on causation on the ground that the expert had conducted no reliability testing in order to validate the proffered opinion, noting that "while [the expert]'s opinion has intuitive appeal and may in the end be correct, it is nonetheless inadmissible without underlying *validation*" (emphasis in original)).  As other courts have recognized, Dr. Pecht's theoretical opinions on time to failure are insufficient to establish a cause-and-effect relationship.  *Owen* v. *Gen. Motors Corp.*, 2007 WL 1655760 (W.D. Miss. 2007) (summary judgment inappropriate because aside from "Dr. Pecht's opinion that the single-sided circuit board used in

15

the Owens' Tahoe had an 'increasing likelihood that it will fail outside the warranty period,'" there was no evidence to show causation).

Here, Dr. Pecht has not attempted <u>any</u> testing to support his speculation about the effects of load conditions.  He has stated a principle in the abstract, specifically, that recovered parts cause replacement devices to be inferior in performance and reliability to devices containing all-new parts.  Pecht Rep. at 10–13.  He concedes that without more information, he "can only opine generically that load conditions <u>could</u> diminish performance," *id.* at 12 (emphasis added), and that device-specific testing would be needed to assess what, if any, effect prior load has had on a device's reliability.  Ex. 3, Pecht Dep. 68:6–69:13.  But he has not analyzed a single device in this case in order to back up that theoretical opinion, nor has he provided even a paper analysis purporting to explain his thinking as to *how* or *why* the generic principle applies the way he claims to the devices at issue here.  *Id.* at 54:1–54:18; *see also id.* at 65:6–65:16.  He did not even ask the foundational questions that he testified he would need in order to do any testing, such as how much load a prior component had.  And his opinion remained untested, despite Plaintiffs promising the Court at the class-certification stage that "comparative testing would show" the impact of alleged "load" on reliability.  Reply ISO Class Certification, ECF No. 122, at 10.

This is precisely the sort of untested speculation that is inadmissible under *Daubert*.  Courts have routinely excluded opinions under *Daubert* on the grounds that an expert's failure to test a hypothesis or otherwise validate a proffered opinion rendered the expert's testimony unreliable.  *See Nease* v. *Ford Motor Co.*, 848 F.3d 219, 232 (4th Cir. 2017) (holding that the court below had abused its discretion in admitting expert engineer's opinion on reliability issues in an automobile products liability case because the expert "conducted no testing whatsoever to arrive at his opinion," noting that he "used no 'methodology' for reaching his opinions" aside from visual observation of the relevant parts); *Smith* v. *Nexus RVs, LLC*, 472 F. Supp. 3d 470, 479 (N.D. Ind. 2020) (excluding expert opinion in part because expert "performed no testing, though he could, that would substantiate his opinion or assist the jury"); *Walker* v. *DDR Corp.*, 2019 WL 1349514, at *7 (D.S.C. Mar. 26, 2019) (collecting cases); *Perez* v. *State Farm Mut. Auto. Ins. Co.*, 2012 WL 3116355, at *5 (N.D. Cal. July 31, 2012) (excluding expert opinion where expert failed to articulate

16

a discernable scientific methodology, and noting that the expert cannot simply rely on expertise alone to support his conclusion).

It was possible for Dr. Pecht to test how the principle applies to the devices implicated by Plaintiffs' claims. Dr. Pecht conceded that there were practical steps that he could have undertaken in order to substantiate his opinions. For example, he testified in deposition that he could have run certain tests in order to assess the effect that prior loading conditions had actually had on the devices at issue in this case. Ex. 3, Pecht Dep. 54:1–54:18; *see also id.* at 65:6–65:16. He chose not to undertake that testing. Similarly, he did not conduct a harm analysis to determine whether *any* class members had actually experienced problems that could be attributed to prior load conditions. *Id.* at 38:8–39:14. And while Dr. Pecht is familiar with the Sherlock software that Dr. Hillman developed—which Dr. Pecht referred to as a means of "basic scientific study," *id.* at 48:2– 50:5—he did not take advantage of the software or use it to conduct a study on a single device implicated by this case, *see id.* at 58:17–59:14. The only support that Dr. Pecht cited for his opinion on devices' performance and reliability is literature discussing the effects of load on electronic components, which "cannot be used as a proxy for the testing that [he] failed to do." *Nease*, 848 F.3d at 233.

Dr. Pecht's failure to test is particularly significant in this case because both Plaintiffs' and Defendants' experts have opined that prior load conditions in and of themselves do not explain how much of an effect, if any, recovered parts have on a device's performance or reliability. As Dr. Pecht defines it, loads can be "minute" or "benign," resulting in a "loss of life" of just 30 seconds. Ex. 3, Pecht Dep. 65:6–65:16; *id.* at 184:9–185:12. And yet he is prepared to tell the jury that a device's lifespan will be "shortened / degraded" because of load. Pecht Rep. at 10–11.

To assess whether load conditions have had any observable impact on reliability or performance—that is, to determine whether Dr. Pecht's purported theory actually resulted in the loss of any appreciable life at all—Dr. Pecht was required to conduct tests in order to meet the standards of reliable scientific methodology in his own field. Ex. 5, Dasgupta Dep. 56:11–20, 75:10–17, 92:8–12 (load does not always result in degradation of parts in ways that are harmful or even observable by users); *see also id.* at 86:21–87:11 (confirming that modeling is needed in

17

order to determine whether a particular amount of load has any specific effect).  Dr. Pecht himself confirmed during his deposition that there is no way to know why any particular device failed (*e.g.*, whether due to load conditions or some other reason) unless a root cause analysis is performed.  Ex. 3, Pecht Dep. 68:6–69:13.  Without this sort of testing, there is no way to know whether prior load conditions have decreased a particular component's life span by a significant amount (*e.g.*, a year) or only a few seconds.  *Id.* at 65:6–65:16.

Dr. Pecht's unexplained failure to test renders his opinions inadmissible as a means of proving the effect that recovered parts have on replacement devices.  *Nease*, 848 F.3d at 232–33.  As one district court recently explained, in response to a similarly deficient expert opinion in a breach of warranty case:

> [The expert witness] is no different than a Rule 702 witness who might wish to opine on the effect of gravity; and, though we all appreciate that gravity exists as a scientific principle and have even seen it in our experience, he could not say that it causes an object to fall at the rate of 9.8 meters/second$^2$ (without regard to mass) or use that to calculate the impact force of a falling object on an individual who thereby suffers an injury. One might likewise appreciate that friction exists as a scientific principle; but, unlike Leonardo da Vinci or anyone since, he cannot put into words how that is measured in terms of its static or dynamic coefficient to explain its effect on rubber soles of work boots. In short, it's one thing to appreciate that a principle exists; it's quite another to do one's homework and apply the principle reliably to a case to enable an opinion in federal court and to guide a jury to answer the question in dispute. [The witness] doesn't do so here.

*Smith*, 472 F. Supp. 3d at 479–80.

## V.    CONCLUSION

For all of the foregoing reasons, this Court should exclude the expert testimony of Dr. Michael Pecht.

1

2    Dated: January 22, 2021                    **PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**

3

4    By: */s/ Karen L. Dunn*
     Karen L. Dunn (DC SBN 1002520)
5    kdunn@paulweiss.com
     2001 K Street, NW
6    Washington, DC 20006
     Telephone: (202) 223-7300
7    Facsimile:  (202) 223-7420

8    *Attorneys for Defendants Apple Inc.,*
     *AppleCare Service Company, Inc., and*
9    *Apple CSC Inc.*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY OF MICHAEL PECHT, PH.D.
Case No. 3:16-cv-04067-WHO