Karen L. Dunn (DC SBN 1002520; *pro hac vice*)
kdunn@paulweiss.com
William A. Isaacson (DC SBN 414788; *pro hac vice*)
wisaacson@paulweiss.com
Kyle N. Smith (DC SBN 1029803; *pro hac vice*)
ksmith@paulweiss.com
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
2001 K Street, NW
Washington, DC 20006
Telephone: (202) 223-7300
Facsimile:  (202) 223-7420

Meredith R. Dearborn (SBN 268312)
mdearborn@paulweiss.com
Gabriel R. Schlabach (SBN 304859)
gschlabach@paulweiss.com
**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
943 Steiner Street
San Francisco, CA 94117
Telephone: (202) 223-7300
Facsimile:  (202) 223-7420

*Attorneys for Defendants*
*APPLE INC., APPLECARE SERVICE COMPANY, INC., and*
*APPLE CSC INC.*

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| VICKY MALDONADO AND JUSTIN CARTER, individually and on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>APPLE INC., APPLECARE SERVICE COMPANY, INC., AND APPLE CSC INC.<br><br>Defendants. | Case No. 3:16-cv-04067-WHO<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO EXCLUDE EXPERT TESTIMONY OF ROBERT A. BARDWELL**<br><br>Date:  April 7, 2021<br>Time:  2:00 PM<br>Judge:  William H. Orrick<br>Courtroom:  2, 17th Floor |

# **TABLE OF CONTENTS**

**Page**

NOTICE OF MOTION AND MOTION ........................................................................................1

MEMORANDUM OF POINTS AND AUTHORITIES ..............................................................1

I.      INTRODUCTION ........................................................................................................1

II.     FACTUAL BACKGROUND ........................................................................................3

        A.      The Fields of "Reliability Engineering" and "Reliability Physics." ........................ 3

        B.      Plaintiffs' Statistical Expert, Dr. Bardwell. ............................................................ 4

        C.      Dr. Bardwell's Statistical Analysis of Return Rates. ............................................. 5

        D.      The "Survival" Rates Revealed by Dr. Bardwell's Statistics. ................................ 6

III.    LEGAL STANDARD ....................................................................................................9

IV.     ARGUMENT ..............................................................................................................10

        A.      Dr. Bardwell Should Be Precluded from Testifying About Devices Where
                His Own Calculations Show a Relative Risk of Return That Is Legally
                Insufficient to Establish Causation................................................................... 10

        B.      Dr. Bardwell's Testimony Should Be Limited to Device Return Rates
                Because Dr. Bardwell Is a Statistician Analyzing Return Data and Is Not
                Qualified to Opine On Whether Returns Are Failures. ........................................ 16

V.      CONCLUSION .............................................................................................................21

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Avila* v. *Willits Envtl. Remediation Tr.*,
633 F.3d 828 (9th Cir. 2011)..................................................................................9

*In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*,
524 F. Supp. 2d 1166 (N.D. Cal. 2007) ...............................................................13, 15

*Coleman* v. *Oracle USA, Inc.*,
2011 WL 2746187 (D. Minn. July 14, 2011)...........................................................19

*Daubert* v. *Merrell Dow Pharms., Inc.*,
43 F.3d 1311 (9th Cir. 1995).........................................................................9, 12, 13, 15

*Daubert* v. *Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993)........................................................................................9, 11

*Elbert* v. *Howmedica, Inc.*,
59 F.3d 174, 1995 WL 383409 (9th Cir. June 28, 1995) .........................................10

*Gen. Elec. Co.* v. *Joiner*,
522 U.S. 136 (1997)..........................................................................................10

*Hendricksen* v. *ConocoPhillips Co.*,
605 F. Supp. 2d 1142 (E.D. Wash. 2009) ..........................................................12, 15

*Jinro Am. Inc.* v. *Secure Investments, Inc.*,
266 F.3d 993 (9th Cir.), *opinion amended on denial of reh'g*, 272 F.3d 1289
(9th Cir. 2001)....................................................................................................18

*Kumho Tire Co., Ltd.* v. *Carmichael*,
526 U.S. 137 (1999)............................................................................................9

*Manley* v. *Nat'l ProSource, Inc.*,
2013 WL 3480385 (S.D. Tex. July 10, 2013), *aff'd sub nom. Manley v.
Invesco*, 555 F. App'x 344 (5th Cir. 2014) ...........................................................20

*In re Novatel Wireless Sec. Litig.*,
2011 WL 5827198 (S.D. Cal. Nov. 17, 2011) .......................................................19

*United States* v. *Pac. Gas & Elec. Co.*,
2016 WL 1640462 (N.D. Cal. Apr. 26, 2016) .......................................................19

*Pyramid Techs., Inc.* v. *Hartford Cas. Ins. Co.*,
752 F.3d 807 (9th Cir. 2014)..................................................................................9

*United States* v. *Rincon*,
28 F.3d 921 (9th Cir. 1994)....................................................................................9

*Rogers* v. *Raymark Indus., Inc.*,
922 F.2d 1426 (9th Cir. 1991)............................................................................9, 18

*In re Roundup Prods. Liab. Litig.*,
   358 F. Supp. 3d 956 (N.D. Cal. 2019) ..................................................................................13

*United States* v. *Santini*,
   656 F.3d 1075 (9th Cir. 2011)...................................................................................10, 20

*In re Silicone Gel Breast Implants Prod. Liab. Litig.*,
   318 F. Supp. 2d 879 (C.D. Cal. 2004).........................................................................10, 12, 15

*St. Paul Fire & Marine Ins. Co.* v. *Am. Dynasty Surplus Lines Ins. Co.*,
   101 Cal. App. 4th 1038 (2002)................................................................................................11

*Townsend* v. *Monster Beverage Corp.*,
   303 F. Supp. 3d 1010 (C.D. Cal. 2018).................................................................................10

**OTHER AUTHORITIES**

Fed. R. Evid. 403 ............................................................................................................................9

Fed. R. Evid. 702 .......................................................................................................................9, 11

Priya Ranganathan, Rakesh Aggarwal, & C.S. Pramesh, *Common Pitfalls in
   Statistical Analysis: Odds Versus Risk*, Perspect. Clin. Res. (2015), *available
   at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4640017 ....................................................14

### NOTICE OF MOTION AND MOTION

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD**

**PLEASE TAKE NOTICE THAT** on April 7, 2021 at 2:00 p.m., or as soon thereafter as the matter may be heard, in the United States District Court, Northern District of California, San Francisco Division, located at 450 Golden Gate Avenue, San Francisco, California 94102, before the Honorable William H. Orrick, Defendants Apple Inc., AppleCare Service Company, Inc., and Apple CSC Inc. will, and hereby do, move to exclude the expert testimony of Robert A. Bardwell. This motion is based on this Notice and Motion and Motion, the Omnibus Declaration of Meredith Dearborn in Support of Apple's *Daubert and* Dispositive Motions with accompanying exhibits, the papers and records on file in this action, and such other written and oral argument as may be presented to the court.

### RELIEF SOUGHT

Apple seeks an order excluding certain opinions of Dr. Robert A. Bardwell pursuant to Federal Rules of Evidence 403, 702, and *Daubert* v. *Merrell Dow Pharms., Inc*.

### MEMORANDUM OF POINTS AND AUTHORITIES

### STATEMENT OF ISSUES TO BE DECIDED

This motion raises the following issues:

**1.      Limitation of Dr. Bardwell's expert testimony regarding certain devices.** Whether the Court should exclude Dr. Bardwell's opinions regarding certain devices on the basis that Dr. Bardwell has not offered a statistical analysis sufficient to establish specific causation, the legal requirement for a breach of contract claim under California law.

**2.      Limitation of Dr. Bardwell's expert testimony to device "returns."** Whether the Court should preclude Dr. Bardwell from offering opinions on device "failures."

## I.      INTRODUCTION

Apple respectfully moves to exclude portions of opinions offered by Plaintiffs' statistics expert, Dr. Robert A. Bardwell.

First, Dr. Bardwell's statistical calculations do not show an elevated risk of return of a sufficient magnitude to allow Plaintiffs to meet their burden of proving causation for many devices

in the class. Dr. Bardwell purports to show that Apple's use of some recovered parts in certain service devices caused those devices to fail sooner, on average, than devices containing only new parts. As set out below in Apple's separate argument, Dr. Bardwell is not qualified to opine that returns equal failures, and the evidence does not support such an opinion. But even setting that mischaracterization aside, Dr. Bardwell's own assumptions and conclusions about what he characterizes as relative "failure" rates do not meet the legal requirement for causation, because for many of the device models on which Dr. Bardwell performed calculations, his relative risk analysis (which he presents as "odds ratios") does not show an elevated risk of return of a sufficient magnitude to allow Plaintiffs to meet their burden of proving causation.

Courts have repeatedly held that expert statistical calculations of the probability that an alleged harm will occur are only admissible if they indicate that the challenged conduct was more likely than not to have caused the harm. "Relative risk," which compares the probability of a harm in a control group and an "exposed" group, shows the likelihood that challenged conduct "caused" the alleged harm. Relative risk is an alternative mathematical expression of the "odds ratios" that Dr. Bardwell computed. Where the relative risk is less than two, it reflects a less-than-50% chance that the challenged conduct caused the claimed harm—and is therefore legally insufficient to establish causation. For numerous device models in this case, Dr. Bardwell's "failure probabilities" computations reflect relative risks of harm of less than two. For those devices, Dr. Bardwell's testimony cannot serve as evidence that the presence of recovered parts more likely than not caused device "failure," because his findings are legally insufficient to support that conclusion—and as a result, these opinions should be excluded as inconsistent with the applicable legal standard for statistical evidence.

<u>Second</u>, Dr. Bardwell should be precluded from offering opinions that fall outside the scope of his expertise as a statistician. Dr. Bardwell analyzed AppleCare return data, but he intends to testify that the returns that he analyzed are a reflection of device "failures." This approach was directly rejected by Plaintiffs' own expert, Dr. Abhijit Dasgupta—who, unlike Dr. Bardwell, has 30 years of experience in the field of reliability physics. Dr. Dasgupta testified: "Not every return may be a hard failure. Sometimes it is determinable whether it was or not, and sometimes it is

almost impossible to determine whether it was a failure or not." He also observed that "I don't think we have enough information to discuss the field failures as far as this study goes."

Dr. Bardwell has no expertise in the field of reliability physics or reliability engineering, and is entirely unqualified to opine on whether the returned devices actually failed or why they failed. Nor could the data he analyzed—data solely based on returns—possibly support such opinions, because returns are made for many reasons that do not include "failure," as Dr. Bardwell himself acknowledges. Accordingly, Dr. Bardwell's opinions should be limited to a presentation of the statistical calculations he made with respect to device returns, and Dr. Bardwell should be precluded from testifying that those calculations are a reflection of device failures. If Plaintiffs wish to establish that returns are indicative of "failure," they should do that through other witnesses and not under the guise of "expert" testimony from a statistician.

## II. FACTUAL BACKGROUND

### A. The Fields of "Reliability Engineering" and "Reliability Physics."

As Plaintiffs' own expert Dr. Dasgupta has explained, there is a specialized field devoted to the study of consumer electronic device degradation and failure: reliability engineering, including reliability physics. Reliability engineering (and its subset, reliability physics) brings together the fields of physics, chemistry, statistics, and mechanical engineering to determine the "underlying causality of reliable functions" in systems. Ex. 5, Deposition of Abhijit Dasgupta ("Dasgupta Dep.") at 7:15–8:17, 9:15–21, 11:1–7.[1] The field is also called the "physics of failure." Ex. 5, Dasgupta Dep. 10:1–20. As Dr. Dasgupta explained, reliability physics addresses "whether load or stress caused an effect on damage or loss of life." Ex. 5, Dasgupta Dep. 146:18–22. Another Plaintiff expert, Dr. Michael Pecht, explained: "Reliability physics and failure analysis involve looking at the effect of load and stress on damage and life." Ex. 3, Dec. 3, 2020 Deposition of Michael Pecht, Ph.D. ("Pecht Dep.") at 111:6–9. It is "a relatively broad field" that looks into "the science of what degrades and ages and eventually fails in engineering systems. So that

---

[1] "Ex." citations in this Motion refer to the exhibits to the Omnibus Declaration of Meredith Dearborn in Support of Apple's *Daubert* and Dispositive Motions ("Dearborn Declaration").

DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY OF ROBERT A. BARDWELL
Case No. 3:16-cv-04067-WHO

underlying causality of loss of reliability function is what we broadly call reliability physics." Ex. 5, Dasgupta Dep. 7:15–24. "[R]eliability engineering," which encompasses reliability physics, along with other fields of study, includes the "stochastic and statistical aspects" of that degradation and failure. *Id.* at 10:4–6; *see also id.* at 11:1–7 (reliability engineers have extensive statistics expertise). The field is defined by a specialized literature. *Id.* at 111:11–113:5.

In order to determine whether a characteristic has caused device failure, reliability engineers and reliability physicists conduct experiments and modeling to determine whether any specific amounts of load cause any specific effects. Ex. 5, Dasgupta Dep. 86:21–87:11; Ex. 3, Pecht Dep. 126:2–13. "[T]he specific relationship between the necessary reliability of the individual components as it relates to the reliability of the composite device cannot be determined without testing" and "[i]t would be difficult, if not impossible, to prove that recovered components are less reliable tha[n] new components without testing because of the complexity of the components and devices at issue." Ex. 22, Mar. 13, 2020 Expert Rebuttal Report of R. Russell Rhinehart at ¶¶ 24, 41.

## B.     Plaintiffs' Statistical Expert, Dr. Bardwell.

Plaintiffs offer the opinions of Dr. Bardwell to support their claim that all devices containing any recovered parts provided under AppleCare are not "equivalent to new in performance and reliability." Dr. Bardwell is a statistician with experience analyzing data for employment litigations. Ex. 8, Dec. 9, 2020 Deposition of Robert A. Bardwell ("Bardwell Dep.") at 13:11–19; Ex. 7, September 14, 2020 Supplemental Expert Report of Robert A. Bardwell ("Sept. 2020 Supp. Rep.") at 26 (Curriculum Vitae); Ex. 6, Feb. 11, 2020 Supplemental Expert Report of Robert A. Bardwell ("Feb. 2020 Supp. Rep.") at 53 (same). He has no expertise in the field of reliability engineering or reliability physics. Prior to this case, he was not familiar with the field of "reliability physics" "in any detail." Ex. 8, Bardwell Dep. 24:14–18. He was "not even sure what the term means." *Id.* at 24:16–18. He also could not define the term "reliability engineering," and he admitted that he has only "<u>peripheral knowledge</u> of these areas." *Id.* at 24:22–25:7 (emphasis added).

DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY OF ROBERT A. BARDWELL
Case No. 3:16-cv-04067-WHO

**C.    Dr. Bardwell's Statistical Analysis of Return Rates.**

Dr. Bardwell used his background in statistics to analyze AppleCare <u>return</u> data and perform statistical calculations on that data.  Specifically, Dr. Bardwell analyzed Apple transactional data for devices returned to Apple pursuant to AppleCare contracts during those contracts' two-year terms.  Ex. 6, Feb. 2020 Supp. Rep. at 6–7, 11 n.18.  The data indicated (among other things) whether the devices were made with only new parts or included some recovered parts.  *Id.* at 7.  The data also indicated the customer-reported reasons for returns in the form of CompTIA codes.  *Id.* at 7 n.12; Ex. 7, Sept. 2020 Supp. Rep. at 13.

From his statistical calculations—which he calls a "survival analysis"—Dr. Bardwell seeks to draw conclusions that devices with recovered parts are more likely to <u>fail</u> than devices with all new parts. Ex. 6, Feb. 2020 Supp. Rep. at 7.  Dr. Bardwell assumes that all Apple devices appearing in the AppleCare data have been returned due to device failure, unless they meet specific criteria to qualify as being counted as replaced for "accidental damage."  Ex. 7, Sept. 2020 Supp. Rep. at 6, 9 (identifying attributes required for a device to be considered damaged under his analysis).[2]  All devices not flagged for accidental damage are treated as "failures," and the data for these devices serves as the basis of his analysis.  Ex. 8, Bardwell Dep. 96:18–19 ("any return that isn't classified as damaged in my analysis is treated as a failure").

Dr. Bardwell classified these returns as "failures," Ex. 6, Feb. 2020 Supp. Rep. at 7 & n.12, even though he acknowledges that customers may have returned their devices for reasons other than hardware failure, including returns due to software issues, network connectivity issues, and use in extreme environmental conditions, Ex. 8, Bardwell Dep. 92:6–96:25.  Dr. Bardwell similarly assumes all devices that were not returned "survived," even though he acknowledges that he has no data about whether those devices continued to operate after they were provided by Apple to

---

[2] The distinction between devices that he marks as "damaged" and as "failed" is critical to his analysis: all devices deemed "damaged" are removed from his analysis of device failures and are treated in his reports as "censored" (ignored entirely) or as competing risks.  Ex. 7, Sept. 2020 Supp. Rept. at 5 (explaining that his revised analysis "treat[s] damaged device replacements as competing risks rather than censored events" (the way his February 2020 analysis did)).

AppleCare customers. *Id.* at 65:6–9 ("Q. And so for every replacement device that's not returned, you don't know how long the device survived after the data was issued. A. That's correct").

Based on his assumption that the AppleCare field return data accurately reflects device "failures" and "survival," Dr. Bardwell conducted a statistical survival analysis comparing "survival curves" of all-new devices and devices containing recovered parts. Ex. 6, Feb. 2020 Supp. Rep. at 5, 11 n.18, 14. These "Kaplan-Meier" curves purport to estimate the probability that the two classes of device would "survive" at various intervals throughout a two-year period. *Id.* at 11 n.18. Based on these curves, Dr. Bardwell performed a log-rank test to determine whether there were statistically significant differences between the two curves, concluding that devices with recovered parts were statistically significantly more likely to "fail" earlier than devices with only new parts. *Id.* at 14–20. He also calculated an average lifetime lost over those two years using the Restricted Mean Lifetime Lost statistic, *id.* at 22; *see also id.* 21–24, and used "Weibull" distributions to extrapolate "survival" rates beyond two years (up to four years) by "fit[ting] Weibull curves to the [Kaplan-Meier] survival curve[s]" of the devices. *Id.* at 24–25.

### D.     The "Survival" Rates Revealed by Dr. Bardwell's Statistics.

Even if taken at face value, Dr. Bardwell's own calculations reveal very high "survival" rates for both all-new devices and devices with recovered parts. Defendants' expert Dr. Stark, applying simple arithmetic to Dr. Bardwell's own statistics, revealed that the vast majority of devices with recovered parts provided under AppleCare are never returned to Apple: 87%, compared to 93% for devices with all-new parts—with variations across devices. Ex. 24, Supplemental Table of Dr. Philip Stark (Stark Dep. Ex. 113) (also showing equal "survival rates" for new and remanufactured devices for the iPad 5, iPad Pro 2 12.9-inch, iPhone X, iPhone XS Max, and rates within one percentage point for numerous other devices); *see also* Ex. 23, Mar. 13, 2020 Expert Report of Prof. Philip Stark at Appendix 2d (calculating two-year and four-year survival rates for devices with recovered parts based on Dr. Bardwell's own calculations). Only a very small percentage of the class—13%—actually returned their class devices to Apple. For the other 87% of devices, Dr. Bardwell concedes that his analysis does not permit him to determine

what percentage have (or will have) inferior performance or reliability.  Ex. 8, Bardwell Dep. 74:24–75:21.

To perform this calculation using Dr. Bardwell's data, Dr. Stark took Table 2 from Dr. Bardwell's February 2020 opening expert report.  In that table, Dr. Bardwell identified the number of returns, and the total number of devices, for both new devices and devices with some recovered parts.  He did this for each of the 41 different device models that Plaintiffs are claiming damages on in this case.  The return rate for each device model is calculated simply by dividing the number of returns by the total number of devices.  The "survival" rate is calculated by merely subtracting the return rate from 100%.  For example, a 5% return rate equates to a 95% survival rate.  According to Dr. Bardwell's numbers, the average return rate for devices with new parts is 93% and the average return rate for devices with one or more recovered parts is 87%.  The survival rates for each device model, using Dr. Bardwell's own data, are shown in the yellow-highlighted columns in the following table:

DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY OF ROBERT A. BARDWELL
Case No. 3:16-cv-04067-WHO

| Model | Replacement Devices | | "Failures" | | "Survival Rate"* | | Data Period (Week) | Excluded Limited History† |
|---|---|---|---|---|---|---|---|---|
| | New | "Reman." | New | "Reman." | New | "Reman." | | |
| iPad | | | | | 89% | | | X |
| iPad 2 | | | | | 93% | 92% | | |
| iPad 3 | | | | | 97% | 92% | | |
| iPad 4 | | | | | 98% | 90% | | |
| iPad 5 | | | | | 98% | 98% | | |
| iPad 6 | | | | | 99% | 98% | | X |
| iPad 7 | | | | | 100% | | | X |
| iPad Air | | | | | 99% | 92% | | |
| iPad Air 2 | | | | | 99% | 94% | | |
| iPad Air 3 | | | | | 99% | 100% | | X |
| iPad Mini | | | | | 98% | 94% | | |
| iPad Mini 2 | | | | | 99% | 95% | | |
| iPad Mini 3 | | | | | 97% | 100% | | X |
| iPad Mini 4 | | | | | 97% | 95% | | |
| iPad Mini 5 | | | | | 99% | 96% | | X |
| iPad Pro | | | | | 96% | 92% | | |
| iPad Pro 9.7-Inch | | | | | 97% | 95% | | |
| iPad Pro 10.5-Inch | | | | | 96% | 95% | | |
| iPad Pro 11-Inch | | | | | 98% | 98% | | X |
| iPad Pro 2 12.9-Inch | | | | | 96% | 96% | | |
| iPad Pro 3 12.9-Inch | | | | | 98% | 100% | | X |
| iPhone 3G | | | | | 89% | 100% | | X |
| iPhone 4 | | | | | 95% | 88% | | |
| iPhone 4S | | | | | 86% | 83% | | |
| iPhone 5 | | | | | 93% | 82% | | |
| iPhone 5S | | | | | 96% | 83% | | |
| iPhone 5c | | | | | 94% | 82% | | |
| iPhone 6 | | | | | 90% | 87% | | |
| iPhone 6 Plus | | | | | 84% | 80% | | |
| iPhone 6S | | | | | 95% | 94% | | |
| iPhone 6S Plus | | | | | 94% | 91% | | |
| iPhone 7 | | | | | 92% | 89% | | |
| iPhone 7 Plus | | | | | 94% | 92% | | |
| iPhone 8 | | | | | 97% | 94% | | |
| iPhone 8 Plus | | | | | 98% | 97% | | |
| iPhone SE | | | | | 95% | 94% | | |
| iPhone X | | | | | 95% | 95% | | |
| iPhone XR | | | | | 99% | 98% | | |
| iPhone XS | | | | | 98% | 97% | | |
| iPhone XS Max | | | | | 98% | 98% | | |
| iPhone 11 | | | | | 100% | | | X |
| Total | | | | | 93% | 87% | | |

†Models are excluded because there are too few new or "remanufactured" replacements or "failures."

*Note: "Survival Rate" is calculated by 1 - ("Failures" / Replacement Devices)

Ex. 24, Supplemental Table of Dr. Philip Stark (Stark Dep. Ex. 113) (highlighting added).

Dr. Bardwell had the opportunity to evaluate this simple arithmetic calculation based on his own data, which was produced by Dr. Stark as a table, and he did not refute it. Dr. Bardwell acknowledged that he was "familiar with" the table and had the opportunity to review the chart,

8

and that he "didn't recalculate" the entries but that he "checked one of them," and "that one agrees." Ex. 8, Bardwell Dep. 68:6–70:14.

## III.    LEGAL STANDARD

Under Federal Rule of Evidence 702, expert testimony is admissible only if "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue"; the witness is qualified "by knowledge, skill, experience, training, or education"; and "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." *Avila* v. *Willits Envtl. Remediation Tr.*, 633 F.3d 828, 836 (9th Cir. 2011) (internal quotation marks omitted); *Daubert* v. *Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589–94 (1993) ("Daubert I").

The party offering the expert bears the burden of establishing that Rule 702 is satisfied. *Daubert*, 509 U.S. at 592 n.10. Federal Rule of Evidence 702 assigns the Court "a gatekeeping role" to ensure that proffered expert testimony is both reliable and relevant to the facts at issue. *Daubert I*, 509 U.S. at 597; *see also Kumho Tire Co., Ltd.* v. *Carmichael*, 526 U.S. 137, 152 (1999) ("The objective of [the *Daubert*] requirement is to ensure the reliability and relevancy of expert testimony"). Even if otherwise admissible under Rule 702, expert testimony may be excluded under Federal Rule of Evidence 403 if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. *United States* v. *Rincon*, 28 F.3d 921, 923 (9th Cir. 1994) (citing *Daubert I*, 509 U.S. at 595). Courts exercise caution in admitting expert testimony because of its unique power to mislead: "Jurors may well assume that an expert, unlike an ordinary mortal, will offer an authoritative view on the issues addressed," leading them down the "garden path." *Rogers* v. *Raymark Indus., Inc.*, 922 F.2d 1426, 1431 (9th Cir. 1991); *see also Daubert* v. *Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1321, n.17 (9th Cir. 1995) ("Daubert II") (noting experts' "special dangers").

Under Rule 702 and *Daubert*, experts should be precluded from offering testimony on issues that exceed the scope of their expertise. *See, e.g., Pyramid Techs., Inc.* v. *Hartford Cas. Ins. Co.*, 752 F.3d 807, 817 (9th Cir. 2014) (affirming exclusion of expert whose report opined on the

propriety of using military standards instead of commercial standards, but who testified at his deposition that he was "not aware of the governing commercial standards because that is not his field of expertise").[3]  Similarly, an expert cannot offer an opinion untethered to the data he purports to analyze.  Where an expert's opinion "is connected to existing data only by the *ipse dixit* of the expert," it is not admissible.  *Gen. Elec. Co.* v. *Joiner*, 522 U.S. 136, 146 (1997); *see also In re Silicone Gel Breast Implants Prod. Liab. Litig.*, 318 F. Supp. 2d 879, 920 (C.D. Cal. 2004) (excluding expert testimony "that if TDA did not cause Cagle's cancer, it accelerated the growth of a preexisting tumor and caused it to become more rapidly invasive and aggressive" where "he has provided no support for th[at] proposition").

## IV.   ARGUMENT

### A.   Dr. Bardwell Should Be Precluded from Testifying About Devices Where His Own Calculations Show a Relative Risk of Return That Is Legally Insufficient to Establish Causation.

Plaintiffs assert that Apple breached the AppleCare contract by providing devices with new and recovered parts, and that the incorporation of any recovered part in a device rendered it inherently inferior in performance and reliability to a device with only new parts.  In an attempt to establish this inferior performance and reliability, Plaintiffs set forth the opinion of Dr. Bardwell, who claims his statistical analysis of return data shows that devices with recovered parts "fail sooner and more often" than devices with all new parts.  Ex. 6, Feb. 2020 Supp. Rep. at 4; Ex. 7, Sept. 2020 Supp. Rep. at 4.

Under California law, Plaintiffs must demonstrate that their alleged damages for a breach of contract claim were "proximately caused by the specific breach"—in other words, specific

---

[3] *See also United States* v. *Santini,* 656 F.3d 1075, 1078–79 (9th Cir. 2011) ("An expert in one field (Dr. Kalish was a psychiatrist) cannot express an opinion relying on data that requires expertise in another field (here, a rap sheet that would require interpretation by an expert in law enforcement record-keeping)."); *Elbert* v. *Howmedica, Inc.*, 59 F.3d 174, 1995 WL 383409 at *1 (9th Cir. June 28, 1995) (finding that a district court abused its discretion in allowing an expert to testify "as to subject areas which were unequivocally outside any area of expertise he might have"); *Townsend* v. *Monster Beverage Corp.*, 303 F. Supp. 3d 1010, 1032 (C.D. Cal. 2018) (rejecting marketing expert's conclusion about the advertising practices of a sports drink where his conclusion was untethered to his survey, concluding the expert's "expertise is in marketing generally" without "any particular expertise in sports drinks," and his "general observation [about the challenged advertisement] is therefore outside the scope of his expertise" and "*ipse dixit*").

causation. *St. Paul Fire & Marine Ins. Co.* v. *Am. Dynasty Surplus Lines Ins. Co.*, 101 Cal. App. 4th 1038, 1060–61 (2002) (internal quotation marks omitted). Therefore, Dr. Bardwell's opinion is only relevant—and only fits the case, as *Daubert* requires—to the extent it can establish specific causation, *i.e.*, that the presence of recovered parts *caused* class members' alleged harm.[4] *Daubert I*, 509 U.S. at 591 (testimony must "fit" issues in dispute to be admissible under Rule 702). But Dr. Bardwell recognizes that, generally speaking, observational studies such as his "do not necessarily show causation." Bardwell Dep. 102:11–23, 104:17–20.

Dr. Bardwell did not attempt to establish causation for individual class members—he calculated averages and probabilities for the class and gave the opinion that devices with one or more recovered parts are "more likely to fail" than devices with only new parts. Ex. 6, Feb. 2020 Supp. Rep. at 6.[5] Based on the return data, which showed an average return rate of 13% for devices with a recovered part compared to returns of 7% for devices with all new parts, Ex. 6, Feb. 2020 Supp. Rep. at 12–13 tbl.2; Ex. 24, Supplemental Table of Dr. Philip Stark (Stark Dep. Ex. 113); Ex. 8, Bardwell Dep. 68:23–70:14, Dr. Bardwell calculated *average* "failure probabilities" for devices with recovered parts and devices with only new parts and *average* "lifetime[s] lost" for devices with recovered parts, Ex. 6, Feb. 2020 Supp. Rep. at 4, 7–8, 19–20, 23–26; Ex. 8, Bardwell Dep. 45:17–20.

But even for these calculated averages and probabilities, Dr. Bardwell's statistical calculations fail to meet the standard for admissible statistical evidence. To ensure that expert

---

[4] At the class certification stage, the Court did not require Plaintiffs to show whether an individual "device experience[d] problems or whether those problems were tied to a non-new part," and allowed Dr. Bardwell's testimony on statistics as support for Plaintiffs' claim that the presence of recovered parts causes devices to be "inferior to new devices" because remanufactured devices are purportedly returned at a higher rate than new devices. Order on Class Certification at 14, 17, 21, ECF No. 160. Regardless of whether Dr. Bardwell's statistical analysis needed to show individualized harm on a device-by-device basis for purposes of allowing the certified class to proceed, at trial Plaintiffs must show class-wide harm that meets the legal requirement for causation.

[5] Similarly, if a natural event causes the unemployment rate in San Francisco to rise from 10% to 20%, the residents of San Francisco are "more likely" to be unemployed due to that event, but these statistics do not tell you whether any individual resident is unemployed or was harmed by the event.

DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY OF ROBERT A. BARDWELL
Case No. 3:16-cv-04067-WHO

testimony meets the *Daubert* fit requirement, courts regularly evaluate whether statistical studies such as Dr. Bardwell's that purport to show that an alleged risk factor caused a specific outcome meet the legal standard for causation. *Daubert II*, 43 F.3d at 1320 ("*Daubert* stressed the importance of the 'fit' between the testimony and an issue in the case . . . . Here, the pertinent inquiry is causation. In assessing whether the proffered expert testimony 'will assist the trier of fact' in resolving this issue, we must look to the governing substantive standard," which "requires plaintiffs to show not merely that [conduct] increased the likelihood of injury, but that it more likely than not caused *their* injuries") (emphasis in original). To do this, courts assess the "relative risk" of an adverse outcome for individuals exposed to the alleged risk factor compared to the risk of the same outcome among those not exposed to the risk factor. *Id.* at 1320–21 (the "relative risk" that a risk factor caused an injury is a "ratio" comparing the "frequency" of the injury in the population exposed to the risk factor and the "frequency" of the injury in the population not exposed to that risk factor). Relative risk is calculated by dividing the probability of an adverse outcome in a test group exposed to a particular factor (here, the 'failure probability' for devices with recovered parts) by the probability of that outcome in a control group (here, the 'failure probability' for devices containing only new parts). *In re Silicone Gel Breast Implants Prod. Liab. Litig.*, 318 F. Supp. 2d at 892 (relative risk calculated "by dividing the proportion of individuals in the exposed group who contract the disease by the proportion of individuals who contract the disease in the non-exposed group").

Courts have repeatedly held that an expert's findings are only probative of specific causation if the relative risk exceeds two. *E.g.*, *In re Silicone Gel Breast Implants Prod. Liab. Litig.*, 318 F. Supp. 2d at 892–93. Where the relative risk is greater than two, the expert's calculations can demonstrate that the challenged conduct is associated with more than double the likelihood of an adverse outcome, absent additional plaintiff-specific evidence. *Id*. This means that an adverse outcome was more likely than not to have been caused by the challenged conduct. By contrast, a relative risk of less than two "actually tends to *dis*prove legal causation" unless it is "combined with other evidence to show it is more likely than not that the accused cause is responsible for a particular plaintiff's injury." *Daubert II*, 43 F.3d at 1321 & n.16 (emphasis in original); *see also*

*Hendricksen* v. *ConocoPhillips Co.*, 605 F. Supp. 2d 1142, 1158 (E.D. Wash. 2009) ("When the relative risk is 2.0, the alleged cause is responsible for an equal number of cases of the disease as all other background causes present in the control group"; therefore, "a relative risk that is greater than 2.0 permits the conclusion that the agent was more likely than not responsible for a particular individual's disease."); *In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*, 524 F. Supp. 2d 1166, 1172 (N.D. Cal. 2007) ("[Epidemiological] studies can also be probative of specific causation, but only if the relative risk is greater than 2.0, that is, the product more than doubles the risk of getting the disease").

While cases analyzing relative risks typically arise in the epidemiological context, the causation analysis should apply equally to any case under a preponderance of the evidence standard where a statistical study purports to demonstrate specific causation by comparing risk probabilities among two populations. Dr. Bardwell seeks to opine that the presence of recovered parts causes devices to fail. Ex. 6, Feb. 2020 Supp. Rep. at 5 ("Remanufactured devices fail earlier and more frequently than new devices"); *see also id.* ("[T]he differences exhibit extreme levels of statistical significance, <u>ruling out that the differences are a result of chance</u>.") (emphasis added). He does this by comparing "failure probabilities" for devices containing recovered parts with "failure probabilities" for devices containing only new parts. *Id.* at 19–20 tbls.2–3. But because even devices that contain only new parts sometimes fail, a relative risk of less than two does not show that the recovered parts <u>caused</u> any particular device to "fail" sooner.[6] Instead, a relative risk of less than two indicates that a device's "failure" is more likely than not caused by something <u>other than</u> the recovered parts, and that the presence of recovered parts more likely than not <u>did not</u> affect

---

[6] It is true that some courts have held a relative risk of two is not <u>categorically</u> required where an expert "can opine, based on the totality of the evidence, that a risk factor caused a plaintiff's disease." *In re Roundup Prods. Liab. Litig.*, 358 F. Supp. 3d 956, 961 n.5 (N.D. Cal. 2019); *see also Daubert II*, 43 F.3d at 1322 (noting that an expert can "testify <u>either</u> that [a product] actually caused plaintiffs' injuries" or <u>else</u> "that [the product] more than doubled the likelihood of" those injuries (emphasis added)). Dr. Bardwell has no expertise in the field of reliability physics and therefore cannot, according to Plaintiffs' own expert Dr. Dasgupta, analyze the cause of device failures, beyond what his statistical calculations show. Dr. Bardwell only looks at the AppleCare return data. He therefore cannot offer an assessment based on the "totality of the evidence"; the only "evidence" he has looked at is return data, not any other evidence of supposed causation.

the device's lifespan.  As a result, any opinion about a heightened "failure" rate of these devices does not fit the evidence.

Dr. Bardwell does not provide the relative risks for the devices he analyzes.[7]  He reports "failure probabilities" by model and by exposure group (referred to by Dr. Bardwell as either "remanufactured" or "new").  Ex. 6, Feb. 2020 Supp. Rep. at 19–20 tbls.3–4.  The relative risk for each model can be easily calculated from this data using arithmetic.  Specifically, the relative risk for each model is calculated by dividing the "failure probability" in the test group (devices with recovered parts) by the "failure probability" in the control group (devices with only new parts).  For example, Table 3 of Dr. Bardwell's Feb. 2020 Supplemental Report reports the "Failure Probabilit[ies]" for an iPhone 4S as 21.4% for remanufactured devices and 20.1% for devices with only new parts.  The relative risk from the presence of recovered parts in the iPhone 4S is therefore 1.06 (21.4% divided by 20.1%).  This indicates that the vast majority of device "failures" among iPhone 4S models were not caused by the inclusion of recovered parts.

As shown in the following chart, the majority of class device models for which Dr. Bardwell calculated "failure probabilities" have relative risks of less than two:

| Model | "New" Failure Probability | "Reman." Failure Probability | Relative Risk* |
|---|---|---|---|
| iPhone 4S | 20.1% | 21.4% | 1.06 |
| iPhone 6 | 16.7% | 23.1% | 1.38 |
| iPhone 6 Plus | 25.5% | 31.6% | 1.24 |
| iPhone 6S | 7.8% | 9.6% | 1.23 |
| iPhone 6S Plus | 9.4% | 14.3% | 1.52 |
| iPhone 7 | 13.9% | 26.0% | 1.87 |
| iPhone 7 Plus | 8.8% | 15.0% | 1.70 |
| iPhone 8 Plus | 2.7% | 4.4% | 1.63 |

---

[7] Dr. Bardwell instead provided "odds ratio" calculations, but these inflate his claimed effects.  Priya Ranganathan, Rakesh Aggarwal, & C.S. Pramesh, *Common Pitfalls in Statistical Analysis: Odds Versus Risk*, Perspect. Clin. Res. (2015), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4640017 ("When there is an association between an exposure and an outcome, OR [odds ratio] exaggerates the estimate of their relationship (is farther from 1.0 than RR ['risk ratio', or relative risk]) . . . [B]y contrast, when RR is more than 1.0, OR is higher than the RR") (citations omitted).  Dr. Bardwell conceded that his "odds ratios" values could be higher than the corresponding relative risk.  Bardwell Dep. at 127:11–128:17 (agreeing that a device with used parts that is twice as likely to fail as a new device would have a relative risk of 2, but might have an odds ratio of 4).

DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY OF ROBERT A. BARDWELL
Case No. 3:16-cv-04067-WHO

| | | | |
|---|---|---|---|
| iPhone SE | 8.8% | 10.8% | 1.23 |
| iPhone X | 6.7% | 10.5% | 1.57 |
| iPhone XS | 1.9% | 3.6% | 1.89 |
| iPhone XS Max | 2.0% | 3.1% | 1.55 |
| iPad 2 | 10.9% | 15.5% | 1.42 |
| iPad 5 | 3.1% | 3.7% | 1.19 |
| iPad Mini 4 | 4.8% | 7.6% | 1.58 |
| iPad Pro 10.5-Inch | 7.5% | 10.7% | 1.43 |

**Source:** Ex. 6, Feb. 2020 Supp. Rep. at 19–20, tbls.3–4
* Calculated by dividing "Reman." Failure Probability by "New" Failure Probability

In total, 16 of the 31 device models Bardwell calculated "failure probabilities" for have relative risks of less than two, comprising slightly more than ▮▮ of the total number of devices Plaintiffs claim are in the class.[8]

These calculations are based on Dr. Bardwell's own statistics. As explained above, where the relative risk of returns is less than two, the statistical evidence cannot prove that the claimed breach of contract caused the claimed harm (*i.e.*, that a device with some recovered parts failed sooner than an all-new device because it included recovered parts). Thus, for the models that have relative risks less than two, according to Dr. Bardwell's own data, the statistical return rate evidence cannot as a matter of law show that the use of recovered parts caused class members' devices to be more likely to fail. *E.g.*, *Daubert II*, 43 F.3d at 1321 & n.16; *Hendricksen*, 605 F. Supp. 2d at 1158; *In re Silicone Gel Breast Implants Prod. Liab. Litig.*, 318 F. Supp. 2d at 892; *In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*, 524 F. Supp. 2d at 1172. Because the statistical analysis for these models cannot possibly establish causation as a matter of law for those device models, Dr. Bardwell should be precluded from offering any opinions on likelihood of return or "failure" for them.

---

[8] The ▮▮ figure is calculated by adding up the total number of devices of each relevant device model in Tables 1 and 2 of Dr. Lance Kaufman's most recent damages report and dividing that sum by the total number of devices in Tables 1 and 2. Ex. 10, Sept. 14, 2020 Third Expert Report of Lance D. Kaufman, at 7–9 tbls.1–2.

DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY OF ROBERT A. BARDWELL
Case No. 3:16-cv-04067-WHO

**B.    Dr. Bardwell's Testimony Should Be Limited to Device Return Rates Because Dr. Bardwell Is a Statistician Analyzing Return Data and Is Not Qualified to Opine On Whether Returns Are Failures.**

There is a specific field of study dedicated to understanding device failures—including the statistical aspects of device degradation and failure—and Dr. Bardwell does not have expertise in that field.  Dr. Bardwell admits that he has limited familiarity with reliability engineering and reliability physics, and he does not claim to be an expert in either field.  Ex. 8, Bardwell Dep. 24:14–25:13.  He has no background in reliability engineering, does not know what the term "reliability physics" means "in any detail," and cannot identify a single instance of having served as an expert in a case involving device reliability.  *Id.*; *see also id.* at 39:13–15.

Despite Dr. Bardwell's complete lack of expertise in the fields of reliability engineering and reliability physics, Dr. Bardwell has attempted to draw conclusions about rates of device <u>failures</u> based on data reflecting device <u>returns</u>.  Ex. 6, Feb. 2020 Rep. at 4 (Dr. Bardwell's report treats returned devices as "failed devices").  His reports use the term "failure" countless times rather than referring to returns.  *E.g.*, *id.* at 4 (describing "findings of elevated failure rates"); *id.* at 5 (characterizing AppleCare return data as showing ▮▮▮▮▮▮▮▮ for every device issued as a replacement"); *id.* at 8 (concluding that used components reflect "HIGH FAILURE RATES"); *id.* at 9 (Table 1 reporting "Failure Rates" for analyzed devices); *id.* at 12–13 (Table 2 reporting device "Failures").

Dr. Bardwell's equation of return rates with failure rates was directly rejected by Plaintiffs' own expert, Dr. Dasgupta, who testified that practitioners in the field would <u>not</u> equate return data to device failure data. Ex. 5, Dasgupta Dep. 140:1–141:11 (agreeing that "when you have return data, within your field there is limited ability to determine how much of that return data is due to failure"); *id.* at 137:13–21 (experts in his field would not use field return data interchangeably with field failure data: "Not interchangeably, no.  I would use it as an indirect indicator of field failure, like I said a few minutes ago, but not interchangeably, no").  When commenting on the AppleCare data in this case—the data on which Dr. Bardwell relies—Dr. Dasgupta was clear that this data did not show failures.  He stated: "<u>I don't think we have enough information to discuss the field failures</u>

DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY OF ROBERT A. BARDWELL
Case No. 3:16-cv-04067-WHO

<u>as far as this study goes</u>, the case that we're discussing today. So today's discussion, I'm limiting to field returns." *Id.* at 218:9–15 (emphasis added).

Experts in the field would not equate returns and failures because, as Dr. Dasgupta explained: "Not every return may be a hard failure. Sometimes it is determinable whether it was or not, and <u>sometimes it is almost impossible to determine whether it was a failure or not</u>." *Id.* at 136:2–10. "[T]here could be a variety of reasons why things get returned, and sometimes it is the customer's inability to perhaps use the device properly. If used properly, it may still be working fine. But it could be it is too complex a system, they're not able to figure it out." *Id.* at 137:1–10.

The database of return data used by Dr. Bardwell for his statistical calculations cannot be used to conclude that the presence of recovered parts causes devices to <u>fail</u> more often. *Id.* at 140:12–19 (acknowledging that "if all you have is the actual return data, you would not be able to reach conclusions about" the failure rate); *id.* at 214:7–215:15 ("There are lot[s] of unknowns" in the AppleCare database; "you're looking for broader trends because you really can't slice and dice that closely there. At best you have a very blunt knife there, so you're looking for broad trends, blunt trends to see is there useful information coming out of there?").

Numerous features in the data that Dr. Bardwell analyzed show that returns cannot be equated to failures. Dr. Bardwell admitted at deposition that the AppleCare data he analyzed includes devices that may have been returned without ever "fail[ing]." Ex. 8, Bardwell Dep. 89:6–8 ("I assume that there may be some devices that are replaced without specifically being able to identify a mode of failure"). The type of analysis that Plaintiffs' expert Dr. Dasgupta said would reveal whether the return resulted from a device failure—a root-cause analysis to determine whether there was a true technical issue—███████████████████████ ███████ Ex. 5, Dasgupta Dep. 118:14–119:10; *see also id.* at 137:22–139:25; Ex. 30, Jan. 8, 2019 Deposition of Jason Fu at 84:11–84:25. Dr. Bardwell acknowledged this undisputed fact. Ex. 8, Bardwell Dep. 90:14–24 (expressing his understanding "that ████████████████ ███████████████████████████████████████████) (emphasis added). ████████ ████████████████████████████████████████████

██████████████ Ex. 29, Oct. 9, 2018 Deposition of Avijit Sen at 82:2–84:4 (█████████████████████████████████████████████████████.[9]

Devices that Dr. Bardwell characterizes as "failed" devices indisputably include devices returned for other reasons.  For example, Dr. Bardwell's analysis would capture devices returned due to software issues, network connectivity issues, and damage resulting from use in extreme environmental conditions.  Ex. 8, Bardwell Dep. 92:6–96:25.  But despite this, Bardwell admits that "<u>any return that isn't classified as damaged in my analysis is treated as a failure.</u>"  *Id.* at 96:18–19 (emphasis added).

Notably, the damage codes that Dr. Bardwell uses to justify treating <u>some</u> returns as failures but not others do not provide reliable information about what actually happened to those devices.  Dr. Bardwell himself admitted that "we don't know with much clarity why these devices return.  We don't have much clarity about whether they were damaged or failed or both failed and were damaged and -- and we don't know the interaction of all these factors."  *Id.* at 159:12–17.

Despite his lack of background to equate returns and failures, Dr. Bardwell improperly makes this leap repeatedly throughout his analysis.[10]  *Jinro Am. Inc.* v. *Secure Investments, Inc.*, 266 F.3d 993, 1006 (9th Cir.), *opinion amended on denial of reh'g*, 272 F.3d 1289 (9th Cir. 2001) (excluding an expert who offered "sweeping generalizations, derived from his limited experience and knowledge"); *Rogers* v. *Raymark Indus., Inc.*, 922 F.2d 1426, 1431–32 (9th Cir. 1991) (excluding testimony where the expert made a comparison "for which there was no foundation," raising the risk that "[t]he jury could have been confused by" the comparison and "misled into making the leap" that it applied to defendant's conduct).  Where an expert's opinion relies on unsupported assumptions, his conclusions are not reliable.

---

[9] In the interest of customer service, Apple may provide customers with a return device regardless—a customer-oriented policy that Plaintiffs seek to twist into an admission of device "failure" that they assert reflects harm to those same customers.  ECF No. 175-13 at 37–38, Lanigan Dep. at 108:21–109:8 (describing customer service approach to address all devices, regardless of whether there is "NTF" (No Trouble Found)); ECF No. 102 at 6–9, Pls' Mot. for Class Cert.

[10] Dr. Bardwell's primary merits report from February 2020 uses the words "fail" or "failure" more than 150 times, while using the word "return" only 3 times.  *See generally* Ex. 6, Feb. 2020 Supp. Rep.

DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY OF ROBERT A. BARDWELL
Case No. 3:16-cv-04067-WHO

Dr. Bardwell seeks to justify treating the device returns in the data he analyzed as device failures by relying on a selective (and misleading) quotation of deposition testimony from an Apple corporate designee.  *See, e.g.*, Ex. 6, Feb. 2020 Supp. Rep. at 4 n.1 (citing "Deposition of Michael Lanigan, January 11, 2019, p. 108:17-25; 109:1-8").[11]  But Dr. Bardwell's reliance on this testimony is outside the ken of his expertise as a statistician: Dr. Bardwell has no special expertise to interpret the meaning of the fact witness deposition testimony he cites regarding the corporate policies he seeks to opine on here.  He cannot dress up his layman's review of the deposition transcript he relies on as expert testimony about the meaning of return data he analyzed as a statistician.  *United States* v. *Pac. Gas & Elec. Co.*, 2016 WL 1640462, at *2 (N.D. Cal. Apr. 26, 2016) (expert testimony "must be directed to matters within the witness' scientific, technical, or specialized knowledge and not to lay matters which a jury is capable of understanding and deciding without the expert's help") (quotations omitted); *see also In re Novatel Wireless Sec. Litig.*, 2011 WL 5827198, at *4 (S.D. Cal. Nov. 17, 2011) (rejecting expert testimony that "quote[d] selectively from" the record about matters that "could be readily understood and accessed by the trier of fact," and where "no specialized or technical knowhow is required to read and draw conclusions from the" material).

Dr. Bardwell has previously been excluded for a similar error.  In *Coleman* v. *Oracle USA, Inc.*, Dr. Bardwell's opinion on behalf of the plaintiff in an employment discrimination case was excluded on numerous grounds, including "reli[ance] on assumptions to make unsupported conclusions."  2011 WL 2746187, at *6 (D. Minn. July 14, 2011).  In that case, Dr. Bardwell erroneously calculated the number of relevant employees in similar roles for relevant years based

---

[11] The full context of Mr. Lanigan's deposition testimony reveals that Dr. Bardwell quotes Mr. Lanigan selectively and misleadingly for the proposition that all returns are failures.  On the same deposition testimony pages, Mr. Lanigan made clear that the opposite is true: "[F]ailure rates is what you're describing.  What we're talking about here is return rate . . . I just want to be . . . clear that it's a return rate."  ECF No. 175-13 at 37, Lanigan Dep. at 108:10–16.  "[F]or our team, it is a failure.  But what I am describing here is these are returns.  And a percentage of those returns will have no trouble found in them; so it's not a failure.  But from a team perspective, at the end of the day, if I have 100 devices come back, whether they're failed, NTF [No Trouble Found], they've come back, we have to address it. . . .  [I]t doesn't mean that the device had a hard failure."  *Id*. at 108:21–109:8.

DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY OF ROBERT A. BARDWELL
Case No. 3:16-cv-04067-WHO

on the assumption that there would be no reduction in force or transfers, as part of his analysis of whether employees who were racial minorities at Oracle were underutilized. *Id*. Here, Dr. Bardwell also makes an unfounded assumption—that returns equate to failures. He should be precluded from offering that opinion.

It is also improper for Dr. Bardwell to opine on whether returns constitute failures without a reliable basis in fact—an error for which Dr. Bardwell's opinions have previously been excluded. In *Manley v. Nat'l ProSource, Inc.*, Dr. Bardwell's opinions in support of a plaintiff in an employment discrimination case were excluded on numerous grounds, including misapplication of data. 2013 WL 3480385, at *7–8 (S.D. Tex. July 10, 2013), *aff'd sub nom. Manley v. Invesco*, 555 F. App'x 344 (5th Cir. 2014). The district court determined that Dr. Bardwell misapplied and misanalysed the data that he asserted supported his opinion that Black applicants were half as likely as similarly situated white applicants to be recommended for employment. *Id*. The court explained that while Dr. Bardwell purported to analyze data related to persons with criminal records (similarly situated to the plaintiff in that case), his analysis instead included "individuals whose criminal charges were all dismissed, who were given deferred adjudication, who were not convicted of the crime they were charged with, and who had no criminal record at all." *Id*. at *7.

Here, Dr. Bardwell seeks to interpret Apple testimony and opine that it shows that device returns are actually device failures. But the testimony establishes no such thing, and Dr. Bardwell is not qualified to make that determination. He should be precluded from offering that opinion, as he was in *Manley*.

\* \* \*

As a statistician, Dr. Bardwell may have expertise to run statistical analyses on the data squarely before him—AppleCare return data. But he lacks the experience and knowledge to translate that data into something else—conclusions about device failure rates. *Santini*, 656 F.3d at 1078–79 (expert in a particular field "cannot express an opinion relying on data that requires expertise in another field"). As a result, Dr. Bardwell is not qualified to opine that AppleCare device returns reflect device failures. He should not be allowed to offer opinions that the return data he analyzed reflects device failure rates.

DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY OF ROBERT A. BARDWELL
Case No. 3:16-cv-04067-WHO

## V.   CONCLUSION

For the foregoing reasons, the opinions of Dr. Bardwell identified above and set forth in the attached Proposed Order should be excluded.

Dated:  January 22, 2021

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

By: /s/ Karen L. Dunn

Karen L. Dunn (DC SBN 1002520)
kdunn@paulweiss.com
2001 K Street, NW
Washington, DC 20006
Telephone: (202) 223-7300
Facsimile:  (202) 223-7420

*Attorneys for Defendants Apple Inc., AppleCare Service Company, Inc., and Apple CSC Inc.*

DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY OF ROBERT A. BARDWELL
Case No. 3:16-cv-04067-WHO