Steve W. Berman (*Pro Hac Vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
Email: steve@hbsslaw.com

Robert B. Carey (*Pro Hac Vice*)
Michella A. Kras (*Pro Hac Vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
11 West Jefferson, Suite 1000
Phoenix, AZ  85003
Telephone: (602) 840-5900
Facsimile:  (602) 840-3012
Email: rob@hbsslaw.com
Email: michellak@hbsslaw.com

*Attorneys for Plaintiffs*

[Additional Counsel on Signature Page]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| VICKY MALDONADO AND JUSTIN CARTER, individually and on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> APPLE INC., APPLECARE SERVICE COMPANY, INC., AND APPLE CSC, INC., <br><br> Defendants. | No. 3:16-cv-04067-WHO <br><br> Related Case: <br> *English v. Apple Inc. et al.* <br> Case No. 3:14-cc-01619-WHO <br><br> PLAINTIFFS' MOTION TO EXCLUDE DEFENDANTS' EXPERT PAUL L. BRIANT, PH.D, AND MOTION TO EXCLUDE IN PART PHILIP STARK, PH.D <br><br> Judge:  Hon. William H. Orrick <br> Courtroom: 2, 17th Floor <br> Complaint Filed:  July 20, 2016 <br> Hearing Date:  April 7, 2021 |

010637-11/1429773 V1



1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

**TABLE OF CONTENTS**

Page

I.      INTRODUCTION .................................................................................................................1

II.     FACTUAL BACKGROUND ...............................................................................................1

        A.      Dr. Briant's Rebuttal Opinions.................................................................................2

        B.      Dr. Stark's Opinions.................................................................................................7

III.    ARGUMENT .......................................................................................................................8

        A.      Dr. Briant's expert opinions about the iPhone SE sample are based
                on insufficient facts and data and fail to apply reliable principles............................9

        B.      Dr. Briant's expert opinions on testing are not based on reliable
                principles and methods and Dr. Briant does not reliably apply the
                principles and methods to the facts of this case. ....................................................10

        C.      Dr. Briant's test results are not helpful to the trier of fact
                or are not relevant...................................................................................................14

        D.      Dr. Stark fails to apply reliable statistical principles to this case............................16

IV.     CONCLUSION ..................................................................................................................17



# TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Amorgianos v. National R.R. Passenger Corp.*,
303 F.3d 256 .................................................................................................................. 8

*Carnegie Mellon Univ. v. Hoffmann-LaRoche, Inc.*,
55 F. Supp. 2d 1024 (N.D. Cal. 1999) ......................................................................... 11

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993) .............................................................................................. 8, 9, 15

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
43 F.3d 1311 (9th Cir.1995) ......................................................................................... 11

*Emblaze Ltd. v. Apple Inc.*,
52 F. Supp. 3d 949 (N.D. Cal. 2014) .............................................................................. 8

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997) ................................................................................................. 8, 14

*Huawei Techs., Co, Ltd v. Samsung Elecs. Co, Ltd.*,
340 F. Supp. 3d 934 (N.D. Cal. 2018) .......................................................................... 15

*Lucido v. Nestle Purina Petcare Co.*,
217 F. Supp. 3d 1098 (N.D. Cal. 2016) ........................................................................ 10

*Perry v. Brown*,
671 F.3d 1052 (9th Cir. 2012) ........................................................................................ 8

*Perry v. Schwarzenegger*,
704 F. Supp. 2d 921 (N.D. Cal. 2010) ........................................................... 8, 12, 14, 17

*Shreve v. Sears, Roebuck & Co.*,
166 F. Supp. 2d 378 (D. Md. 2001) .............................................................................. 10

*United States v. Singleton*,
82 F.3d 424 (9th Cir. 1996) .......................................................................................... 14

### OTHER AUTHORITIES

Federal Rule of Evidence 702 ............................................................................ 1, 8, 14, 10, 15



1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

## I.     INTRODUCTION

Plaintiffs move to strike Defendants' ("Apple") expert, Dr. Paul Briant, and to exclude in part Apple's expert, Dr. Philip Stark, for opinions related to Briant's opinions. Apple identified Dr. Briant as a rebuttal to Plaintiffs' expert, Dr. Michael Pecht. Dr. Pecht opines that remanufactured devices with used parts can never be equivalent to new devices in performance and reliability because they have been subject to load or stress conditions. To rebut Dr. Pecht, Dr. Briant tested the functionality and processing speeds of twenty-eight new and remanufactured iPhone SEs, before and after subjecting the phones to stress tests he designed. Ignoring any statistical considerations related to the sample size or the results of the testing, he concludes that new devices perform worse than remanufactured devices. Because Dr. Briant's testing procedures and conclusions are unreliable fail to comply with Federal Rule of Evidence 702, his opinions should be excluded.

Dr. Stark, a statistician, offers opinions to support Dr. Briant (along with others not at issue). Dr. Stark addresses the statistical considerations related to Dr. Briant's testing, specifically that the sample size of twenty-eight devices was sufficient and running a statistical analysis of Dr. Briant's results. Because Dr. Stark fails to identify and apply reliable statistical techniques and methods in forming his opinions, his opinions do not comply with Rule 702.

Consequently, Plaintiffs request that the Court exclude the testimony of Dr. Briant in full and exclude Dr. Stark's Briant-related opinions in paragraphs 19, 93–97 and Table 1 of his report.

## II.     FACTUAL BACKGROUND

Apple identified Dr. Briant, a mechanical engineer, as a rebuttal expert to Plaintiffs' expert, Dr. Michael Pecht. Expert Rebuttal Report of Paul L. Briant, Ph.D. P.E. ("Briant Rep.") ¶ 13, Mar. 13, 2020 (Ex. 1).[1] Apple also identified Dr. Stark, a statistician, as an expert to support the opinions of Dr. Briant through statistical analysis.[2] Expert Report of Prof. Philip Stark, Ph.D.

---

[1] The Exhibit numbers referenced in this Motion refer to the Exhibits attached to the Declaration of Steve Berman in Support of Plaintiffs' Motion to Exclude Defendants' Expert Paul L. Briant, Ph.D. and Motion to Exclude in Part Philip Stark, Ph.D.

[2] Most of Dr. Stark's opinions are being offer to rebut Plaintiffs' expert, Dr. Robert Bardwell, but those opinions are not at issue in this motion.

PLAINTIFFS' MOTION TO EXCLUDE BRIANT
No. 3:16-cv-04067-WHO
010637-11/1429773 V1                                    - 1 -

HB   HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

("Stark Rep.") ¶¶ 19, 93–96 (Ex. 2). Because Dr. Briant's opinions rely on Dr. Stark's statistical analysis and Dr. Stark's opinions rely on Dr. Briant's iPhone testing, Plaintiffs address both opinions in one motion.

**A.       Dr. Briant's Rebuttal Opinions**

Dr. Briant is offering rebuttal opinions to Dr. Pecht, who opined that devices containing used components can never be as reliable as devices containing all new components, because they have been subject to stress (load) conditions. Report of Michael Pecht, Ph.D. ("Pecht Rep.") at 13, Feb. 25, 2019 (Ex. 3). Dr. Briant is a mechanical engineer whose studies focused on solid mechanics, specifically measuring the stresses and strains in articular cartilage in a knee. Deposition of Paul Briant ("Briant Dep.") 13:8–14:24, Dec. 2, 2020 (Ex. 4). He has not written any papers on the testing of consumer electronics, rather his papers all focus on medical devices. *Id.* 15:25–16:14; Briant Rep. App'x. A at 2-3 (Ex. 1). Dr. Briant has no experience testifying in a case involving consumer electronics. Briant Dep. 16:15–20, 24:17–27:10 (Ex. 4); Briant Rep. App'x. B (Ex. 1). Dr. Briant claims expertise in testing of components and that he has tested cell phones and tablets. Briant Dep. 16:21–17:2, 18:8–19:24, 22:12–24:8, 27:14–23 20:11–21:23 (Ex. 4).

Apple tasked Dr. Briant with testing new and remanufactured iPhone SEs that Apple provided him. Briant Rep. ¶ 18 (Ex. 1); Briant Dep. 33:15–19 (Ex. 4). Dr. Briant admitted he did not select the iPhone SE, but counsel for Apple said they were available and asked him to test them. *Id.* 33:15–19. He received sixty iPhone SEs from Apple, thirty new and thirty remanufactured (with used parts) from Apple. Apple's statistics expert, Dr. Philip Stark, identified which of the original sixty devices were to be a non-testing sample set[3] and which were to be a testing sample set. *Id.* 37:24–38:3; Stark Rep. ¶ 93 (Ex. 2). Because an individual at Exponent accidentally opened both a new and remanufactured iPhone SE from the non-testing sample set,

___

[3] Dr. Briant claimed half the iPhone SEs were set aside "in case testing was desired by other parties," although there is no indication in his report that was the purpose. Briant Rep. 39:6–9. It should be noted that Dr. Briant was identified as a rebuttal expert, meaning Plaintiffs were not entitled a sur-rebuttal. Through an agreement of the parties, Apple eventually agreed to allow Plaintiffs to submit a sur-rebuttal report to Dr. Briant, but Apple also did not offer these devices to Plaintiffs to test.

HB  HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

Dr. Briant removed one new and one remanufactured iPhone SE from the set to be tested, ultimately testing fourteen new iPhone SEs and fourteen remanufactured iPhone SEs. Briant Rep. ¶ 18–19 & n.2 (Ex. 1).[4]

Dr. Briant does not know anything about the history of the iPhone SEs[5] he tested—when they were manufactured, how long they were stored at Apple, where they were stored, or how they were selected by Apple. Briant Dep. 39:10–23, 130:4-131:12 (Ex. 4). Dr. Briant claimed that the iPhone SEs he tested were representative of the iPhone SEs given to consumers, but admitted he received that understanding from Apple's counsel. *Id.* 40:19–11. He also admitted he does not know what used parts are in the remanufactured iPhone SEs or if they match what was actually given to consumers. *Id.* Dr. Briant did not perform any analysis or calculation to determine whether a sample of twenty-eight units would be meaningful. *Id.* 38:4–16. He testified that his opinions were limited to the iPhone SEs that he tested in this case—he is not extrapolating them to all the iPhone SEs or all of the devices at issue in this case. *Id.* 34:13–35:5.

Dr. Briant's testing consisted of performance tests that he ran out-of-the-box and again three more times after he subjected to the iPhones to three different stress tests. Dr. Briant's first ran initial "performance" tests on all twenty-eight iPhone SEs. Dr. Briant's performance tests consisted of "quantitative" tests that were ran using a third-party program, Geekbench, and "functional checks," which included taking a photo with flash, confirming WiFi connection, adjusting ringtone volume, confirming the silence switch works, and confirming the adjust display brightness works. Briant Rep. ¶¶ 21–24 & Table 1 (Ex. 1). Dr. Briant chose to use Geekbench to test the iPhone SEs, but he admitted he had never used it before, does not know anyone who has used Geekbench, could not say how he found the application, only that he "knew of its existence." Briant Dep. 45:9–46:2 (Ex. 4). Using Geekbench, Dr. Briant ran what he called "Single-Core

---

[4] Dr. Briant could not recall how he decided which two iPhones to remove. Briant Dep. 37:19–23 (Ex. 4).

[5] Apple did not provide any information about the iPhone SEs used for testing. Plaintiffs note that Apple sold its iPhone SE model from 2016 to 2018. https://www.apple.com/newsroom/2016/03/21Apple-Introduces-iPhone-SE-The-Most-Powerful-Phone-with-a-Four-inch-Display/; https://www.businessinsider.com/discontinued-apple-products-iphone-x-iphone-se-apple-watch-edition-2018-9?r=nordic#iphone-se-4.

HB  HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

CPU," "Multi-Core CPU," and Compute Metal" tests. Briant Rep. ¶ 23 & Table 1 (Ex. 1). While couching these as "performance tests," Dr. Briant testified "[t]he purpose of the Geekbench is to evaluate the processers and their speed, so to really focus on the hardware of the chips—on the MLB." Briant Dep. 46:5–10 (Ex. 4). When asked to describe the Single-Core CPU test, Dr. Briant testified that the test focuses on the CPU, "the primary processing" chip while doing "single-threaded operations," meaning it is running single tasks. *Id.* 47:23–48:18. Dr. Briant could not remember what functions the test ran, only remembering a single task: "image compression." *Id.* 48:19–25. He ran each test three times and then selected the highest score for his report. *Id.* 49:22–50:21. When asked to describe the Multi-Core CPU test, Dr. Briant described it similar to the Single-Core except it would test multiple tasks at the same time. *Id.* 48:2–9. Dr. Briant described his "understanding" of the Metal test as "focused on the GPU, which is the graphics processing unit. And so it's processed on a chip for the display." *Id.* 49:9–13. When asked what specifically the test was looking at related to the display, Dr. Briant testified: "I don't remember all of the or— and I'm not obviously familiar with all the details of what it does." *Id.* 49:14–17. Dr. Briant testified that he understood what the Geekbench is "trying to do and evaluate for the processing speed," but admitted "I don't know the ins and outs of their programs" and did not know whether he used these types of performance tests before. *Id.* 70:17–71:18. He could not recall ever running performance tests that test the processing speed of cell phones (similar to Geekbench) and could only say he has "done functionality tests." *Id.* 71:19–25.[6]

After Dr. Briant ran the initial out-of-the-box Geekbench tests and functional tests, he subjected all of the iPhones to three "reliability stress" tests: operational heat soak, repeated drop, and cyclic torsion. Briant Rep. ¶¶ 25-26 & Table 2 (Ex. 1). After each stress test, Dr. Briant ran the Geekbench tests and functional tests again. Briant Dep. 55:5–56:3 (Ex. 4). Dr. Briant personally selected and designed the three stress tests, claiming they represent three larger buckets of stressors: environmental-type loading, impact-type loading, and mechanical loading. *Id.* 65:22–

---

[6] Dr. Briant performed each of the Geekbench tests three times and selected the highest score and he chose the maximum based on the results and because two of the three numbers "were very similar." 49:22-50:22.

PLAINTIFFS' MOTION TO EXCLUDE BRIANT
No. 3:16-cv-04067-WHO
010637-11/1429773 V1

- 4 -

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

66:24, 68:7–21. Dr. Briant admitted that Apple performs more reliability stress tests and he was not trying to recreate the conditions a user would put their devices through or look at what Apple would do, but to evaluate Dr. Pecht's "hypothesis." *Id.* 64:17–66:2, 69:22–70:16.

Dr. Briant's first reliability stress test, heat soak, involved streaming a video over WiFi while the device was in a 45°C, 90% relative humidity chamber. Briant Rep. ¶ 27 (Ex. 1); Briant Dep. 91:9–11 (Ex. 4). Dr. Briant testified that he chose 45°C because it was as hot as he could go while the iPhones still operated, that 90% was "about as high as we can push the humidity," and he selected 18 hours "to get a sense over what might be happening at that time." *Id.* 78:12–79:9. Dr. Briant admitted that the ███████████████████████████████████ ███████████████████████████████████. *Id.* 86:13–88:8, 89:23–90:12; Briant Dep Ex. 122 (Ex. 6). But Dr. Briant testified he did not need to run additional stress tests to test Dr. Pecht's hypothesis. Briant Dep. 88:21–89:8 (Ex. 4). He also did not consider running any other environmental stress tests that Apple runs on its devices. *Id.* 105:4–25. After performing the heat soak, he again ran the functional and Geekbench tests on all the iPhones. *Id.* 90:17–19.

Dr. Briant's second reliability stress test, repeated drop, involved "dropping" the iPhones on the back from a drop height of 45 cm onto particle board, 1,500 times. Briant Rep. ¶ 28 (Ex. 1). Dr. Briant did not want to answer whether he was trying to recreate how a customer would drop their phone, but had to admit that customers drop their phones from different heights, different angles, and on different surfaces. Briant Dep. 94:20–95:5, 99:17–100:1 (Ex. 4). He also conceded that Apple ███████████████████████████████████ ███████████████████. *Id.* 97:1–98:3; Briant Dep. Ex. 122 (Ex. 6). After performing the drop test, Dr. Briant ran the functional and Geekbench tests again. Briant Dep. 100:2–5 (Ex. 4). After the drop test, Dr. Briant noted that the cameras on three new iPhones and one remanufactured iPhone were unable to focus. Briant Rep. ¶ 31 (Ex. 1). These were the only noted functional failures. *Id.* Dr. Briant did not consider running any other impact stress tests that Apple runs on its devices. Briant Dep. 106:1–10 (Ex. 4).



Last, Dr. Briant ran a torsion test, where each iPhone was subjected to "20,000 cycles at 1.8 N-m." Briant Rep. ¶ 29 (Ex. 1). After running the torsion test, Dr. Briant ran the functional Geekbench tests a fourth time. Briant Dep. 104:9–12 (Ex. 4). Dr. Briant did not inspect the iPhones for microcracks or internal damage. *Id.* 102:2–14. ██████████████████████ ████████████████████████████████████ *Id.* 103:2–13. He conceded that some degradation or failure modes may only be apparent while a device is under stress, but he did not perform any real-time diagnostics during his stress tests because he did not have the capability. *Id.* 106:11–107:3.

Dr. Briant concluded from these Geekbench tests and functional checks that remanufactured iPhones performed better than new iPhones and have fewer functional failures. Briant Rep. ¶ 16 & p. 14 Fig. 5 (Ex. 1); *see also* Briant Dep. 124:8–125:1 (describing Figure 5) (Ex. 4). Dr. Briant admitted he actually did not see a drop in Geekbench performance scores across the two populations of iPhones (for the single CPU and multi CPU tests), but that they remained steady. *Id.* 123:1–22. Rather his conclusion was based on mean scores for all of the devices; the average score for devices with used parts was higher than the average score for devices with new parts (for the single and multi CPU score). Briant Rep. ¶ 30 & Table 3 (Ex. 4); Briant Dep. 123:23–124:4 (Ex. 4). Briant essentially ignores the Metal score in coming to this conclusion, which shows that new phones perform slightly better after undergoing all the stress tests. *Id.*

Dr. Briant's testing results include one new iPhone that had half the performance of all other iPhones, even before any stress tests were performed. Briant Rep. at 14 Fig. 5 (Ex. 1); Briant Dep. 46:18–47:12, 57:7–10, 59:1–60:15 (Ex. 4); Briant Dep Ex. 120. (Ex. 5). Dr. Briant would not initially concede that one outlier with a small sample size would skew his results, he did not run any statistical analysis or standard deviation test to determine if any devices should be excluded, and claimed he had no engineering reason to exclude the device that was pulling down the mean of the new iPhones. Briant Dep. 60:15–62:15 (Ex. 4). When presented with his Figure 5 with that low performing iPhone removed for the Single CPU and Multi CPU tests, Dr. Briant then admitted there was not "substantial difference" between the two populations. *Id.* 125:2–128:16; Briant Dep. Ex. 123 (Ex. 7); Briant Dep. Ex. 124 (Ex. 8). When asked if removing that single device would

PLAINTIFFS' MOTION TO EXCLUDE BRIANT
No. 3:16-cv-04067-WHO
010637-11/1429773 V1                                    - 6 -

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

change his opinions, he stated that he functional failures in the cameras still demonstrated a difference and he saw "some" differences between the two populations in the Geekbench (despite just testifying he did not see a "substantial" difference). Briant Dep. 28:17–129:22 (Ex. 4).

**B.    Dr. Stark's Opinions**

Apple tasked Dr. Philip Stark, a statistician, with identifying which of the original sixty iPhone SEs were to be a non-testing sample set[7] and which were to be a testing sample set. Stark Rep. ¶ 93 (Ex. 2). Dr. Stark states that Apple "made available 60 iPhone SEs," but did not know anything about the history of the iPhones—how Apple selected them, whether that selection was randomized, where they were stored, or how they were transported. *Id.*; Deposition of Philip Stark ("Stark Dep.") 205:25–207:13, 208:9–209:4, Dec. 1, 2020 (Ex. 9). Stark also claims, in a footnote, that he "used simulations to determine that a sample size of 10 of each type [remanufactured or new] was adequate to have more than a 90% chance of detecting a performance difference of 5% . . . ." Stark Report ¶ 93 n.53 (Ex. 2).

Dr. Stark also analyzed Dr. Briant's test results, both with and without the new device with "a rather lower performance than the other devices." *Id.* ¶ 95. He concludes, by relying on the analysis *including the low performing new iPhone*, that remanufactured devices perform better than new devices. *Id.* ¶ 96. But he conceded that none of the differences between the two populations were statistically significant, even including the low performing device. *Id.* And although he does not highlight this fact in his report, "[a]fter removal of the abnormal device, Stark reports that the tests show three statistically significant findings, all three showing that phones with some used parts performed worse." Rebuttal Expert Report of Robert Bardwell, Ph.D. ("Bardwell Rebuttal Rep.") at 10, 18–19, Sept. 14, 202 (Ex. 10); Stark Report at 28, Table 1 (Ex. 2). Stark

---

[7] Dr. Briant claimed half the iPhone SEs were set aside "in case testing was desired by other parties," although there is no indication in his report that was the purpose. Briant Rep. 39:6–9 (Ex. 1). It should be noted that Dr. Briant was identified as a rebuttal expert, meaning at the time Dr. Briant submitted his report, Plaintiffs were not entitled a sur-rebuttal. Through an agreement of the parties, Apple eventually agreed to allow Plaintiffs to submit a sur-rebuttal report to Dr. Briant, but even then, Apple also did not offer these devices to Plaintiffs to test.

HB    HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

performs no statistical analysis to determine whether the new iPhone with abnormally low scores should be removed from the analysis.

## III.   ARGUMENT

To qualify as an expert under Fed. R. Evid. 702, the Court looks at "whether the in expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993). "This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592–93. While there is no exhaustive list of factors in determining an expert's reliability courts may consider:

> (1) whether a method can be (and has been) tested; (2) whether the method has been subjected to peer review and publication; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the method's operation; (5) a degree of acceptance of the method within a relevant community; (6) whether the expert is proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation; (7) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; (8) whether the expert has adequately accounted for obvious alternative explanations; (9) whether the expert employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field; and (10) whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.

*Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 946–47 (N.D. Cal. 2010) (internal citations and quotations omitted), aff'd sub nom. *Perry v. Brown*, 671 F.3d 1052 (9th Cir. 2012). "To warrant admissibility, however, it is critical that an expert's analysis be reliable at every step." *Amorgianos v. National R.R. Passenger Corp.*, 303 F.3d 256. 267 (2d Cir. 2002). "A trial court thus must be sure that its review of expert testimony focuses 'solely on principles and methodology, not on the conclusions that they generate.'" *Emblaze Ltd. v. Apple Inc.*, 52 F. Supp. 3d 949, 954 (N.D. Cal. 2014) (quoting *Daubert*, 509 U.S. at 595). "But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only

PLAINTIFFS' MOTION TO EXCLUDE BRIANT
No. 3:16-cv-04067-WHO
010637-11/1429773 V1
- 8 -

HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

by the ipse dixit of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, (1997).

The proponent of the expert has the burden of proving admissibility by a preponderance of the evidence. *Id.* at *4 (quoting *Lust By & Through Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996)). "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591 (quoting Fed. R. Evid. 702 & 3 Weinstein & Berger ¶ 702).

**A.    Dr. Briant's expert opinions about the iPhone SE sample are based on insufficient facts and data and fail to apply reliable principles.**

To support his testing methodology, Dr. Briant claims that the iPhone SEs that he tests are: (1) randomly selected iPhone SEs; and (2) representative of the iPhone SEs Apple would give its consumers. Neither claim is supported by facts or data. Dr. Briant relies on Dr. Stark's selection of some iPhone SEs from the total lot provided to claim random selection. Dr. Briant admitted that he did not select the iPhone SE as the device to test or limit testing to just that device. Apple selected that particular model.  As far as the specific devices provided for testing, Dr. Briant ***has no idea*** what process Apple used in selecting the iPhone SEs. He does not know how Apple selected the sixty iPhone SEs they sent him or if the selection was randomized.[8] The randomized part of the selection occurred after Apple preselected the sixty iPhone SEs and Dr. Stark reduced that number to thirty (and Dr. Briant later reduced twenty-eight) for testing. Dr. Briant does not have a factual basis to claim that he tested randomly selected iPhone SEs.

Dr. Briant also does not reliably apply the principle of randomization. Dr. Stark claims that randomization is essential in a controlled trial and goes to great efforts to randomize the sixty iPhone SEs that Apple provided to Briant. Stark Rep. ¶¶ 25, 93 (Ex. 2). Apple's own expert identifies randomization as an essential principle, yet Dr. Briant does nothing to randomize his test sample, other than rely on Dr. Stark.

---

[8] Dr. Briant also cannot rely on Dr. Stark, because like Dr. Briant, Dr. Stark does not know how Apple selected the iPhones for testing.

Dr. Briant also does not have a factual basis to say that the iPhone SEs he received were representative of iPhones consumers would have received. Dr. Briant does not know when Apple manufactured the devices, how Apple stored the devices, how long they were stored, what used components the remanufactured devices contain, or whether the devices he received are a representative sample of what Apple gives consumers.[9] Neither Briant nor Stark ruled out that the devices delivered were selected because of statistical traits or conditions of storage. He admits that his testing results relate only to the twenty-eight devices he tested and he cannot show that they represent all iPhone SEs in the class, much less all devices in the class. Because Apple stopped selling iPhone SEs in 2018, they could be older than what a consumer normally receives. They could have been stored in a different environment than what a consumer normally receives. They could have been damaged in the intervening time between manufacture and when the consumer received them. The remanufactured devices may not be representative of the devices consumers normally receive, as they may not contain a similar mix of used parts or could contain fewer used parts. Dr. Briant does not have sufficient facts or data to claim the tested represent what a consumer would receive. Fed. R. Evid. 702(A).

**B.    Dr. Briant's expert opinions on testing are not based on reliable principles and methods and Dr. Briant does not reliably apply the principles and methods to the facts of this case.**

Dr. Briant has not shown that the stress tests he performed are the product of reliable principles and methods, nor has he show that he reliably applied those principles and methods to test how stress conditions affect the performance of the iPhones. He claims that he selected his stress tests to fill three general buckets: environmental-type loading, impact-type loading, and mechanical loading. Dr. Briant cites nothing to show that only one has never offered expert testimony based on his testing of cell phones. *See id.* (method has not been subject to peer review); *Lucido v. Nestle Purina Petcare Co.*, 217 F. Supp. 3d 1098, 1107 (N.D. Cal. 2016) (expert not calling upon specialized knowledge in his field to testify about the adequacy of testing procedures);

---

[9] Again, Dr. Briant cannot rely on Dr. Stark. Dr. Stark also does not know anything about the history of the iPhone SEs, including where or how Apple stored the iPhones, how Apple transported them, or the history of the iPhone SEs before they were sent to Dr. Briant.

PLAINTIFFS' MOTION TO EXCLUDE BRIANT
No. 3:16-cv-04067-WHO
010637-11/1429773 V1                          - 10 -

HB  HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

*Shreve v. Sears, Roebuck & Co.*, 166 F. Supp. 2d 378, 392 (D. Md. 2001) ("a mechanical engineer is not necessarily qualified to testify as an expert on any issue within the vast field of mechanical engineering . . . the engineer must possess some special skill, knowledge or experience"). Dr. Briant's has not established that his testimony is based on research he has done independently of this litigation or testifying to matters that grew naturally out of his research in medical devices. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1317 (9th Cir.1995).

Dr. Briant's only support for any type of testing standards are his citation to Apple's ████████████████ documents, but he did not adopt those testing standards in whole or in part. ███████████████████████████████████████. Briant Dep. Ex. 122 (Ex. 8). █ ████████████████████████████████████████████████████████ ████████████████████████. *Id.* at APL-MLDNDO00190533. ███████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████. *Id.* at APL-MLDNDO00190534. And while Dr. Briant performed a torsion test ███████████████████████████ ████████████████████████████████████████████████████████ ████████████████████. *Id.* at APL-MLDNDO00190542–43. The ████████████████ ████████████████████ than the three tests Dr. Briant performed.

"The Ninth Circuit has repeatedly stated that where evidence of pre-litigation research or peer review is not available, the experts must (1) 'explain precisely how they went about reaching their conclusions' and (2) 'point to some objective source—a learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal or the like—to show that they have followed the scientific method as it is practiced by (at least) a recognized minority of the scientists in their field.'" *Carnegie Mellon Univ. v. Hoffmann-LaRoche, Inc.*, 55 F. Supp. 2d 1024, 1034 (N.D. Cal. 1999) (quoting cases). Dr. Briant admitted that he chose his test parameters, but could not cite any specific reasons for his choices, nor did he cite any industry standards or reputable sources that support his choices. For example, when asked why he chose eighteen hours for his heat soak he only offered that he wanted "to start to get a sense of what might be happening over that time." Briant Dep. 79:2–7 (Ex. 4). And he admitted he was limited

PLAINTIFFS' MOTION TO EXCLUDE BRIANT
No. 3:16-cv-04067-WHO
010637-11/1429773 V1                    - 11 -

HB  HAGENS BERMAN
1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

on how hot or humid he could test the devices, not for an engineering reason, because of his testing capabilities. *Id.* 78:12–23.

Plaintiffs' rebuttal expert to Dr. Briant, Dr. Dasgupta, identifies how these tests are insufficient. Dr. Dasgupta has over thirty- years' experience in reliability engineering, including teaching courses on reliability engineering and conducting research in reliability physics, design for reliability, and accelerated stress testing. Rebuttal Expert Report of Abhijit Dasgupta, Ph.D. ("Dasgupta Rep.") ¶¶ 1-3, Sept. 25, 2020 (Ex. 11). Dr. Dasgupta explains "The accelerated 'wear-out' tests reported by Dr. Briant, used loading combinations, stress levels and test durations that were too limited to sufficiently represent the types and combinations of loading conditions that portable electronic products experience in realistic life-cycle conditions." *Id.* ¶ 18(c). Dr. Briant admitted he was not trying to replicate real-world conditions, but cites nothing to show that such limited stress testing is appropriate or reliable in the reliability-engineering field, or appropriate when measuring wear-out due to stress. Dr. Dasgupta also points to Dr. Briant's failure to do combined stress testing, which is both documented in reliability-engineering and in Apple's own ▮▮▮▮▮▮▮▮▮▮▮▮ document. *Id.* ¶¶ 27–28, 35-40. Dr. Briant was unsure of what a "combined stress test" was initially, then claiming his heat soak "applied multiple things at once," but he did not consider anything like ▮▮▮▮▮▮▮▮. Briant Dep. 112:2-18 (Ex. 4). Dr. Dasgupta also showed that running performance tests while the devices are under stress is industry standard. Dasgupta Rep. ¶¶ 41-42 (Ex.11). Dr. Briant admitted he did not run any such tests. Briant Dep. 106:11–107:3 (Ex. 4). Last, Dr. Briant failed to inspect the devices for any microcracks or damage, which Dr. Dasgupta describes as a practice in the industry. *Id.* 102:2–14; Dasgupta Rep. ¶¶ 41-42 (Ex. 11). Dr. Briant has ignored the accepted testing in the relevant community. *Perry*, 704 F. Supp. 2d at 946.

Dr. Briant's claims that he used "good engineering practices," but he described those processes as verifying the applied stresses, blinding the testers, properly calibrating the equipment, randomizing the samples, and testing in a controlled environment. Briant Dep. 76:8–77:18 (Ex. 4). Dr. Briant claims that one of the good engineering practices he adopted was randomizing the samples. But he cannot say that the selection of devices was randomized—he has no idea how

PLAINTIFFS' MOTION TO EXCLUDE BRIANT
No. 3:16-cv-04067-WHO
010637-11/1429773 V1

- 12 -

HB  HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

Apple chose the devices, nor has Apple identified its randomization process. *Id.* 39:10–23, 130:4-131:12. Dr. Briant cannot rely on Dr. Stark for randomization either because like Dr. Briant, Dr. Stark does not know how Apple chose the iPhone SEs for testing. Stark Dep. 205:25–207:13, 208:9–4 (Ex. 9). The remaining practices Dr. Briant describes may be general engineering practices, but they do nothing to show that the tests he chose are good engineering practices for testing the effect of stress on cell phones.

He also claims that he used "standard industry techniques for consumer electronics," without any support in his report. Briant Rep. ¶ 32 (Ex. 1). When asked to explain the standard industry techniques he imposed, he testified:

> Referring to the basic types of tests that are informed with environmental, shock and mechanical, you know, using -- you know, the -- we have chambers here at Exponent for the testing which -- you know, which can be -- which are used similarly across the industry. The drop, obviously, as we talked about, certainly familiar with the drop testing overall and I know that the, you know, slap-drop, among other things, can certainly be done and is done commonly, as well as the torsion test, so...

Briant Dep. 140:6–22 (Ex. 4). Dr. Briant again makes claims about the three categories and his alleged familiarity with testing, but cites nothing in his report or during his deposition that support his claim he is using "standard industry techniques for consumer electronics." *Id.*; Briant Rep. ¶¶ 1, 32 (Ex. 1).

Dr. Briant also has not shown that the Geekbench tests are reliable or that he has reliably applied those tests to this case. Dr. Briant relies on the results from the Geekbench software to determine that remanufactured devices have better performance than new devices. Dr. Briant has never used Geekbench before to test the "performance" of cell phones, nor could he identify where he learned of Geekbench. While he offers the claim that "it was utilized across the industry," he could not identify anyone he knows who uses Geekbench and his only explanation for choosing it was that he "aware of it." Briant Dep. 45:13-21 (Ex. 4). He cites nothing in his report to show that Geekbench is used in "the industry," citing only Geekbench's own website. Briant Rep. ¶¶ 22–23 (Ex. 1). Dr. Briant could only explain what Geekbench tests are in the most general terms, admitting he is not familiar with the details of the testing or the ins and outs of the program. Dr.

PLAINTIFFS' MOTION TO EXCLUDE BRIANT
No. 3:16-cv-04067-WHO
010637-11/1429773 V1

- 13 -

HB HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

Briant also could not say whether he has used Geekbench type tests before, only that he has previously done "functionality tests" on cell phones. Briant Dep. 71:19–25 (Ex. 4). Dr. Briant also concedes that Geekbench only evaluates the processors and their speed.

Dr. Briant has not demonstrated that Geekbench is a reliable method that he has used in his limited experience of cell phone testing or a reliable method used in the industry. *See Perry*, 704 F. Supp. 2d at 946–47 (listing factors).  Dr. Briant also has not established Geekbench is a reliable method to evaluate performance—he admits Geekbench only tests processor speeds, meaning he is only testing the motherboard or MLB. For Dr. Briant to testify that a series of tests, that only test the processor speed, which he cannot explain and he does not fully understand, lead to the conclusion that there is no diminished performance or that new iPhones perform worse, is the type of analytical gap in an expert's testimony that is inadmissible. *See Joiner*, 522 U.S. at 146.

Dr. Briant also fails to apply reliable statistical principles. Dr. Briant testified he did not do any statistical calculations on whether the sample size is appropriate. Dr. Briant also did not do any statistical analysis or standard deviation to determine if he should remove from his results the one new iPhone that appeared to be outlier. And while he did not want to concede that one outlier in a small sample could skew the results, he had to admit that removing that one device eliminated any "substantial difference." Briant Dep. 127:8–23, 128:10–16 (Ex. 4). He claimed he was basing his decision not to remove the device from an engineering perspective, not a statistical analysis, but he conceded that even in engineering there are outliers in new devices. *Id.* 132:8–22. Both of Plaintiffs' experts, Dr. Robert Bardwell, a statistician, and Dr. Abhijit Dasgupta, an expert in reliability engineering, opined that the new iPhone that appeared to be an outlier should be removed from the analysis. Bardwell Rebuttal Rep. at 17–18, 20–22 (Ex. 10); Dasgupta Rep. ¶ 48 (Ex. 11). Because Dr. Briant's opinions do not meet the requirements of Rule 702, they should be excluded.

**C.**    **Dr. Briant's test results are not helpful to the trier of fact or are not relevant.**

Dr. Briant's results are not helpful to the trier of fact. He cannot claim that the Geekbench scores are a proper measurement of performance, as he admits they only measure processor speeds. Dr. Briant only has a vague understanding of what Geekbench is actually testing or measuring, thus

HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

he cannot explain what he is measuring to the jury. And his conclusion, that new devices perform worse than remanufactured devices, is directly dependent on the inclusion of one outlier in a small sample size and his insufficient stress testing "Expert testimony is not helpful unless there is a 'fit' between the testimony and the issues of the case." *United States v. Singleton*, 82 F.3d 424 (9th Cir. 1996) (quoting *Daubert*, 509 U.S. at 591). Dr. Briant admits he is not trying to recreate the load conditions a device would experience in consumers' hands, only whether it would show decreased performance after his three limited stress tests on the iPhones, affecting the reliability of the Geekbench scores. Because his testing has such limited applicability—limited to one model, a very small sample size, and limited testing that does not replicate the stresses placed on actual devices—and this case involves millions of devices and over 40 different models of iPhone and iPhones, his testimony is not helpful to a jury.

Dr. Briant's claims about the failed cameras is not relevant to Plaintiffs' claims, nor would they be helpful to the trier of fact. After Dr. Briant performed his drop tests, he identified damage to four of the cameras—one camera on a remanufactured device and three on a used device. But these camera failures are the result of what Apple would classify as accidental damage—dropping a device. Plaintiffs have not claimed that putting used components in devices increases the chance of failures due to accidental damage. *Daubert*, 509 U.S. at 591 (requiring expert testimony be relevant to understand the evidence or determine a fact in issue). There is also no evidence that any of the remanufactured devices contained used cameras, so Dr. Briant's finding about the cameras may have nothing to do with used cameras being more reliable (as he tries to insinuate) and merely the result of chance. The fact that some cameras were damaged by the drop test and others were not, particularly with such a small sample size, is not evidence of decreased performance. As Dr. Bardwell explains from a statistical standpoint, because the sample size is so small, failures in three devices versus one device are meaningless. Bardwell Rebuttal Rep. at 13-14 (Ex. 10). Testimony relating to whether cameras were damaged by a drop, when accidental damage is not at issue in this case, would be unhelpful and confusing for the jury, it should not be admitted. *Huawei Techs., Co, Ltd v. Samsung Elecs. Co, Ltd.*, 340 F. Supp. 3d 934, 993–94 (N.D. Cal. 2018).

PLAINTIFFS' MOTION TO EXCLUDE BRIANT
No. 3:16-cv-04067-WHO
010637-11/1429773 V1

- 15 -

HB HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

**D.      Dr. Stark fails to apply reliable statistical principles to this case.**

If the Court excludes Dr. Briant's opinions, Dr. Stark's support of those opinions should also be excluded. Dr. Stark also independently fails to comply with Rule 702 when applying statistical principles to this case.

Dr. Stark first violates his own stated principles on randomization. Dr. Stark states that randomization is required in a controlled trial: "In general, to establish that one thing causes another requires a randomized, controlled trial (RCT) in which some individuals (the 'treatment group'), selected at random, are "exposed" to the potential cause, and their responses are compared to the responses of randomly selected subjects who were not exposed (the 'control group')." Stark Rep. ¶ 25 (Ex. 2). He also makes a point of "using a cryptographic quality pseudo-random number generator (PRNG) to" reduce the sample from sixty iPhone SEs to thirty iPhone that he does not know how Apple selected the devices or if they were selected randomly. *Id.* ¶ 93 & n.53; Stark Dep. 205:25–207:13, 208:9–209:4 (Ex. 9). Dr. Stark then relies on Dr. Briant's tests to conclude that remanufactured devices perform better than new devices. Stark Rep. ¶ 96 (Ex. 2). Dr. Briant claims causation without randomization, violating his own stated principle.

Dr. Stark also provides faulty analysis showing how such a small sample is appropriate for testing. *Id.* ¶ 93 & n.53. Dr. Stark claims:

> I used simulations to determine that a sample size of 10 of each type was adequate to have more than a 90% chance of detecting a performance difference of 5%, on the assumption that the measurements have a normal distribution with standard deviation 3%, using a two sample permutation test with the difference in sample means as the test statistic.

*Id.*[10] As Dr. Bardwell explains, Dr. Stark's required sample size is based on faulty assumptions. Bardwell Rebuttal Rep. at 10 (Ex. 10). *Using Dr. Stark's own program* to compute sample size and dictating the sample have 90 percent power and a 5% performance difference to match Dr. Stark's

---

[10] Dr. Stark does not say whether he performed this analysis before or after Apple informed him of the number of devices available for testing.

HB  HAGENS BERMAN

1301 SECOND AVENUE, SUITE 2000 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

parameters, Dr. Bardwell determined that a sample size of 100 was required to detect the difference at a 0.05 level of statistical significance, not ten devices. *Id.*

Dr. Stark also does not apply or provide any principle of statistics that justifies leaving the iPhone with the lower Geekbench scores in the analysis. Stark Rep. ¶¶ 95-96 (Ex. 2). Although Dr. Stark admits the results are not statistically significant, he relies on them to make a determination of which category of devices perform better—new or remanufactured. *Id.* ¶ 96. Comparing the mean scores for all new devices with the mean scores for all remanufactured devices, he claims that remanufactured devices perform better. *Id.* Dr. Stark also lists the mean testing scores excluding the low performing iPhone, and his result actually demonstrate the opposite— remanufactured devices perform worse, with three of the test results being statistically significant. *Id.* at Table 1; *see also* Bardwell Rebuttal Rep. at 18 (Ex. 10). Dr. Bardwell ran two "standard statistical tests" to determine whether that low performing iPhone should be omitted from the results, including a standard deviation test and a Tukey Fence test. *Id.* at 20-22. Both tests dictate that, statistically speaking, the low performing iPhone should be omitted and the Tukey Fence test shows the device is an extreme outlier. *Id.* Dr. Stark offers no basis not to run a standard statistical analysis on whether to exclude a device that, by Dr. Stark's own admission "had rather lower performance that the other devices." Stark Rep. ¶ 95 (Ex. 2). His failure to account adequately for his decision not to statistically analyze the one outlier renders his opinion unreliable. *See Perry*, 704 F. Supp. 2d at 947 (courts consider whether the expert has adequately accounted for obvious alternative explanations). Plaintiffs request that the Court exclude Dr. Stark's opinions that are offered to support Dr. Briant, specifically paragraphs 19, 93-96, and Table 1 (on page 28).

## IV.    CONCLUSION

Plaintiffs request that this Court exclude all of Dr. Briant's opinions. Plaintiffs also request that the Court exclude the opinions expressed in paragraphs 19, 93–97 and Table 1 of Dr. Stark's report, supporting Dr. Briant.



DATED:  January 22, 2021

Respectfully submitted by,

HAGENS BERMAN SOBOL SHAPIRO LLP

By: */s/ Steve W. Berman*
    Steve W. Berman (*Pro Hac Vice*)
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
Email:  steve@hbsslaw.com

Robert B. Carey (*Pro Hac Vice*)
Michella A. Kras (*Pro Hac Vice*)
HAGENS BERMAN SOBOL SHAPIRO LLP
11 West Jefferson, Suite 1000
Phoenix, AZ 85003
Telephone: (602) 840-5900
Facsimile:  (602) 840-3012
Email: rob@hbsslaw.com
michellak@hbsslaw.com

Renee F. Kennedy *(Pro Hac Vice)*
P.O. Box 2222
Friendswood, TX 77549
Telephone: (832) 428-1552
Email: kennedyrk22@gmail.com

*Attorneys for Plaintiffs*